UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RECEIVED

2011 NOV 21  P 10: 30

U S DISTRICT COURT SDNY

| | |
|---|---|
| New York City District Council of Carpenters Pension Fund, New York City District Council of Carpenters Welfare Fund, New York City District Council of Carpenters Annuity Fund, and New York City District Council of Carpenters Apprenticeship, Journeyman Retraining, Educational and Industry Fund, by their Trustees, Frank Spencer, Douglas J. McCarron, John Ballantyne, Paul Tyznar, Paul O'Brien, Kevin M. O'Callaghan, Catherine Condon, David Meberg, Bryan Winter, and John DeLollis,<br><br>        Plaintiffs,<br><br>    -against-<br><br>Michael Forde, John Greaney, Joseph Olivieri, Brian Hayes, Michael Mitchell, Finbar O'Neill, K.A.F.C.I., Michael Brennan, Turbo Enterprises, Inc., Terence Buckley, Pitcohn Construction Enterprises, Inc., Gerard McEntee, Pyramid Associates Construction Corp., James Duffy, EMB Contracting Corp., Michael Batalias, Elisavet Batalias, Matthew Kelleher, Brian Carson, Joseph Ruocco, John Stamberger, and Michael Vivenzio,<br><br>        Defendants. | Index No. 11-CV-5474 (LBS)<br><br>**FIRST AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs, New York City District Council of Carpenters Pension Fund (the

"Pension Fund"), New York City District Council of Carpenters Welfare Fund (the

"Welfare Fund"), New York City District Council of Carpenters Annuity Fund ("the

Annuity Fund"), and New York City District Council of Carpenters Apprenticeship,

Journeyman Retraining, Educational and Industry Fund (the "Apprenticeship Fund")

(collectively the "Funds"), by their Trustees, Frank Spencer, Douglas J. McCarron, John

Ballantyne, Paul Tyznar, Paul O'Brien, Kevin M. O'Callaghan, Catherine Condon, David Meberg, Bryan Winter, and John DeLollis, (collectively, the "Trustees"), by and through their undersigned counsel allege as follows:

Nature of Action

1.      This is an action to recover millions of dollars embezzled from the Funds by the defendants, who conspired and engaged in a scheme to enrich themselves at the expense of thousands of rank-and-file union members and thousands of other beneficiaries of the Funds.  The defendants, including former trustees of the Funds, union officials, their associates, and a number of contractors, acted in concert to embezzle the assets of the Funds by carrying out a scheme in which contractors made improper payments of money and other things of value to labor representatives, who in exchange for their receipt of such money and other things of value deliberately failed to enforce applicable collective bargaining agreements designed to serve and protect workers.  The defendants thereby violated the civil provisions of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO").  In addition, by the aforementioned illegal acts, certain of the union official defendants who are former trustees of the Funds (defendants Forde and Greaney), and one former employer trustee (defendant Olivieri), breached their fiduciary duties to the Funds under the Employee Retirement Income Security Act of 1974 ("ERISA") by enabling contractors to avoid their contribution obligations to the Funds.  Other participants in this scheme defrauded the Funds, pursuant to New York common law of fraud, by submitting falsified records, depriving the Funds of a critical tool used to ensure that employers fulfilled their contribution obligations to the Funds for the benefit of the Funds' participants.  As a result of the foregoing, the Funds were deprived of millions of dollars

in contributions rightfully owed by contractors under the applicable collective bargaining agreements.  The Trustees seek to remedy this harm by this action.

2.      The Trustees bring this action pursuant to RICO, 18 U.S.C. § 1964(c) and (d), ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), ERISA § 206(d)(4), 29 U.S.C. § 1106(d)(4), and New York state common law to obtain relief as authorized by 18 U.S.C. § 1964, ERISA § 409, 29 U.S.C. § 1109, and New York common law against the defendants.

## Jurisdiction and Venue

3.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 18 U.S.C. § 1964, ERISA §§ 502(e)(1) and (f), 29 U.S.C. §§ 1132(e)(1) and (f), and 28 U.S.C. § 1367.

4.      Venue is proper in this district under 18 U.S.C. § 1965, and ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because (a) the Funds are administered in this district, (b) many of the illegal acts and breaches of fiduciary duty took place in this district, and (c) one or more of the defendants reside in this district, and under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this district.

## The Parties

5.      The Funds are jointly-administered employee benefit plans, as that term is defined by 29 U.S.C. § 1002(3), established under Section 302(c)(5) of the Taft-Hartley Act, 29 U.S.C. § 186(c)(5).  The Funds provide health, pension, annuity, vacation, and apprenticeship benefits to participants and their eligible dependents.  The Funds are each managed by a board of trustees, half appointed by the District Council of New York City and Vicinity of the United Brotherhood of Carpenters and Joiners (the "District Council"), and half appointed by contractors and contractor associations.  The Trustees

are fiduciaries of the Funds as that term is defined by 29 U.S.C. § 1002(21).  The Funds'
offices are located at 395 Hudson Street, New York, New York.  The District Council and
its constituent local unions, and each of the Funds affect interstate commerce within the
meaning of RICO.

6.     The United Brotherhood of Carpenters and Joiners (the "U.B.C.J.") is a
national labor union that represents skilled workers who work principally on
construction sites.  The District Council and its constituent local unions are labor
organizations within the meaning of the Labor-Management Relations Act of 1947, 29
U.S.C. §§ 142 and 152, and the Labor Management Reporting and Disclosure Act of
1959, 29 U.S.C. § 402 (i) and (j).  The District Council is the administrative body that
oversees the New York City locals of the U.B.C.J.  On behalf of its locals, the District
Council enters, and has entered into, numerous collective bargaining agreements
("CBAs") with various construction contractors and associations of construction
contractors who operate at jobsites in the five boroughs of New York City.  The District
Council is headquartered at 395 Hudson Street, New York, New York.

7.     The District Council and its constituent locals are bound by a court-
ordered Consent Decree entered in 1994 in the United States District Court for the
Southern District of New York, in a civil case brought by the United States government.
*United States v. District Council of Carpenters*, No. 90 Civ. 5722 (S.D.N.Y. Mar. 7,
1994) (the "Consent Decree").

8.     The Consent Decree enjoins all current and future officers, employees, and
members of the District Council and its constituent locals from, among other things,
"committing any act of racketeering activity" as defined in 18 U.S.C. § 1961, "knowingly
associating with any member or associate of any La Cosa Nostra crime family or any

other criminal group", and from "obstructing or otherwise improperly interfering with the work of the officers" appointed pursuant to or addressed in the Consent Decree.

9.      Pursuant to their CBAs with the District Council, signatory contractors were required, among other things, to employ only union members to perform specified construction work, to pay a specified hourly rate, and to contribute to the Funds for each hour of covered work performed by their workers.  In addition, signatory contractors were required to submit weekly remittance reports to the Funds, reporting the names and hours worked by all carpentry-trade employees on their jobsites that week, and to make the required contributions to the Funds for those workers.

10.      The District Council's CBAs with contractors also generally authorized the District Council (or constituent local unions) to appoint a "shop steward" to each job. The shop steward's principal duty was to be the daily "eyes and ears" of the District Council (or appointing union) and to report a contractor's violations of the CBA.  The shop steward was required to submit weekly reports, referred to as shop steward reports, to the constituent local union office identifying all carpentry-trade employees, including union and non-union members, and the hours they worked.  The Funds relied on the shop steward reports to ensure that contributions to the Funds were being made for all covered work.

11.      Defendant Michael Forde ("Forde") was the Executive Secretary-Treasurer of the District Council and a trustee of the Funds from approximately 2000 until approximately August 2009.  In his capacity as a trustee, Forde owed fiduciary duties to the Funds.

12.      Forde was also a participant of the Funds.

13.     Forde is currently receiving $704.00 per month from the Pension Fund. Upon his death, his surviving spouse will be entitled to receive that amount for a period of 36 months.

14.     As of September 2, 2011, Forde's Annuity Fund account balance was $663,806.40. That amount is subject to change based on investment earnings or losses.

15.     Defendant John Greaney ("Greaney") was an employee of the District Council, serving as the appointed Business Manager of Local 608 from approximately 2000 until approximately 2008, and was a trustee of the Funds from approximately 2000 until approximately August 2009. In his capacity as a trustee, Greaney owed fiduciary duties to the Funds.

16.     Greaney was also a participant of the Funds.

17.     Effective October 1, 2014, Greaney will be eligible to receive a monthly benefit of $1,048.00 from the Pension Fund for the remainder of his life.

18.     As of September 2, 2011, Greaney's Annuity Fund account balance was $316,963.96. That amount is subject to change based on investment earnings or losses.

19.     Defendant Joseph Olivieri ("Olivieri") was the Executive Director of the Association of Wall, Ceiling and Carpentry Industries of New York, and he served as a trustee of the Funds from approximately 2000 until approximately August 2009. In his capacity as a trustee, Olivieri owed fiduciary duties to the Funds.

20.     Upon information and belief, defendant Brian Hayes ("Hayes") was an employee of the District Council, serving as the appointed Business Agent of Local 608 from approximately May 2004 until approximately August 2009. Upon information and belief, Hayes was responsible for appointing Local 608 "shop stewards" who were

supposed to monitor job sites and record the time employees worked in covered employment.

21.     Upon information and belief, defendant Michael Mitchell ("Mitchell") was a member of the District Council and Local 608, and from approximately 2000 until approximately 2004, Mitchell was a Local 608 shop steward.

22.     Upon information and belief, defendant Finbar O'Neill ("O'Neill") was sole owner of a drywall contractor, K.A.F.C.I. ("KAFCI"), in the 1990s, and an associate of Forde.

23.     Upon information and belief, defendant KAFCI was a corporation organized under the laws of the State of New York with its principal place of business at 93 Radford Street, Yonkers, New York 10705.

24.     At all relevant times, KAFCI was a signatory to a CBA with the District Council.

25.     Upon information and belief, defendant Michael Brennan ("Brennan") was a member of the District Council and Local 608, and from approximately 1994 until approximately December 2004, Brennan was a Local 608 shop steward.

26.     Upon information and belief, defendant Turbo Enterprises, Inc. ("Turbo") was a corporation organized under the laws of the State of New York with its principal place of business at 73-34 52nd Avenue, Maspeth, New York 11378.

27.     At all relevant times, Turbo was a signatory to a CBA with the District Council.

28.     Upon information and belief, defendant Terence Buckley ("Buckley") is a resident of the State of New York and was the sole owner (and CEO) of Turbo.

4819-6290-4586.9

29.     Upon information and belief, defendant Pitcohn Construction Enterprises, Inc. ("Pitcohn") was a corporation organized under the laws of the State of New York with its principal place of business at 114 East 32nd Street, Suite 801, New York, New York 10016.

30.     At all relevant times, Pitcohn was a signatory to a CBA with the District Council.

31.     Upon information and belief, defendant Gerard McEntee ("McEntee") is a resident in this District in the state of New York and was the sole owner (and CEO) of Pitcohn.

32.     Upon information and belief, defendant Pyramid Associates Construction Corp. ("Pyramid") is a corporation organized under the laws of the State of New York with its principal place of business at 5325 66th Street, Maspeth, New York 11378.

33.     At all relevant times, Pyramid was a signatory to a CBA with the District Council.

34.     Upon information and belief, defendant James Duffy ("Duffy") is a resident of the State of New York and the sole owner (and CEO) of Pyramid.

35.     Upon information and belief, defendant Brian Carson ("Carson") was a member of the District Council and Local 157, and from approximately 2000 until approximately 2005, Carson was a Local 157 shop steward.

36.     Upon information and belief, defendant EMB Contracting Corp. ("EMB") is a corporation organized under the laws of the State of New York with its principal place of business at 38-26 27th Street, Long Island City, New York 11101.

37.     At all relevant times, EMB was a signatory to a CBA with the District Council.

4819-6290-4586.9

38.     Upon information and belief, defendant Michael Batalias ("M. Batalias") is a resident of the State of New York and is an owner and the de-facto president of EMB.

39.     Upon information and belief, defendant Elisavet Batalias ("E. Batalias") is a resident of the State of New York and is an owner and the president of EMB.

40.     Upon information and belief, defendant Matthew Kelleher ("Kelleher") is a resident of the State of New York and was an employee of EMB.

41.     Upon information and belief, defendant John Stamberger ("Stamberger") was a member of the District Council and Local 608, and from approximately 2000 until approximately 2005, Stamberger was a Local 608 shop steward.

42.     Upon information and belief, defendant Joseph Ruocco ("Ruocco") was a member of the District Council and Local 157, and from approximately 2004 until approximately 2006, Ruocco was a Local 157 shop steward.

43.     Upon information and belief, defendant Michael Vivenzio ("Vivenzio") was a member of the District Council and Local 157, and from approximately 2002 until approximately 2003, Vivenzio was a Local 157 shop steward.

44.     Upon information and belief, On Par Masonry ("On Par"), which is not a defendant in this suit, was a corporation organized under the laws of the State of New York with its principal place of business at 230 South 5th Avenue, Mount Vernon, New York 10550.

45.     At all relevant times, On Par was a signatory to a CBA with the District Council.

46.     Upon information and belief, James Murray ("Murray"), who is not a defendant in this suit, is a resident of the State of New York, and the sole owner of On Par.

Factual Background

47.     From approximately 1994 to 2004 and as recently as 2007 to 2008, Forde,

Greaney, Olivieri, Hayes, Brennan, Mitchell, Carson, Ruocco, Stamberger, Vivenzio,

KAFCI, O'Neill, On Par, Murray, Turbo, Buckley, Pitcohn, McEntee, Pyramid, Duffy,

EMB, M. Batalias, E. Batalias, and Kelleher were active participants in unlawful

racketeering conspiracies and criminal acts that unlawfully deprived and defrauded the

Funds of millions of dollars in contributions owed by contractors under their CBAs.  The

contractors and their principals paid bribes in exchange for union officials' submission

of false shop steward reports and other unlawful acts that facilitated the contractors'

non-payment of required contributions to the Funds.

48.     Forde, Greaney, and Olivieri, each a former trustee of the Funds, breached

their fiduciary duty to the Funds, a duty called the highest known to the law[1], by the acts

described above, including by accepting bribes and facilitating, among other things, the

circumvention of contractors' CBA requirements to contribute to the Funds.  As a result,

the Funds were deprived of millions of dollars in funds owed by contractors.

49.     Mitchell, Brennan, Carson, Ruocco, Stamberger, and Vivenzio, each a shop

steward on On Par job sites at varying times, defrauded the Funds by submitting false

shop steward reports that misrepresented the number of hours worked by carpenters on

the job site, allowing On Par to avoid paying contributions to the Funds for the

unreported hours without detection.  As a result, the Funds were deprived of millions of

dollars in contributions they were properly owed.

50.     In May of 2006, the United States indicted Murray for, among other

things, his and On Par's embezzlement of money rightfully belonging to the Funds.  *U.S.*

---

[1] *Donovan v. Bierwirth*, 680 F.2d 263, 272 (2d Cir. 1982)

*v. Murray*, No. 06-00443 (S.D.N.Y. May 24, 2006).  Following a superseding information in 2009, Murray pled guilty to charges of embezzling and conspiring to embezzle the assets of an employee benefit fund, bribing and conspiring to bribe union officials, offering to influence the operations of an employee benefit plan, conspiring to structure, failing to account for and pay taxes to the IRS, and money laundering.  The superseding information and plea transcript were unsealed on July 22, 2011.

51.     In July of 2009, the United States charged Buckley with, among other things, his and Turbo's embezzlement of money rightfully belonging to the Funds.  *United States v. Buckley*, No. 09-00732 (S.D.N.Y. July 29, 2009).  The case was unsealed and the docket made public on February 22, 2011.  Upon information and belief, Buckley pled guilty to at least certain of the charges.

52.     In August of 2009, the United States indicted Forde, Greaney, Hayes, Brennan, O'Neill, Olivieri, Carson, Ruocco, Stamberger, and Vizenzio for, among other things, accepting cash bribes and embezzling of money rightfully belonging to the Funds by facilitating contractors' non-payment of contributions to the Funds.  *United States v. Forde*, No. 08-828 (S.D.N.Y. Aug. 5, 2009).  The indictments were unsealed on August 5, 2009.  Subsequently, all of the aforesaid defendants other than Olivieri pled guilty to all or some of the aforesaid charges.  Olivieri was convicted after trial by jury of perjury for lying about his association with Murray.

53.     The trustees of the Funds who were not involved in the above-mentioned criminal activities, including all the trustees named as Plaintiffs in this action, became aware of the particulars of the acts alleged in paragraphs 47-49 after the indictment referred to in paragraph 52 was unsealed.

4819-6290-4586.9

54.     In December of 2008, the United States charged Mitchell for, among other things, embezzlement of money rightfully belonging to the Funds by facilitating contractors' non-payment of contributions due to the Funds, and taking bribes from such contractors.  Upon information and belief, Mitchell pled guilty to at least certain of the charges in 2009.  The information against, and plea transcript of Mitchell were unsealed on July 27, 2010.

55.     The trustees of the Funds who were not involved in the above-mentioned criminal activities, including all the trustees named as Plaintiffs in this action, became aware of the particulars of Mitchell's criminal activities after the transcript of his guilty plea referred to in paragraph 54 was unsealed.

56.     In March of 2010, the United States charged Kelleher with, among other things, paying cash bribes to union officials.  *United States v. Kelleher*, No. 10-00257 (S.D.N.Y. March 16, 2010).  Kelleher pled guilty to paying and conspiring to pay cash bribes to union officials on behalf of EMB in order to facilitate violations of its CBA.  The sealed Information and plea transcript were unsealed by the court when judgment was entered on September 7, 2011.

57.     The trustees of the Funds who were not involved in the above-mentioned criminal activity, including all the trustees named as Plaintiffs in this action, became aware of the particulars of Kelleher's criminal activity after the transcript of his guilty plea referred to in paragraph 56 was unsealed.

58.     During the relevant time period, Defendants wrongfully concealed material facts relating to their unlawful conduct against Plaintiffs, including by acting individually and/or collectively as part of the racketeering conspiracy alleged herein. Defendants' unlawful conduct was carried out secretly and to avoid detection, and their

acts and communications in furtherance of their conspiracy were purposefully and inherently secret and self-concealing.

59.     As a result of such wrongful concealment and the secret nature of Defendants' unlawful conduct, Plaintiffs did not know of or discover, and could not have known of or discovered in the exercise of reasonable diligence, the unlawful conduct and resulting injury alleged herein that underlies the RICO claims and other wrongs alleged herein until after criminal proceedings against various Defendants, as set forth further below, were publicly disclosed beginning in August 2009.

60.     Defendants further wrongfully concealed the material facts relating to their unlawful conduct and resulting injury by (as alleged more specifically below in paragraphs 66, 75, 80, 86, 95, 96, 102, 109) the following acts:

(a) false testimony by Forde on or about January 28, 2009 in litigation brought by the Funds against a contractor concerning facts material to the RICO claims alleged herein and obstruction of investigations into his wrongful conduct (as subsequently admitted to by Forde);

(b) false testimony by Greaney on or about February 6, 2009 in litigation brought by the Funds against a contractor concerning facts material to the RICO claims alleged herein (as subsequently admitted to by Greaney);

(c) false testimony by Olivieri on or about December 18, 2007 concerning facts material to the RICO claims alleged herein (as established by Olivieri's conviction for perjury after a jury trial);

(d) false testimony by Hayes on or about January 26, 2009 in litigation brought by the Funds against a contractor concerning facts material to the RICO claims alleged herein (as subsequently admitted to by Hayes);

(e) false testimony by Mitchell in depositions conducted by Independent Investigator Walter Mack[2] in or about August 2004 and September 2005 concerning facts material to the RICO claims alleged herein (as subsequently admitted to by Mitchell); and

(f) destruction of subpoenaed documents by Brennan in or about July 2004 concerning facts material to the RICO claims alleged herein, for the purpose of impeding the Independent Investigator's investigation (as admitted to by Brennan).

61.     The acts described in paragraph 60 (a)-(f) above were undertaken in furtherance of the racketeering conspiracy alleged herein.  By virtue of these actions and, upon information and belief, other similar actions within the peculiar knowledge of Defendants, Defendants affirmatively prevented Plaintiffs from discovering the nature of their claims and the injury resulting from the RICO violations and the other wrongs alleged herein.

62.     During the relevant time period, Plaintiffs exercised due diligence in pursuing discovery of the claims asserted herein.  For example, when Plaintiffs received information that certain of the Defendants who were contractors had not paid the full amount of contributions required by their respective CBAs, Plaintiffs caused audits to be performed.  Plaintiffs also commenced lawsuits or arbitration proceedings against certain contractor Defendants, asserting collection claims under ERISA and the Labor Management Relations Act of 1947 for breach of the relevant CBAs and related agreements and related claims, including against Pitcohn, Turbo, KAFCI and Pyramid (as well as non-party On Par).  In the course the lawsuits, principals of these contractor

---

[2] Walter Mack was appointed Independent Investigator to monitor the District Council pursuant to a Stipulation and Order entered by the Court on December 18, 2002. *United States v. District Council*, No. 90 Civ. 5722 (S.D.N.Y. Dec. 18, 2002).  Mr. Mack served as Independent Investigator through 2005.

Defendants and certain of the other Defendants herein who were trustees of the Funds or officials of the District Council or its constituent local unions (i) refused to give testimony concerning facts material to the RICO claims alleged herein based on the assertion of their Fifth Amendment rights not to incriminate themselves (as alleged in paragraphs 128 and 133 below); (ii) testified falsely concerning facts material to the RICO claims alleged herein (as alleged above); and (iii) fled the country (as alleged in paragraph 115 below).

63.    As a consequence of the foregoing false testimony, obstruction and other fraudulent and criminal conduct, although Plaintiffs had reason to believe that contractor Defendants owed monies to the Funds, Plaintiffs were unable to discover the conduct that underlies their RICO and other claims and the resulting injury alleged herein until after the criminal proceedings involving certain of the Defendants became public in August 2009.  Accordingly, any applicable statutes of limitations with respect to Plaintiffs' claims did not accrue and/or were tolled until that time, at the earliest.

64.    Thus, at the time of the collection actions, Plaintiffs did not know of, and could not reasonably have discovered, the facts underlying the claims asserted herein, including the making and acceptance of bribes among the Defendants and, in particular, the facts underlying the RICO violations and the resulting RICO injury asserted herein. Moreover, the Funds brought these collection actions by two of their trustees, one of whom, Forde, was at the center of the RICO claims alleged herein.  Despite his role as a trustee who brought suit on behalf of the Funds, Forde, as alleged above, testified falsely in the actions to conceal from the Funds his and other Defendants' wrongful conduct as alleged herein.

65.     Furthermore, as alleged below, each of Forde, Greaney and Olivieri were at all relevant times trustees of the Funds and, as such, they each owed fiduciary duties to the Funds.  Their fiduciary duties required, among other things, that each of Forde, Greaney and Olivieri provide accurate and truthful information about the Funds' financial condition, including but not limited to contributions owed to the Funds, and their operations and about any acts of malfeasance or nonfeasance concerning the Funds.  As set forth herein, each of Forde, Greaney and Olivieri engaged in numerous unlawful acts, as detailed in paragraphs 66-94 herein, while serving as trustees of the Funds and purposely did not disclose that conduct or the effects of that conduct that deprived the Funds of millions of dollars, to the Funds.  By failing to disclose such material information to the Funds, despite a duty to do so, any applicable statutes of limitations with respect to Plaintiffs' claims against Forde, Greaney and Olivieri did not accrue and/or were tolled until August 2009, at the earliest, when the criminal proceedings against various Defendants were first publicly disclosed.

Conduct of Forde

66.     Forde has admitted that, from approximately 1994 to 2004, he, and other District Council and local union officials, accepted bribes in the form of cash payments from certain contractors, including On Par, Turbo, Pyramid, KAFCI, and another contractor which is currently not a party, New York City Acoustics, among others, in return for allowing the contractors to violate the terms of their CBAs with the District Council.  In return for the bribes, the contractors were allowed to use undocumented workers and avoid making contributions to the Funds on behalf of those workers.  Forde admitted that he knew he was violating the Consent Decree, and obstructed investigations into his conduct.  In addition, Forde has admitted that he gave false

testimony in a January 2009 deposition in a suit between the Funds and a contractor, denying that he was aware of the contractor using undocumented workers.  Transcript of Plea at 14-16, *United States v. Forde*, No. 08-828 (S.D.N.Y. July 28, 2010).  Upon information and belief, the contractor Forde gave false testimony about is Pitcohn.

67.     On July 28, 2010, Forde pled guilty to racketeering conspiracy and racketeering conduct charges in violation of 18 U.S.C. § 1962(c) and (d), crimes arising from the conduct described in paragraph 66 above.  *Id.* at 6, 13.

68.     The court has since ordered Forde to pay $5,085,964.05 in restitution to the Funds.  Second Amended Judgment, *United States v. Forde*, No. 08-828 (S.D.N.Y. October 14, 2011).  The restitution figure reflects the court's determination of the Funds' losses from Pitcohn, Pyramid, Turbo, and KAFCI as a result of Forde's misconduct.  Restitution Order, *United States  v. Forde*, No. 08-828 (S.D.N.Y. April 19, 2011).

69.     Of the $5,085,964.05 in restitution that Forde has been ordered to pay the Funds, $977,547.03 represents Pension Fund contributions and $799,439.13 represents Annuity Fund contributions.  The remaining amounts include sums due to the Welfare Fund, Welfare Fund vacation benefit program, and Apprenticeship Fund.

70.     Upon information and belief, Forde and others also accepted bribes from the following contractors who are not currently parties to this suit: Eurotech, Ess & Vee, Golden Bug, and Commercial Drywall.  (Gov.'s Mem. Regarding the Restitution Obligations of Defs. Michael Forde, John Greaney, and Brian Hayes, at 6 n.5, *U.S. v. Forde*, No. 08-828 (S.D.N.Y. Feb. 2, 2011)).

71.     Forde's criminal conduct, consisting of, among other things, taking bribes in return for permitting contractors to violate their CBAs, thereby depriving the Funds

of contributions, all while serving as a trustee of the Funds, constitutes a clear breach of his fiduciary duties to the Funds.

Conduct of Greaney

72.     Greaney has admitted that, from approximately 1998 to 2004, he accepted or shared in illegal cash payments from a number of contractors, including but not limited to On Par, Turbo, Pitcohn, and Pyramid.  Greaney has admitted that he shared in the illegal cash payments he received from contractors with a number of other District Council and constituent local union officials, including Forde and Hayes. Greaney has admitted that he, along with others, accepted the cash payments in return for permitting contractors to violate the terms of their CBAs with the District Council. Transcript of Plea at 21-25, *United States v. Greaney*, No. 08-CR-828 (S.D.N.Y. July 16, 2010).

73.     Greaney has admitted that he, along with others, allowed union work cards to be issued to illegal immigrants who were employed by contractors On Par, Turbo, Pitcohn and Pyramid.  Greaney, and others, were aware that the illegal immigrants were being paid in cash, and that the contractors were not making contributions to the Funds on behalf of the illegal immigrants as required by the CBAs. *Id.* at 22.

74.     Greaney has admitted that he, along with others, violated the Consent Decree by manipulating the District Council's out-of-work list in order to allow friends to obtain work as shop stewards or to allow contractors to request stewards.  *Id.* at 22.

75.     Greaney has admitted that he gave false testimony in violation of the Consent Decree in 2005, denying that he was aware of the out-of-work list being manipulated to compromise the effectiveness of shop stewards as monitors of

contractors' compliance with their CBAs, including making required contributions to the Funds. *Id.* at 22-23.

76.    Greaney has admitted that he was aware that the contractors filed false remittance reports, underreporting the number of carpenters on particular jobs and the number of hours actually worked.  He has admitted that he was aware that the false remittance reports were filed by wire, and that as a result of the false reports, the Funds did not receive from the contractors the contributions the contractors were required to make pursuant to their CBAs. *Id.* at 23.

77.    Greaney has admitted that he, along with others, was aware that certain shop stewards assigned to On Par underreported the number of union carpenters working on a particular job and the number of hours being worked by carpenters.  These shop stewards were not assigned to job sites run by other contractors, in order to facilitate their efforts to ensure On Par's evasion of its obligations under its CBA, including to make required contributions to the Funds. *Id.* at 23.

78.    As a result of the acts described in paragraphs 72 to 77 above, Greaney, and others, allowed On Par, Turbo, Pitcohn and Pyramid to embezzle funds intended for the Funds by not making appropriate contributions to Funds as required by their CBAs. *Id.* at 23.

79.    Greaney has admitted that he, and others, by accepting illegal cash payments in return for ignoring and facilitating violations of the CBAs by contractors, deprived the District Council, its constituent locals, and the Funds of the honest services of their officers and trustees, respectively. *Id.* at 23-24.

80.    In addition to the above-described criminal and unlawful acts, Greaney has admitted that he committed perjury when he testified in a civil deposition in or

about February 2009 in a lawsuit between the Funds and Pitcohn by denying that he had ever met James Murray, owner of On Par, or accepted cash payments from Gerard McEntee, owner of Pitcohn. *Id.* at 24.

81.     On July 16, 2010, Greaney pled guilty to, among other things, racketeering conspiracy, racketeering conduct, conspiracy, unlawful acceptance of money by a labor representative, and perjury charges in violation of 18 U.S.C. § 1962(c) and (d), 18 U.S.C. § 371, 18 U.S.C. § 1343, 29 U.S.C. § 186(b), and 18 U.S.C. § 1623. These crimes admitted by Greaney arose from the conduct described in paragraphs 72 to 80 above. *Id.* at 25-26.

82.     The court has since ordered Greaney to pay $4,973,259.92 in restitution to the Funds. Judgment in a Criminal Case, *United States v. Greaney*, No. 08-828 (S.D.N.Y. June 20, 2011). The restitution figure reflects the court's determination of the Funds' losses from Pitcohn, Pyramid, and Turbo as a result of Greaney's misconduct. Restitution Order, *United States v. Greaney*, No. 08-828 (S.D.N.Y. June 20, 2011).

83.     Of the $4,973,259.92 in restitution that Greaney has been ordered to pay the Funds, $969,497.72 represents Pension Fund contributions and $789,019.13 represents Annuity Fund contributions. The remaining amounts include sums due to the Welfare Fund, Welfare Fund vacation benefit program, and Apprenticeship Fund.

84.     Upon information and belief, Greaney also accepted bribes from the following contractors who are not parties to this suit: Eurotech, Ess & Vee, and Perimeter. Transcript of Trial at 740, *United States v. Olivieri*, No. 08-828 (S.D.N.Y. Oct. 25, 2010).

85.     Greaney's criminal conduct, taking bribes in return for permitting contractors to violate their CBAs and depriving the Funds of contributions, while

serving as a trustee of the Funds, constitutes a clear breach of his fiduciary duties to the Funds.

### Conduct of Olivieri

86.     On October 27, 2010, Olivieri was convicted of perjury after a trial by jury with respect to sworn testimony given in or about December 2007 in the Consent Decree case in which Olivieri denied, among other things, his association with Murray of On Par, and knowledge of Murray's efforts to continue operating his business under the guise of another contractor.  (*U.S. v. Olivieri*, No. 08-CR-828 (S.D.N.Y. 2010).)

87.     Upon information and belief, Olivieri, while a trustee of the Funds, knew that Murray had been circumventing On Par's CBA by paying bribes to avoid enforcement of, among other provisions, its requirement that contributions be made to the Funds for workers performing covered work.

88.     In January 2005, Murray loaned Olivieri $730,000.

89.     In March 2005, Independent Investigator Walter Mack deposed Murray in the course of an anti-corruption investigation into possible bribery of union officials by contractors seeking to circumvent their CBAs, and served him with a stop order shutting down On Par.  Murray successfully enlisted Olivieri's aid that same day in having the stop order withdrawn.  At this time, Olivieri still owed Murray $730,000, and was a trustee of the Funds.

90.     In or about April 2005, Olivieri introduced Murray to Lawrence Cooley, the owner of a defunct contracting company called Commercial Drywall, so that Murray could take over and use Commercial Drywall as a front for continuing his operations.  At this time, Olivieri still owed Murray $730,000, and was a trustee of the Funds.

4819-6290-4586.9

91.     In July 2005, Olivieri approved in his capacity as a trustee of the Funds a $750,000 payment plan by which On Par agreed to pay delinquent contributions to the Funds. At this time, Olivieri still owed $730,000 to Murray. At no time did Olivieri disclose his loan from Murray to the Funds.

92.     Despite his knowledge that Murray and On Par were under investigation for corruption that affected the Funds, and his fiduciary obligation to disclose to his fellow trustees all that he knew about Murray's and On Par's illegal activities and continuing efforts to evade its contribution obligations to the Funds, Olivieri aided Murray in avoiding the consequences of the investigation, and further helped him successfully take over another contractor to use as a front. All the while, Olivieri never disclosed to his fellow trustees that he had a financial conflict of interest.

93.     In the aforementioned perjured testimony, Olivieri lied when he falsely denied that he had aided Murray in his effort to retain work on which he had cheated the Funds by failing to make required contributions, through a secret take-over of a defunct contractor (Commercial Drywall).

94.     Olivieri's conduct while a trustee of the Funds constitutes a clear breach of his fiduciary duty to the Funds.

### Conduct of Hayes

95.     Hayes has admitted that he, along with Greaney, accepted a bribe from Turbo in exchange for which Hayes deliberately failed to discharge his responsibilities as Business Agent of Local 608 by permitting Turbo to violate its CBA with the District Council, including by, among other things, not making required contributions to the Funds. Hayes has admitted that he thereafter obstructed investigations in violation of the Consent Decree by, among other things, giving false testimony under oath at a

deposition concerning his criminal conduct.  Transcript of Plea at 22-26, *United States v. Hayes*, No. 08-CR-828 (S.D.N.Y. Aug. 20, 2010).

96.   Upon information and belief, Hayes was referring to his  deposition testimony in or about January 2009 in the Funds' lawsuit against Pitcohn in which he denied having knowledge that Pitcohn was making off-the-books payments to employees.

97.   On August 20, 2010, Hayes pled guilty to racketeering conspiracy and racketeering charges in violation of 18 U.S.C. § 1962(c) and (d), crimes arising from the conduct described in paragraph 95 above. *Id.* at 5, 27-28.

98.   The court has since ordered Hayes to pay $120,000 in restitution to the Funds.  Restitution Order, *United States v. Hayes*, No. 08-828 (S.D.N.Y. April 28, 2011).  The restitution figure reflects the court's determination of how much of the Funds' losses attributed to Pitcohn, Pyramid, and Turbo should be repaid by Hayes for his misconduct. Restitution Order, *United States v. Hayes*, No. 08-828 (S.D.N.Y. April 28, 2011).

99.   Upon information and belief, Hayes accepted cash bribes and other things of value from EMB through its employee, Kelleher, in exchange for permitting EMB to violate its CBA by, among other things, not making required contributions to the Funds.

100.   Upon information and belief, Hayes also accepted bribes from Pitcohn and Pyramid.

<u>Conduct of Mitchell</u>

101.   Mitchell has admitted that, from 2000 to 2004, he agreed to accept payments of over $10,000 in bribes from Murray of On Par.  Mitchell has further admitted he understood that, in return, he would file false shop steward reports with the

-23-

Union for On Par's job sites, including one in the vicinity of 600 Washington Street in Manhattan, which underreported the hours worked by carpenters on those sites. Mitchell admitted he thereby aided On Par's violation of its CBA by, among other things, allowing On Par to avoid making required contributions to the Funds.  Transcript of Plea at 28-31, *United States v. Mitchell*, No. 09-00521 (S.D.N.Y. May 20, 2009).

102.    Mitchell further admitted that on August 2, 2004 and September 14, 2005 he knowingly made false statements under oath at depositions conducted by Independent Investigator Walter Mack, including testifying that the shop steward reports he submitted were accurate.  *Id.* at 31-33.

103.    On May 20, 2009, Mitchell pled guilty to charges of conspiracy to unlawfully accept improper payments of money to a labor representative, embezzlement of assets of an employee benefit fund, acceptance of improper payments of money to a labor representative, and perjury, in violation of 18 U.S.C. § 371, 29 U.S.C. § 186(b), and 18 U.S.C. § 1623.

Conduct of KAFCI and O'Neill

104.    O'Neill has admitted that, from 1994 until approximately 1999, he paid cash bribes to Forde and other District Council and local union officials.  The payments to Forde ranged between $5,000 and $7,500, although sometimes they were larger, and were paid to Forde three to four times a year on average.  In return for the bribes, Forde ensured that the District Council assigned shop stewards to O'Neill's (KAFCI's) job sites who would not report O'Neill for hiring non-union and "off the books" employees, not paying them union wages and benefits required under his CBA, and not making required contributions to the Funds.  Transcript of Plea at 24-30, *United States v. O'Neill*, No. 08-CR-828 (S.D.N.Y. May 20, 2010).

4819-6290-4586.9

105.    O'Neill has admitted that, from approximately 1997 through approximately 2004, he delivered cash bribes in excess of $100,000 to Forde on behalf of Murray, owner of On Par.  O'Neill has admitted that he was aware that On Par employed non-union and "off the books" employees and did not pay union benefits and wages required under the CBA, including required contributions to the Funds.  O'Neill has admitted that he was further aware that the bribes paid by Murray were for the purpose of ensuring that Forde would allow On Par to continue violating the CBA without scrutiny from the District Council.  O'Neill has admitted that he kept a portion of the bribes paid by Murray for himself for acting as a middleman.  *Id.*

106.    On May 20, 2010, O'Neill pled guilty to conspiracy to unlawfully bribe union representatives, and acts of bribing union representatives in violation of 18 U.S.C. § 371, and 29 U.S.C. § 186(a), crimes arising from the conduct described in paragraphs 104 to 105 above.  *Id.* at 8, 30-31.

107.    The court has since ordered O'Neill to pay $112,704.13 in restitution to the Funds. Restitution Order, *United States v. O'Neill*, No. 08-828 (S.D.N.Y. August 19, 2011).  The restitution figure reflects the court's determination of the Funds' losses from KAFCI as a result of O'Neill's misconduct.

<u>Conduct of Brennan</u>

108.    From 2000 to 2004, Brennan has admitted that he, along with others, accepted payments of money and other things of value totaling over $1,000 from On Par.  Brennan has admitted that he understood that, in return, On Par would be permitted to violate its CBA by, among other things, not making required contributions to the Funds.  Brennan has admitted that he was aware that such conduct was a

4819-6290-4586.9

violation of the Consent Decree.  Transcript of Plea at 14-17, *United States v. Brennan*,

No. 08-CR-828 (S.D.N.Y. July 6, 2010).

109.    In addition, Brennan has admitted that he destroyed subpoenaed

documents to impede an investigation by the independent investigator.  *Id.* at 15.

110.    On July 6, 2010, Brennan pled guilty to charges of unlawful racketeering

acts in violation of 18 U.S.C. § 1962(c), a crime arising from the conduct described in

paragraphs 108 to 109 above.

### Conduct of On Par and Murray

111.    From approximately 2000 to 2004, On Par, by and through its sole owner,

Murray, engaged in a scheme to bribe District Council and constituent local union

officials in order to facilitate violations of the terms of On Par's CBA, including, among

other things, requirements to pay workers contractual wage rates and make

contributions to the Funds, as specified in the CBA.

112.    Among the District Council and constituent local union officials

participating in the scheme with Murray were Forde, Greaney, Mitchell, and Brennan.

In addition, O'Neill facilitated the scheme by delivering payments from Murray to Forde

while keeping a portion for himself for acting as a middleman.

113.    This pattern of activity consisted of numerous predicate criminal acts

upon which Plaintiffs' claims of Civil RICO violations are grounded, specifically

including improper payment of money or other things of value to labor representatives

by an employer, and embezzlement of assets of an employee benefit fund in violation of

29 U.S.C. § 186(a), and 18 U.S.C. § 664, respectively.

114.    Upon information and belief, at the same time, Mitchell, Brennan, Carson,

Ruocco, Stamberger and Vivenzio conspired with Murray to engage in acts of fraud by

deliberately underreporting the number of hours being worked on the On Par job sites at which they served as shop stewards, at the behest of Murray, often for monetary gain. This allowed Murray to avoid making required contributions to the Funds without fear of detection, because the shop steward reports relied on by the Funds to determine contractors' compliance with the contribution obligations of the CBAs would not betray his underpayment.

115.    Upon information and belief, when Murray became aware that On Par was under investigation by Mack for violating its CBA and possible bribery of union officials, he successfully enlisted the aid of Olivieri to halt a shut down order against On Par that would have forced On Par to cease operations with respect to jobs on which Murray was cheating the Funds by not paying all required contributions for covered work. Subsequently, during the course of Mack's ongoing investigation of On Par and Murray, Murray again turned to Olivieri for help.  Murray and Olivieri concocted a scheme by which Murray would secretly obtain control of another contracting company in order to continue his business, and complete jobs on which Murray had been cheating the Funds, under a new name.  Olivieri thereupon arranged an in-person meeting between Murray and Lawrence Cooley, owner of a defunct company named Commercial Drywall. Olivieri attended the meeting himself to make the introduction to Cooley.  Murray subsequently continued his business through Commercial Drywall until fleeing the country in March 2006.

116.    As a result of Murray's and On Par's conduct, the Funds were deprived of required contributions amounting to at least $9,455,283.17.  At the least, $5,912,796.17 of the required contributions have not been recovered by the Funds.

4819-6290-4586.9

117.   In or about 2006, having reason to believe that On Par owed monies to the Funds, the Funds brought a civil suit against On Par and Murray.  As Murray, who had fled the United States, defaulted, the Funds were unable discover additional information concerning conduct and facts material to the RICO claims alleged herein.

118.   On January 13, 2009, Murray pled guilty to charges of embezzling and conspiring to embezzle the assets of an employee benefit fund, bribing and conspiring to bribe union officials, offering to influence the operations of an employee benefit plan, conspiring to structure, failing to account for and pay taxes to the IRS, and money laundering in violation of 18 U.S.C. § 371, 18 U.S.C. § 664, 29 U.S.C. § 186(a), 18 U.S.C. § 1954, 26 U.S.C. § 7202 and 18 U.S.C. § 1956.  Transcript of Plea, *U.S. v. Murray*, No. 06-00443 (S.D.N.Y. Jan. 13, 2009). Murray's plea, detailing particulars of his criminal participation in a scheme to defraud the Funds was not unsealed until July of 2011.

### Conduct of Turbo and Buckley

119.   From approximately 1998 to 2004 Turbo, by and through its sole owner, Buckley, engaged in a scheme to bribe District Council and constituent local union officials in order to facilitate violations of the terms of Turbo's CBA, including, among other things, requirements to pay workers contractual wage rates and make contributions to the Funds.

120.   Among the District Council and constituent local union officials participating in the scheme were Forde, Greaney, and Hayes.

121.   This pattern of activity consisted of numerous predicate criminal acts upon which Plaintiffs' claims of Civil RICO violations are grounded, specifically including improper payment of money or other things of value to labor representatives

by an employer, and embezzlement of assets of an employee benefit fund in violation of 29 U.S.C. § 186(a), and 18 U.S.C. § 664, respectively.

122.    On July 29, 2009, Buckley pled guilty to charges of improper payment of money or other things of value to labor representatives by an employer, and engaging in transactions involving property derived from unlawful activity in violation of 29 U.S.C. § 186(a) and 18 U.S.C. § 1957(a).  *U.S. v. Buckley*, No. 09-00732 (S.D.N.Y. July 29, 2009).

123.    As a result of Turbo's and Buckley's conduct, the Funds have been deprived of required contributions amounting to at least $1,376,418.22.

Conduct of Pitcohn and McEntee

124.    From approximately 2001 to 2004, Pitcohn, by and through its sole owner, McEntee, engaged in a scheme to bribe District Council and constituent local union officials in order to facilitate violations of the terms of Pitcohn's CBA, including, among other things, requirements to pay workers contractual wage rates and contribute to the Funds.

125.    Upon information and belief, among the District Council and local union officials participating in the scheme were Greaney and Hayes.

126.    This pattern of activity consisted of numerous predicate criminal acts upon which Plaintiffs' claims of Civil RICO violations are grounded, specifically including improper payment of money or other things of value to labor representatives by an employer, and embezzlement of assets of an employee benefit fund in violation of 29 U.S.C. § 186(a), and 18 U.S.C. § 664, respectively.

127.    As a result of Pitcohn and McEntee's conduct, the Funds have been deprived of required contributions amounting to at least $1,449,855.51.

128.   In or about 2006, having reason to believe that Pitcohn owed monies to the Funds, the Funds brought a civil suit against Pitcohn and McEntee.  In the course of prosecuting that litigation, the Funds deposed McEntee, who pleaded the Fifth Amendment in response to questions concerning facts material to the RICO claims alleged herein.

### Conduct of Pyramid and Duffy

129.   From approximately 2001 to 2004, Pyramid, by and through its sole owner, Duffy, engaged in a scheme to bribe District Council and constituent local union officials in order to facilitate violations of the terms of Pitcohn's CBA, including, among other things, requirements to pay workers contractual wage rates and contribute to the Funds.

130.   Upon information and belief, among the District Council and local union officials participating in the scheme were Forde, Greaney, and Hayes.

131.   This pattern of activity consisted of numerous predicate criminal acts upon which Plaintiffs' claims of Civil RICO violations are grounded, specifically including improper payment of money or other things of value to labor representatives by an employer, and embezzlement of assets of an employee benefit fund in violation of 29 U.S.C. § 186(a), and 18 U.S.C. § 664, respectively.

132.   As a result of Pyramid's and Duffy's conduct, the Funds have been deprived of required contributions amounting to at least $937,471.36.

133.   In or about 2006, having reason to believe that Pyramid owed monies to the Funds, the Funds brought a civil suit against Pyramid and Duffy.  In the course of prosecuting that litigation, the Funds deposed Duffy, who pleaded the Fifth Amendment in response to questions concerning facts material to the RICO claims alleged herein.

4819-6290-4586.9

Conduct of EMB, M. Batalias, and E. Batalias

134.   Upon information and belief, from 2007 to 2008 at a minimum, EMB and its owners, including M. Batalias and E. Batalias, engaged in a scheme to bribe District Council and constituent local union officials in order to facilitate violations of the terms of EMB's CBA, including, among other things, requirements to pay workers contractual wage rates and contribute to the Funds.

135.   Upon information and belief, among the District Council and local union officials participating in the scheme was Hayes.

136.   Through this pattern of activity, EMB and its owners conspired to participate in, advance, and profit from a racketeering scheme.

137.   As a result of EMB's and its owners' conduct, the Funds have been deprived of required contributions in an amount within the peculiar knowledge of, among others, M. Batalias, E. Batalias, Kelleher, and Hayes.

Conduct of Kelleher

138.   Kelleher has admitted that on several occasions in 2007 and 2008 he delivered cash and other things of value to union officials on behalf of his employer, EMB, so that EMB could pay carpenters off-the-books and not make required contributions to the Funds.  Transcript of Plea at 14-15, *United States v. Kelleher*, No. 10-00257 (S.D.N.Y. March 16, 2010).

139.   On March 16, 2010, Kelleher pled guilty to charges of unlawfully bribing and conspiring to bribe a labor official in violation of 29 U.S.C. § 186 and 18 U.S.C. § 371.

4819-6290-4586.9

140.   The court has since ordered Kelleher to pay $16,505 in restitution to the Funds.  Restitution Order, *United States v. Kelleher*, No. 10-257 (S.D.N.Y. Oct. 14, 2011).

Conduct of Carson

141.   Carson has admitted that in 2004, while acting as a shop steward on an On Par job site and in return for monetary gain, he signed and submitted false shop steward reports to the Union misrepresenting the number of workers and their hours, knowing that required contributions would consequently not be made to the Funds.  In fact, Carson admitted that he did not even show up on the job site after the first week, though he continued to collect his pay.  Transcript of Plea at 14-16, *United States v. Carson*, No. 08-828 (S.D.N.Y. April 5, 2010).

142.   On April 5, 2010, Carson pled guilty to charges of embezzling money from the Funds by submitting false shop steward reports that underreported covered work at On Par work sites in violation of 18 U.S.C. § 664.

Conduct of Ruocco

143.   Ruocco has admitted that he was a shop steward at an On Par job site on East 69th Street in Manhattan and, therefore, in charge of keeping a list of carpenters on the job.  At the request of On Par, he kept certain names off his list in exchange for compensation from On Par, knowing that this would facilitate On Par in avoiding making required contributions to the Funds on behalf of the workers left off his reports.  Transcript of Plea at 13-15, *United States v. Ruocco*, No. 08-828 (S.D.N.Y. July 8, 2010).

144.   On July 8, 2010, Ruocco pled guilty to charges of embezzling money from the Funds by submitting false shop steward reports that underreported covered work at On Par work sites in violation of 18 U.S.C. § 664.

4819-6290-4586.9

### Conduct of Stamberger

145.    Upon information and belief, Stamberger was a shop steward at an On Par job site, where he knowingly filled out false shop steward reports by underreporting the number of carpenters hours being worked in exchange for bribes, and as a result, allowed On Par to avoid making required contributions to the Funds for the hours worked not recorded on his reports.

146.    On March 12, 2010, Stamberger pled guilty to charges of conspiring to commit an offense against the United States and unlawful acceptance of money or other things of value as a labor representative in violation of 18 U.S.C. § 371 and 29 U.S.C. § 186, respectively.  *United States v. Stamberger*, No. 08-828 (S.D.N.Y.).

### Conduct of Vivenzio

147.    Vivenzio has admitted that, from September 2002 to September 2003, he was a shop steward at an On Par job site on 45th Street in Manhattan, where he knowingly filled out false shop steward reports by underreporting the number of carpenter hours being worked, and as a result, allowed On Par to avoid making required contributions to the Funds for the hours worked but not recorded on his reports. Transcript of Plea at 12-13, *United States v. Vivenzio*, No. 08-828 (S.D.N.Y. June 23, 2010).  Upon information and belief, Vivenzio accepted bribes from On Par in exchange for filing false reports.

148.    On June 23, 2010, Vivenzio pled guilty to charges of embezzling money from the Funds by submitting false shop steward reports that underreported covered work at On Par work sites in violation of 18 U.S.C. § 664.

4819-6290-4586.9

<u>Claims for Relief</u>

### <u>1. Violation of RICO, 18 U.S.C. § 1962(c), by Forde, Greaney, Hayes, Mitchell, Brennan, KAFCI, O'Neill, Turbo, Buckley, Pitcohn, McEntee, Pyramid, and Duffy</u>

149.    The Trustees re-allege and incorporate by reference Paragraphs 1 to 148 as if stated in full herein.

150.    This claim is brought against Forde, Greaney, Hayes, Mitchell, Brennan, KAFCI, O'Neill, Turbo, Buckley, Pitcohn, McEntee, Pyramid, and Duffy (who along with On Par and Murray are referred to collectively as "RICO Participants"), each of whom constitutes a "person" as defined in 18 U.S.C. § 1961(3).

151.    At the times alleged in this complaint, the District Council, including its constituent locals, and the Funds, individually and collectively, constituted an "enterprise" as defined in 18 U.S.C. § 1961(4).

152.    At the times alleged in this complaint, the RICO Participants were an association-in-fact that constituted an "enterprise" as defined in 18 U.S.C. § 1961(4).

153.    Each of the above enterprises was, at all relevant times, engaged in activities that affected interstate commerce.

154.    Each of defendants Forde, Greaney, Hayes, Mitchell, and Brennan were employed by and acted as agents of the District Council and/or its constituent local unions and each was associated with the above RICO enterprises, as alleged in paragraphs 1 to 153 above.

155.    Each of defendants KAFCI, O'Neill, Turbo, Buckley, Pitcohn, McEntee, Pyramid, and Duffy, and non-parties On Par and Murray, was a contractor or the sole owner of a contractor, and each was associated-in-fact with the other RICO Participants and the above RICO enterprises, as alleged in paragraphs 1 to 154 above.

-34-

156.    The RICO Participants conducted and participated, directly and indirectly, in the conduct of the affairs of the alleged enterprises through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c) involving frequent improper payments of money or other things of value to labor representatives by employers, improper acceptance of money or other things of value by labor representatives, obstruction of justice, and embezzlement of assets of an employee benefit fund, for the purpose of enriching themselves at the expense of the Funds. The RICO Participants conducted the affairs of the enterprises in a manner which allowed KAFCI, On Par, Turbo, Pitcohn, and Pyramid to violate their CBAs and thereby enrich their respective owners, O'Neill, Murray, Buckley, McEntee and Duffy, who, in exchange, had made the above-described improper payments (bribes) to Forde, Greaney, Hayes, Mitchell, and Brennan, who thereby enriched themselves. In particular, by paying these bribes, the contractors were permitted to hire non-union and "off the books" workers and otherwise to avoid reportage of hours worked in covered employment and thereby avoid paying contractually required wages and contributions to the Funds.

157.    Specifically, between 1994 and 2004, each of the contractors, O'Neill on behalf of KAFCI, Murray on behalf of On Par, Buckley on behalf of Turbo, McEntee on behalf of Pitcohn, and Duffy on behalf of Pyramid, made improper payments of money or other things of value to labor representatives including Forde, Greaney, Hayes, Mitchell, and Brennan. This conduct constituted violations of 29 U.S.C. § 186(a), and racketeering activity within the meaning of 18 U.S.C. § 1961(1)(B). The specified improper payments are detailed in paragraphs 66, 72, 95, 101, 104, 105, 108, 111, 112, 119, 120, 122, 124, 125, 129, and 130 above and incorporated herein.

4819-6290-4586.9

158.   In connection with the conduct alleged in paragraph 156 to 157 above, between 1994 and 2004, Forde, Greaney, Hayes, Mitchell, and Brennan each received improper payments of money or other things of value from one or more of the individual owners of the aforesaid contractor-employers.  This conduct constituted violations of 29 U.S.C. § 186(b), and racketeering activity within the meaning of 18 U.S.C. § 1961(1)(B). The specified improper receipt of payments are detailed in paragraphs 66, 72, 95, 101, and 108 above and incorporated herein.

159.   In connection with the conduct alleged in paragraphs 156 to 158 above, between 1994 and 2004, Forde, Greaney, Hayes, Mitchell, and Brennan each obstructed the administration of justice through a variety of unlawful acts, including false testimony at a deposition by each of Forde, Greaney, Mitchell, and Hayes, and the destruction of documents by Brennan.  This conduct constituted violations of 18 U.S.C. § 1623, and racketeering activity within the meaning of 18 U.S.C. § 1961(1)(B).  The specified unlawful obstructions are detailed in paragraphs 66, 75, 80, 95, 102, and 109 above and incorporated herein.

160.   By and through the conduct alleged in paragraphs 156 to 159 above, during the period from 1994 to 2004, each of the RICO Participants caused assets of the Funds to be embezzled.  This conduct constituted violations of 18 U.S.C. § 664, and racketeering activity within the meaning of 18 U.S.C. § 1961(1)(B).  The specified embezzlement is described in paragraphs 66, 72, 73, 76, 77, 95, 101, 104, 105, 108, 111, 112, 113, 114, 119, 120, 122, 124, 125, 129, and 130 above and incorporated herein.

161.   The acts, practices and conduct alleged in paragraphs 156 through 160 above involve numerous acts of racketeering activity occurring between 1994 and 2004

and constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

162.   The racketeering acts alleged in paragraphs 156 through 160 above were interrelated in that the common goal and purpose was to benefit the RICO Participants – the defendant-contractors (and their owners) – by facilitating their repeated violations of their CBAs, including permitting them to hire non-union and "off the books" workers, avoid paying workers contractual wages and benefits, and avoid making required contributions to the Funds, and the defendant-union officials by their receipt of the quid pro quo bribes. The Funds and their participants and beneficiaries were repeated victims of these racketeering acts. The racketeering activity of the RICO Participants was not confined to isolated events, but rather amounted to repeated and continuous racketeering activity over a period of at least 10 years.

163.   The RICO Participants have directly and indirectly conducted and participated in the affairs of the enterprises through the pattern of activity described above, in violation of 18 U.S.C. § 1962(c). By reason of this violation, the Funds have been injured in their business and property in an amount to be determined at trial, before trebling and not including punitive damages.

164.   Pursuant to 18 U.S.C. § 1964(c), Forde, Greaney, Hayes, Mitchell, Brennan, KAFCI, O'Neill, Turbo, Buckley, Pitcohn, McEntee, Pyramid, and Duffy are jointly and severally liable to the Funds for the amount of their ultimate loss, trebled, plus interest, costs, and attorneys' fees.

## 2.  Violation of RICO, 18 U.S.C. § 1962(d), by Forde, Greaney, Olivieri, Hayes, Mitchell, Brennan, Carson, Ruocco, Stamberger, Vivenzio, KAFCI, O'Neill, Turbo, Buckley, Pitcohn, McEntee, Pyramid, Duffy, EMB, M. Batalias, E. Batalias, and Kelleher

165.    The Trustees re-allege and incorporate by reference Paragraphs 1 to 164 as if stated in full herein.

166.    This claim is brought against Forde, Greaney, Olivieri, Hayes, Mitchell, Brennan, KAFCI, O'Neill, Turbo, Buckley, Pitcohn, McEntee, Pyramid, Duffy, EMB, M. Batalias, E. Batalias, Kelleher, Carson, Ruocco, Stamberger and Vivenzio (who along with On Par and Murray are referred to collectively as "RICO Conspirators"), each of whom constitutes a "person" as defined in 18 U.S.C. § 1961(3).

167.    The RICO Conspirators conspired to commit the violations of 18 U.S.C. § 1962(c) described in paragraphs 149 through 164 above, each of which is repeated and realleged herein.

168.    Each of the RICO Conspirators knew about and agreed to, and did, facilitate the scheme alleged in paragraphs 149 to 164 above, as part of the above-described conspiracy.

169.    In connection with the conduct alleged in the above paragraphs 156 to 160 and 167 to 168, each of the defendant-contractors, O'Neill on behalf of KAFCI; Murray on behalf of On Par; Buckley on behalf of Turbo; McEntee on behalf of Pitcohn; Duffy on behalf of Pyramid; and Kelleher, M. Batalias, and E. Batalias on behalf of EMB, made improper payments of money or other things of value to labor representatives including Forde, Greaney, Hayes, Mitchell, and Brennan.  This conduct constituted violations of 29 U.S.C. § 186(a), and racketeering activity within the meaning of 18 U.S.C. § 1961(1)(B).  The specified improper payments are detailed in paragraphs 66, 72, 95, 101,

104, 105, 108, 111, 112, 119, 120, 122, 124, 125, 129, and 130 above and incorporated herein.

170.   In connection with the conduct alleged in paragraphs 156 to 160 and 167 to 169 above, between 1994 and 2004, Forde, Greaney, Hayes, Mitchell, and Brennan each received improper payments of money or other things of value from one or more of the individual owners of the aforesaid contractor-employers.  This conduct constituted violations of 29 U.S.C. § 186(b), and racketeering activity within the meaning of 18 U.S.C. § 1961(1)(B).  The specified improper receipt of payments is described in paragraphs 66, 72, 95, 101, and 108 above and incorporated herein.

171.   In connection with the conduct alleged in paragraphs 156 to 160 and 167 to 170 above, between 1994 and 2004, Forde, Greaney, Hayes, Mitchell, and Brennan each obstructed the administration of justice through a variety of unlawful acts, including false testimony at a deposition by each of Forde, Greaney, Mitchell, and Hayes, and the destruction of documents by Brennan.  This conduct constituted violations of 18 U.S.C. § 1623, and racketeering activity within the meaning of 18 U.S.C. § 1961(1)(B).  The specified unlawful obstructions are detailed in paragraphs 66, 75, 80, 95, 102, and 109 above and incorporated herein.

172.   By and through the conduct alleged in paragraphs 156 to 160 and 167 to 171 above, between 1994 and 2004 and as recently as 2007 and 2008, Forde, Greaney, Hayes, Mitchell, Brennan, KAFCI, O'Neill, Turbo, Buckley, Pitcohn, McEntee, Pyramid, Duffy, On Par, Murray, EMB, M. Batalias, E. Batalias, Kelleher, Carson, Ruocco, Stamberger and Vivenzio each caused assets of the Funds to be embezzled.  This conduct constituted violations of 18 U.S.C. § 664, and racketeering activity within the meaning of 18 U.S.C. § 1961(1)(B).  The specified embezzlement is described in

paragraphs 66, 72, 73, 76, 77, 78, 95, 99, 101, 104, 105, 108, 111, 112, 113, 114, 119, 120, 122, 124, 125, 129, 130, 134, and 138 above and incorporated herein.

173.    In connection with the conduct alleged in paragraphs 156 to 160 and 167 to 172, Olivieri knew about and agreed to, and did, facilitate the scheme alleged in paragraphs 156 to 160 and 167 to 172 by aiding Murray in avoiding the consequences of an investigation into On Par's conduct and Murray's bribery of union officials and shop stewards, all in furtherance of a scheme by which Murray embezzled money from the Funds.

174.    In connection with the conduct alleged in paragraphs 156 to 160 and 167 to 172, Carson, Ruocco, Stamberger, and Vivenzio knew about and agreed to, and did, facilitate the scheme alleged in paragraphs 156 to 160 and 167 to 172 by filing false reports and accepting bribes, all in furtherance of a scheme by which Murray embezzled money from the Funds.

175.    By reason of the RICO Conspirators' conspiracy to violate 18 U.S.C. § 1962(c), each of the RICO Conspirators violated 18 U.S.C. § 1962(d), as a proximate result of which the Funds have been injured in their business and property in an amount to be determined at trial, before trebling and not including punitive damages.

176.    Pursuant to 18 U.S.C. § 1964(c), Forde, Greaney, Olivieri, Hayes, Mitchell, Brennan, Carson, Ruocco, Stamberger, Vivenzio, KAFCI, O'Neill, Turbo, Buckley, Pitcohn, McEntee, Pyramid, Duffy, EMB, M. Batalias, E. Batalias, and Kelleher are jointly and severally liable to the Funds for the amount of their ultimate loss, trebled, plus interest, costs, and attorneys' fees.

4819-6290-4586.9

### 3.  Forde's Breach of Fiduciary Duty under ERISA

177.    The Trustees re-allege and incorporate by reference Paragraphs 1 to 176 as if stated in full herein.

178.    At all relevant times, Forde was a trustee of the Funds.  In his capacity as trustee, he owed the Funds fiduciary duties, which required that he discharge his duties with respect to the Funds solely in the interest of the Funds' participants and beneficiaries, and for the exclusive purpose of providing benefits to the participants and beneficiaries.  ERISA § 404(a), 29 U.S.C. § 1104(a).

179.    Forde accepted bribes and other things of value from contractors, and in return, by acts of malfeasance and deliberate non-feasance, permitted those contractors to avoid their obligations under their CBAs by employing non-union and "off the books" workers, not paying them the negotiated wages and benefits, and not making required contributions to the Funds.

180.    Forde's conduct constituted a breach of his fiduciary duties.

181.    As a result of Forde's breach, the Funds were harmed in an amount to be determined at trial.

182.    Forde is personally liable to the Funds for any losses to the Funds resulting from each such breach, and such other equitable or remedial relief as the court may deem appropriate, plus interest, costs, and attorneys' fees. ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(g), 29 U.S.C. § 1132(g).

### 4.  The Pension Fund's and Annuity Fund's Right of Offset With Respect to Forde's Benefits Under ERISA § 206(d)(4), 29 U.S.C. § 1106(d)(4)

183.    The Trustees re-allege and incorporate by reference Paragraphs 1 to 182 as if stated in full herein.

4819-6290-4586.9

184.    ERISA § 206(d)(4), 29 U.S.C. § 1106(d)(4), permits a pension plan, such as the Pension Fund and the Annuity Fund, to offset a participant's benefits provided under an employee pension benefit plan by an amount that the participant is ordered or required to pay to the plan if (A) the order or requirement to pay arises (i) under a judgment or conviction for a crime involving such plan, (ii) under a civil judgment entered by a court in an action brought in connection with a violation or alleged violation of the fiduciary responsibility provisions of ERISA, or (iii) pursuant to a settlement agreement between certain specified parties, (B) the judgment, order, decree or settlement agreement expressly provides for offset of all or part of the amount ordered or required to be paid to the plan against the participant's benefits provided under the plan, and (C) in a case in which ERISA's survivor annuity requirements are applicable, certain spousal consent requirements are satisfied.

185.    Whereas the spousal consent provisions of ERISA § 206(d)(4)(C), 29 U.S.C. § 1106(d)(4)(C), are not applicable to Forde's Pension Fund benefits because there was previously an election to waive the right of his spouse to a qualified joint and survivor annuity in accordance with the requirements of ERISA § 205(C), 29 U.S.C. § 1105(C).  Nor do the spousal consent provisions of ERISA § 205(C), 29 U.S.C. § 1105(C) apply to Forde's Annuity Fund benefit.

186.    The $977,547.03 that Forde has been ordered to pay the Pension Fund and the $799,439.13 that Forde has been ordered to pay the Annuity Fund relate to his crimes against the Pension Fund and the Annuity Fund and his breaches of fiduciary duties to the Pension Fund and the Annuity Fund.

187.    Forde's monthly Pension Fund benefits should be offset pursuant to ERISA § 206(d)(4), 29 U.S.C. § 1106(d)(4), against the $977,547.03 that he has

previously been ordered by the court to restore to the Pension Fund plus any additional amounts for which Forde is found liable to the Pension Fund in this action.  As a result of the offset, Forde is not entitled to any Pension Fund benefits.

188.    Forde's Annuity Fund account balance should be offset pursuant to ERISA § 206(d)(4), 29 U.S.C. § 1106(d)(4), against the $799,439.13 that he has previously been ordered by the court to restore to the Annuity Fund plus any additional amounts for which Forde is found liable to the Annuity Fund in this action.  As a result of the offset, Forde is not entitled to any Annuity Fund benefits.

### 5.  Greaney's Breach of Fiduciary Duty under ERISA

189.    Plaintiff Trustees re-allege and incorporate by reference Paragraphs 1 to 188 as if stated in full herein.

190.    At all relevant times, Greaney was a trustee of the Funds.  In his capacity as trustee, he owed the Funds fiduciary duties, which required that he discharge his duties with respect to the Funds solely in the interest of the Funds' participants and beneficiaries, and for the exclusive purpose of providing benefits to the participants and beneficiaries.  ERISA § 404(a), 29 U.S.C. § 1104(a).

191.    Greaney accepted bribes and other things of value from contractors, and in return, by acts of malfeasance and deliberate non-feasance, permitted those contractors to avoid their obligations under their CBAs by employing non-union and "off the books" workers, not paying them the negotiated wages and benefits, and not making required contributions to the Funds.

192.    Greaney's conduct constituted a breach of his fiduciary duties.

193.    As a result of Greaney's breach, the Funds were harmed in an amount to be determined at trial.

4819-6290-4586.9

194.     Greaney is personally liable to the Funds for any losses to the Funds resulting from each such breach, and such other equitable or remedial relief as the court may deem appropriate, plus interest, costs, and attorneys' fees. ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(g), 29 U.S.C. § 1132(g).

### 6.  The Pension Fund's and Annuity Fund's Right of Offset With Respect to Greaney's Benefits Under ERISA § 206(d)(4), 29 U.S.C. § 1106(d)(4)

195.     The Trustees re-allege and incorporate by reference Paragraphs 1 to 194 as if stated in full herein.

196.     ERISA § 206(d)(4), 29 U.S.C. § 1106(d)(4), permits a pension plan, such as the Pension Fund and the Annuity Fund, to offset a participant's benefits provided under an employee pension benefit plan by an amount that the participant is ordered or required to pay to the plan if (A) the order or requirement to pay arises (i) under a judgment or conviction for a crime involving such plan, (ii) under a civil judgment entered by a court in an action brought in connection with a violation or alleged violation of the fiduciary responsibility provisions of ERISA, or (iii) pursuant to a settlement agreement between certain specified parties, (B) the judgment, order, decree or settlement agreement expressly provides for offset of all or part of the amount ordered or required to be paid to the plan against the participant's benefits provided under the plan, and (C) in a case in which ERISA's survivor annuity requirements are applicable, certain spousal consent requirements are satisfied.

197.     Whereas the spousal consent provisions of ERISA § 206(d)(4)(C), 29 U.S.C. § 1106(d)(4)(C), are not applicable to Greaney's benefits because he is single.

198.     The $969,497.72 that Greaney has been ordered to pay the Pension Fund and the $789,019.13 that Greaney has been ordered to pay the Annuity Fund relate to

his crimes against the Pension Fund and the Annuity Fund and his breaches of fiduciary duties to the Pension Fund and the Annuity Fund.

199.    Greaney's monthly Pension Fund benefit, upon becoming payable, should be offset pursuant to ERISA § 206(d)(4), 29 U.S.C. § 1106(d)(4), against the $969,497.72 that he has previously been ordered by the court to restore to the Pension Fund plus any additional amounts for which Greaney is found liable to the Pension Fund in this action.  As a result of the offset, Greaney is not entitled to any Pension Fund benefits.

200.    Greaney's Annuity Fund account balance should be offset pursuant to ERISA § 206(d)(4), 29 U.S.C. § 1106(d)(4), against the $789,019.13 that he has previously been ordered by the court to restore to the Annuity Fund plus any additional amounts for which Greaney is found liable to the Annuity Fund in this action.  As a result of the offset, Greaney is not entitled to any Annuity Fund benefits.

### 7.  Olivieri's Breach of Fiduciary Duty under ERISA

201.    The Trustees re-allege and incorporate by reference Paragraphs 1 to 200 as if stated in full herein.

202.    At all relevant times, Olivieri was a trustee of the Funds.  In his capacity as trustee, he owed the Funds fiduciary duties, which required that he discharge his duties with respect to the Funds solely in the interest of the Funds' participants and beneficiaries, and for the exclusive purpose of providing benefits to the participants and beneficiaries.  ERISA § 404(a), 29 U.S.C. § 1104(a).

203.    As detailed in paragraphs 86 through 94, and 115, above, Olivieri aided and facilitated the scheme of Murray to cheat the Funds out of monies owed by On Par, monies that were not paid to the Funds as a result of Murray's bribes paid to Forde,

Greaney, Mitchell, Brennan, Carson, Ruocco, Stamberger and Vivenzio.  Olivieri further failed to inform his fellow trustees of a material financial conflict of interest, namely a $730,000 loan from Murray, and instead acted on behalf of the trustees when approving a payment plan for On Par.

204.   Olivieri's conduct constituted a breach of his fiduciary duties.

205.   As a result of Olivieri's breach, the Funds were harmed in an amount to be determined at trial.

206.   Olivieri is personally liable to the Funds for any losses to the Funds resulting from each such breach, and such other equitable or remedial relief as the court may deem appropriate, plus interest, costs, and attorneys' fees.  ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(g), 29 U.S.C. § 1132(g).

## 8.  Fraud by Mitchell (N.Y. Common Law)

207.   The Trustees re-allege and incorporate by reference Paragraphs 1 to 206 as if stated in full herein.

208.   At all relevant times, Mitchell served as a shop steward.  As a shop steward, his responsibilities included accurately recording the presence of carpenters working under a CBA on his assigned job site and the total number of hours worked by each such carpenter.

209.   Shop stewards are the "eyes and ears" of the District Council, including its constituent locals, and the Funds on each job site.  The Trustees in particular relied on the accuracy of shop steward reports in determining whether employers were making required contributions to the Funds.

210.   Between 2000 and 2004, Mitchell deliberately submitted shop steward reports that underreported the number of carpenters working and the hours worked on

job sites at which he was the shop steward, in exchange for cash bribes of over $10,000 from the contractors on those sites, including Murray of On Par. Mitchell knew that by misrepresenting the number of workers and the hours worked on the sites he monitored in his shop steward reports, the contractors would be able to avoid having to pay contributions to the Funds. The full extent, scope and details of Mitchell's misrepresentations are within the peculiar knowledge of Mitchell himself.

211. The Trustees justifiably relied on the accuracy of Mitchell's shop steward reports in determining whether the contractors on the sites Mitchell was assigned to monitor had made the required contributions. The Trustees were misled into overlooking violations of the contractors' CBAs with respect to required contributions to the Funds by Mitchell's intentional misrepresentations.

212. As a result of Mitchell's misrepresentations, the Funds were defrauded of an amount within the peculiar knowledge of Mitchell himself.

213. Mitchell is personally liable to the Funds for losses the Funds suffered as a result of his fraud, and any punitive damages and other remedies the Court deems fit and proper to award.

### 9. Fraud by Brennan (N.Y. Common Law)

214. The Trustees re-allege and incorporate by reference Paragraphs 1 to 213 as if stated in full herein.

215. At all relevant times, Brennan served as a shop steward. As a shop steward, his responsibilities included accurately recording the presence of carpenters working under a CBA on his assigned job site and the total number of hours worked by each such carpenter.

216.   Shop stewards are the "eyes and ears" of the District Council, including its constituent locals, and the Funds on each job site.  The Trustees in particular relied on the accuracy of shop steward reports in determining whether employers were making the appropriate required contributions to the Funds.

217.   Between 2000 and 2004, Brennan committed acts of fraud, the specifics of which are within the peculiar knowledge of Brennan himself and which, upon information and belief, include deliberately submitting shop steward reports that underreported the number of carpenters working and the hours worked on his job sites, in exchange for cash bribes of over $1,000 from Murray of On Par.  Brennan knew that by misrepresenting the number of workers and hours worked on the sites he monitored in his reports, On Par would be able to avoid having to pay the contributions to the Funds.  The full extent, scope and details of Brennan's misrepresentations are within the peculiar knowledge of Brennan himself.

218.   The Trustees justifiably relied on the accuracy of Brennan's shop steward reports in determining whether the contractors on the sites Brennan was assigned to monitor had made the required contributions.  The Trustees were deliberately misled into overlooking violations of the contractors' CBAs with respect to required contributions to the Funds by Brennan's intentional misrepresentations.

219.   As a result of Brennan's misrepresentations, the Funds were defrauded of an amount within the peculiar knowledge of Brennan himself.

220.   Brennan is personally liable to the Funds for any losses the Funds suffered as a result of his fraud, and any punitive damages and other remedies the Court deems fit and proper to award.

## 10.  Fraud by Carson (N.Y. Common Law)

221.    The Trustees re-allege and incorporate by reference Paragraphs 1 to 220 as if stated in full herein.

222.    At all relevant times, Carson served as a shop steward.  As a shop steward, his responsibilities included accurately recording the presence of carpenters working under a CBA on his assigned job site and the total number of hours worked by each such carpenter.

223.    Shop stewards are the "eyes and ears" of the District Council, including its constituent locals, and the Funds on each job site.  The Trustees in particular relied on the accuracy of shop steward reports in determining whether employers were making the required contributions to the Funds.

224.    In 2004, Carson deliberately submitted shop steward reports that underreported the number of carpenters working and the hours worked on his job site in exchange for bribes from the contractor on that site, namely Murray of On Par. Carson knew that by misrepresenting the number of workers and the number of hours worked on the site in his shop steward reports, On Par would be able to avoid having to pay required contributions to the Funds.  The full extent, scope and details of Carson's misrepresentations are within the peculiar knowledge of Carson himself.

225.    The Trustees justifiably relied on the accuracy of Carson's shop steward reports in determining whether the contractors on the sites Carson was assigned to monitor had made the required contributions.  The Trustees were deliberately misled into overlooking violations of the contractors' CBAs with respect to required contributions to the Funds by Carson's intentional misrepresentations.

4819-6290-4586.9

226.   As a result of Carson's misrepresentations, the Funds were defrauded of an amount within the peculiar knowledge of Carson himself.

227.   Carson is personally liable to the Funds for losses the Funds suffered as a result of his fraud, and any punitive damages and other remedies the Court deems fit and proper to award.

### 11.  Fraud by Ruocco (N.Y. Common Law)

228.   The Trustees re-allege and incorporate by reference Paragraphs 1 to 227 as if stated in full herein.

229.   At all relevant times, Ruocco served as a shop steward.  As a shop steward, his responsibilities included accurately recording the presence of carpenters working under a CBA on his assigned job site and the total number of hours worked by each such carpenter.

230.   Shop stewards are the "eyes and ears" of the District Council, including its constituent locals, and the Funds on each job site.  The Trustees in particular relied on the accuracy of shop steward reports in determining whether employers were making the required contributions to the Funds.

231.   In 2004, Ruocco deliberately submitted shop steward reports that underreported the number of carpenters working and the hours worked on his job site in exchange for bribes from the contractor on that site, namely Murray of On Par. Ruocco knew that by misrepresenting the number of workers and number of hours worked on the site he monitored in his shop steward reports, the contractor would be able to avoid having to pay required contributions to the Funds.  The full extent, scope and details of Ruocco's misrepresentations are within the peculiar knowledge of Ruocco himself.

232.   The Trustees justifiably relied on the accuracy of Ruocco's shop steward reports in determining whether the contractors on the sites Ruocco was assigned to monitor had made the required contributions.  The Trustees were deliberately misled into overlooking violations of the contractors' CBAs with respect to required contributions to the Funds by Ruocco's intentional misrepresentations.

233.   As a result of Ruocco's misrepresentations, the Funds were defrauded of an amount within the peculiar knowledge of Ruocco himself.

234.   Ruocco is personally liable to the Funds for losses the Funds suffered as a result of his fraud, and any punitive damages and other remedies the Court deems fit and proper to award.

### 12.  Fraud by Stamberger (N.Y. Common Law)

235.   The Trustees re-allege and incorporate by reference Paragraphs 1 to 234 as if stated in full herein.

236.   At all relevant times, Stamberger served as a shop steward.  As a shop steward, his responsibilities included accurately recording the presence of carpenters working under a CBA on his assigned job site and the total number of hours worked by each such carpenter.

237.   Shop stewards are the "eyes and ears" of the District Council, including its constituent locals, and the Funds on each job site.  The Trustees in particular relied on the accuracy of shop steward reports in determining whether employers were making the appropriate required contributions to the Funds.

238.   Upon information and belief, from 2002 to 2003, Stamberger committed acts of fraud, the specifics of which are within the peculiar knowledge of Stamberger himself and which, upon information and belief, include deliberately submitting shop

steward reports that underreported the number of carpenters working and the hours worked on his job site in exchange for bribes from the contractor on that site, namely Murray of On Par.  Stamberger knew that by committing those acts, On Par would be able to avoid having to pay required contributions to the Funds.  The full extent, scope and details of Stamberger's misrepresentations are within the peculiar knowledge of Stamberger himself.

239.   The Trustees justifiably relied on the accuracy of Stamberger's shop steward reports in determining whether the contractors on the sites Stamberger was assigned to monitor had made the required contributions.  The Trustees were deliberately misled into overlooking violations of the contractors' CBAs with respect to required contributions to the Funds by Stamberger's intentional misrepresentations.

240.   As a result of Stamberger's misrepresentations, the Funds were defrauded of an amount within the peculiar knowledge of Stamberger himself.

241.   Stamberger is personally liable to the Funds for losses the Funds suffered as a result of his fraud, and any punitive damages and other remedies the Court deems fit and proper to award.

### 13.  Fraud by Vivenzio (N.Y. Common Law)

242.   The Trustees re-allege and incorporate by reference Paragraphs 1 to 241 as if stated in full herein.

243.   At all relevant times, Vivenzio served as a shop steward.  As a shop steward, his responsibilities included accurately recording the presence of carpenters working under a CBA on his assigned job site and the total number of hours worked by each such carpenter.

244.    Shop stewards are the "eyes and ears" of the District Council, including its constituent locals, and the Funds on each job site.  The Trustees in particular relied on the accuracy of shop steward reports in determining whether employers were making the appropriate required contributions to the Funds.

245.    Between 2002 and 2003, Vivenzio deliberately submitted shop steward reports that underreported the number of carpenters working and the hours worked on his job site in exchange for bribes from the contractor on that site, namely Murray of On Par.  Vivenzio knew that by misrepresenting the number of workers and number of hours worked on the site he monitored in his shop steward reports, the contractor would be able to avoid having to pay required contributions to the Funds.  The full extent, scope and details of Vivenzio's misrepresentations are within the peculiar knowledge of Vivenzio himself.

246.    The Trustees justifiably relied on the accuracy of Vivenzio's shop steward reports in determining whether the contractors on the sites Vivenzio was assigned to monitor had made the required contributions.  The Trustees were deliberately misled into overlooking violations of the contractors' CBAs with respect to required contributions to the Funds by Vivenzio's intentional misrepresentations.

247.    As a result of Vivenzio's misrepresentations, the Funds were defrauded of an amount within the peculiar knowledge of Vivenzio himself.

248.    Vivenzio is personally liable to the Funds for losses the Funds suffered as a result of his fraud, and any punitive damages and other remedies the Court deems fit and proper to award.

<u>Prayer for Relief</u>

Wherefore Plaintiffs pray that the Court:

A. With respect to the First and Second claims, award:

    a. Damages to be determined at trial, trebled;

    b. Interest;

    c. Attorneys' fees;

    d. Costs and disbursements of this action; and

    e. Any such other and further relief as this Court may deem just and proper as provided for under RICO, 18 U.S.C. § 1964(c);

B. With respect to the Third Claim:

    a. Order Michael Forde to pay damages in an amount to be determined at trial and order such other equitable or remedial relief as may be just and equitable as provided for under ERISA § 409, 29 U.S.C. § 1109, plus interest, costs, and attorneys' fees under ERISA § 502(g), 29 U.S.C. § 1132(g);

C. With respect to the Fourth Claim:

    a. Order Michael Forde's monthly benefits from the Pension Fund and his Annuity Fund account to be offset, pursuant to ERISA § 206(d)(4), 29 U.S.C. § 1056(d)(4), against the amount that he has previously been ordered by the Court to pay to the Pension Fund and the Annuity Fund as well as by any additional amounts that he is ordered to pay to the Pension Fund and the Annuity Fund in this action;

D. With respect to the Fifth Claim:

4819-6290-4586.9

    a. Order John Greaney to pay damages in an amount to be determined at trial and order such other equitable or remedial relief as may be just and equitable as provided for under ERISA § 409, 29 U.S.C. § 1109, plus interest, costs, and attorneys' fees under ERISA § 502(g), 29 U.S.C. § 1132(g);

E. With respect to the Sixth Claim:

    a. Order John Greaney's monthly benefits from the Pension Fund, when they become payable, and his Annuity Fund account to be offset, pursuant to ERISA § 206(d)(4), 29 U.S.C. § 1056(d)(4), against the amount that he has previously been ordered by the Court to pay to the Pension Fund and the Annuity Fund as well as by any additional amounts that he is ordered to pay to the Pension Fund and the Annuity Fund in this action;

F. With respect to the Seventh Claim:

    a. Order Joseph Olivieri to pay damages in an amount to be determined at trial and order such other equitable or remedial relief as may be just and equitable as provided for under ERISA § 409, 29 U.S.C. § 1109, plus interest, costs, and attorneys' fees under ERISA § 502(g), 29 U.S.C. § 1132(g);

G. With respect to the Eight Claim:

    a. Order Michael Mitchell to pay damages in an amount to be determined at trial, punitive damages to be determined by the Court, and order such other equitable or remedial relief as may be just and equitable;

H. With respect to the Ninth Claim:

4819-6290-4586.9

     a. Order Michael Brennan to pay damages in an amount to be determined at trial, punitive damages to be determined by the Court, and order such other equitable or remedial relief as may be just and equitable;

I.  With respect to the Tenth Claim:

     a. Order Brian Carson to pay damages in an amount to be determined at trial, punitive damages to be determined by the Court, and order such other equitable or remedial relief as may be just and equitable;

J.  With respect to the Eleventh Claim:

     a. Order Joseph Ruocco to pay damages in an amount to be determined at trial, punitive damages to be determined by the Court, and order such other equitable or remedial relief as may be just and equitable;

K.  With respect to the Twelfth Claim:

     a. Order John Stamberger to pay damages in an amount to be determined at trial, punitive damages to be determined by the Court, and order such other equitable or remedial relief as may be just and equitable;

L.  With respect to the Thirteenth Claim:

     a. Order Michael Vivenzio to pay damages in an amount to be determined at trial, punitive damages to be determined by the Court, and order such other equitable or remedial relief as may be just and equitable;

M. Award Plaintiffs the costs, interest, and attorneys' fees of this action; and

N. Provide other relief as may be just and equitable.

4819-6290-4586.9

Dated:  New York, New York.
        November 21, 2011

Respectfully submitted,

KAUFF MCGUIRE & MARGOLIS LLP

By: _____
        Raymond G. McGuire
        Harlan J. Silverstein
        Elizabeth O'Leary

950 Third Avenue
Fourteenth Floor
New York, NY 10022
(212) 644-1010

Attorneys for Plaintiffs

STILLMAN & FRIEDMAN, P.C.

        Scott M. Himes

425 Park Avenue
New York, NY 10022
(212) 223-0200

Of Counsel

4819-6290-4586.9