UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------X
New York City District Council of Carpenters
Pension Fund, New York City District Council
of Carpenters Welfare Fund, New York City
District Council of Carpenters Annuity Fund,          **11-CV-5474**
and New York City District Council of                 **(LAP)(GWG)**
Carpenters Apprenticeship, Journeyman
Retraining, Educational and Industry Fund,
by their Trustees, Frank Spencer, Douglas J.
McCarron, John Ballantyne, Paul Tyznar,
Paul O'Brien, Kevin M. O'Callaghan,
Catherine Condon, David Meberg, Bryan Winter
and John DeLollis,

                 Plaintiffs,

      -against-

Michael Forde, John Greaney, Joseph Olivieri,
Brian Hayes, Michael Mitchell, Finbar O'Neill,
K.A.F.C.I., Michael Brennan, Turbo Enterprises,
Inc., Terence Buckley, Pitchon Construction
Enterprises, Inc., Gerard McEntee, Pyramid
Associates Construction Corp., James Duffy,
EMB Contracting Corp., Michael Batalias,
Elisavet Batalias, Matthew Kelleher, Brian
Carson, Joseph Ruocco, John Stamberger and
Michael Vivenzio,

                 Defendants.
--------------------------------------------X
JOHN GREANEY et. al.

                Plaintiffs,          **16-CV-3551**
                         **(LAP)(GWG)**

      -against-

THE NEW YORK CITY DISTRICT COUNCIL OF
CARPENTERS PENSION FURN et.al.,

                 Defendants.

--------------------------------------------X

**MEMORANDUM OF LAW IN OPPOSITION TO
FUNDS' MOTION FOR SUMMARY JUDGMENT
AND IN SUPPORT FOR GREANEYS'
CROSS MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT..................................1

STATEMENT OF FACTS

    A. History of Corruption..........................6

    B. United States v. Forde, et.al.
       Criminal Trial, Damages and Restitution.......16

    C. Formation of Restitution Orders..............19

    D. Instant Suit and Funds' Ex. 30...............26

    E. Joseph Olivieri..............................29

    F. Calculation of Turbo Losses..................30

    G. Calculation of On Par Losses.................33

    H. Reports of the Review Officer................37

    I. History of Administrative Claims Proceedings
       under ERISA...................................52

ARGUMENT

I   THE FUNDS RICO CLAIMS ARE TIME-BARRED...........64

    A. General Principles...........................64

    B. Previous Decision By Judge Preska...........65

    C. Storm Warnings..............................67

    D. A Claim of Due Diligence Is Inconsistent
       With Positions Taken by the Funds
       In the RO Stipulation........................71

    E. The Findings of the Review Officer Do Not Support
       a Finding of Due Diligence...................71

        1. Not Collecting Benefits With Wages......72

        2. Data Systems Designed to Fail.  Data Not Focused

on The Participants Who Earn the Benefits...73

3.   Conflicts of Interest by Counsel..........74

4.   Block Vote.................................77

5.   Grossly Inadequate Collection, Reporting and Systems....................................77

6.   No Training.  No Fiduciary Counsel........79

F.   Greaney Deposition Testimony....................80

G.   You Would Have To Be Living Under A Rock.......81

H.   Conclusion.....................................82

II.   ON PAR AND TURBO CLAIMS

A. The Funds Have Had Their Day in Court (Turbo)....82

B.   The Unambiguous Agreement and Release Was Intended to Be a "Full" Recovery of The Pecuniary Loss (On Par).....................91

1. New York Law Governs the Agreement..........93

2. No Party has claimed the Agreement is Ambiguous.................................93

3. The On Par Settlement Abated the Claim Prior to the institution of the Civil RICO suit.............................97

III.   MVRA AND RICO

A. MVRA Background............................98

B. Schedule of Payments.......................101

C. Constitutional Challenges under MVRA.......105

1. Sixth Amendment.......................105

2. Eighth Amendment......................105

3. Due Process...........................106

D. Interrelationship Between MVRA and RICO....106

E. Entry of A Civil Rico Judgment That Trebles a MVRA Order Under FRCP 69...................111

F. When to Treble...........................113

IV.  THE FUNDS AND GREANEYS' CLAIMS UNDER ERISA

A. In an ERISA Tax Qualified Plan, the Fiduciaries
   Must Act in Accordance with Plan Documents.....115

   1. Written Plan Requirement..................115

   2. Duty To Act In Accordance
      With Plan Documents......................117

   3. Elimination of Spousal Rights
      Protected by ERISA.......................120

   4. Not Following Title 1 or Plan Documents in
      Claims Proceedings.......................121

   5. Standard of Review.......................123

B. The Amendment of ERISA Section 206 Created
   A Remedy at Law...............................125

C. The Funds Have No Further Claims For Money Damages
   Under ERISA

   1.  Funds Have No New Damages But Seek A Greater
       Recovery ...............................129

   2.  Section 206 of ERISA Means
       What It Says............................130

   3.  Irony of the Funds Position............138

   4.  The Funds Cannot Amend Their Pleadings in
       Their Briefs And Raise ERISA violations which
       are Time Barred.........................141

V.   MVRA, RICO AND ERISA WERE INTENDED FIT TOGETHER..143

VI.  PENALTIES FOR FAILURE TO PROVIDE DOCUMENTS.......145

REQUEST FOR RELIEF....................................146

**INDEX TO GREANEY EXHIBITS**

G. Ex. 1:  Funds First Amended Complaint (FAC)

G. Ex. 2:  Greaney's Answer to FAC

G. Ex. 3:  Greaneys' ERISA Complaint (EC)

G. Ex. 4:  Funds Answer to EC

G. Ex. 5:  Funds Rule 26 Damage Disclosures

G. Ex. 6:  Article IV of Trust Agreements all Funds

G. Ex. 7:  O'Dwyer & Bernstein-counsel to Funds-Retainer

G. Ex. 8:  Letter regarding Moscatiello plea

G. Ex. 9:  Restitution Orders to Funds (Nisall and Delio)

G. Ex. 10: O'Dwyer advises Board-Forde can stay pending
           sentence

G. Ex. 11: First page of Board minutes 2000-2010 (annual)

G. Ex. 12: Review Officer Stipulation (RO Stipulation)

G. Ex. 13: Letter showing date of Hayes plea

G. Ex. 14: Greaney sentence transcript

G. Ex. 15: Government's Supplementary Memorandum for
           Sentencing

G. Ex. 16: Threat to Greaney in indictment

G. Ex. 17: Emails by and between Government and Funds on
           Restitution/Sentence

G. Ex. 18: March 10, 2011 KMM letter to Judge Marrero on
           Restitution

G. Ex. 19: January 13, 2011 Restitution Obligation of Hayes

G. Ex. 20: Transcript of Oral Argument on Restitution

G. Ex. 21: First RO Report

G. Ex. 22: Second RO Report

G. Ex. 23: Third RO Report

G. Ex. 24: Fourth RO Report

G. Ex. 25: Fifth RO Report

G. Ex. 26: Sixth RO  Report

G. Ex. 27: Seventh RO Report

G. Ex. 28: Eighth RO Report

G. Ex. 29: Final RO Report

G. Ex. 30: Appointment of Joseph Olivieri as Trustee

G. Ex. 31: Offers to settle with Olivieri for 3-4K

G. Ex. 32: April 2, 2009 Letter accompanying Agreement and
           Release-On Par

G. Ex. 33: Olivieri Transcript identifying April 2, 2009
           letter

G. Ex. 34: Olivieri Transcript on On Par Settlement

G. Ex. 35: May 14, 2009 Board of Trustees minutes

G. Ex. 36: On Par Satisfaction of Judgment

G. Ex. 37: Board of Trustees minutes of March 10, 2010

G. Ex. 38: Statement of Policy for Collections

G. Ex. 39: Delinquency Committee Minutes

G. Ex. 40: Malpractice Action against O'Dwyer & Bernstien

G. Ex. 41: Greaney's Amended Response to Second Request For
           Production of Documents

G. Ex. 42: Partial Board Minutes of May 6, 2003 (Greaney's
           appointment to the Board)

G. Ex. 43: Pension Plan Document

G. Ex. 44: Pension Trust Document

G. Ex. 45: Quesada & Moore letter of January 12, 2015

G. Ex. 46: Quesada & Moore letter of January 26, 2015

G. Ex. 47: KMM letter of February 12, 2015

G. Ex. 48A & B: Quesada & Moore letter of March 2, 2015 with
           Exhibits

G. Ex. 49: Quesada & Moore letter of May 13, 2016

G. Ex. 50: Imelda Greaney's Revocation of Waiver

G. Ex. 51: Quesada & Moore letter of August 25, 2015

G. Ex. 52: Annuity Plan Document

G. Ex. 53: Annuity Trust Document

G. Ex. 54: Quesada & Moore letter of January 11, 2016

G. Ex. 55: Annuity Plan SPD

G. Ex. 56: Pension Plan SPD

G. Ex. 57: Apprenticeship Fund Trust

G. Ex. 58: Vacation Fund Trust

G. Ex. 59A & B: Welfare Fund Trust

G. Ex. 60: Amendment to Trust (all Funds)

G. Ex. 61: Greaney Request for Documents and Funds' Response

G. Ex. 62: Greaney Request for Interrogaties and Funds'
           Response

G. Ex. 63: Funds Supplemental Response to Greaney's Notice
           for Production

G. Ex. 64: Partial Board Minutes of November 8, 2004

G. Ex. 65: February 6, 2009 Deposition Transcript of
           Greaney (pgs 47-49)

G. Ex. 66: Page 164 of Joseph Olivieri Trial Transcript

G. Ex. 67: Arbitration Decision regarding Deadlocked
           Resolution of September 17, 2009 re Joseph
           Olivieri

G. Ex. 68: March 26, 2016 letter regarding how much
           Restitution was paid

G. Ex. 69: Funds Rule 26(a)(1)(A) Disclosures

G. Ex. 70: Funds February 10, 2017 letter

G. Ex. 71: Index to Funds Document Production

G. Ex. 72: Judge Berman's September 10, 2014 Decision

Appendix A: News reports from Westlaw

## INDEX TO FUNDS EXHIBITS

Funds Ex. 1: Funds Board of Trustees Minutes of May 14, 2009

Funds Ex. 2: Transcript of Forde Guilty  Plea

Funds Ex. 3: Transcript of Greaney Guilty Plea

Funds Ex. 4: Entire Transcript of April 28  2017 Deposition of John Greaney

Funds Ex. 5: Indictment filed August 3, 2009 and unsealed several days later

Funds Ex. 6: S6 Indictment filed on June 30, 2010

Funds Ex. 7: Judgment against Forde (October 14, 2011-Second Amended)

Funds Ex. 8: Judgment against Greaney-June 20, 2011

Funds Ex. 9: November 2010 Decision and Order against Forde with accompanying Statement

Funds Ex. 10: Olivieri Trial - pertinent portions

Funds Ex. 11: Proposed Default Judgment in On Par

Funds Ex. 12: Signed October 31, 2006 Judgment in On Par (by default)

Funds Ex. 13: Turbo Opinion and Award-dated November 22,2011

Funds Ex. 14: Governments' Memorandum Regarding Restitution Obligations of Forde, Greaney and Hayes

Funds Ex. 15: Greaney Restitution Order

Funds Ex. 16: Forde Restitution Order

Funds Ex. 17: Transcript of Oral Argument on Restitution

Funds Ex. 18: SRZ letter to Judge Marrero regarding Forde Restitution (Nov 10,2010)

Funds Ex. 19: KMM letter to Judge Marrero re Forde Restitution (February 18, 2011)

Funds Ex. 20: Agreement and General Release in On Par

Funds Ex. 21: Affidavit of Service dated 9/11/2012- on Buckley

Funds Ex. 22: Deposition of Gerard McEntee (August 26,2008)

Funds Ex. 23: Deposition of James Duffy (August 19, 2008)

Funds Ex. 24: Funds' November 24, 2014 pension denial

Funds Ex. 25: Greaney's March 2, 2015 appeal argument on pension denial

Funds Ex. 26: Funds July 20, 2015 denial of appeal on pension

Funds Ex. 27: Funds August 11, 2015 denial of annuity claim and refusal to participate on grounds of futility

Funds Ex. 28: Q & M appeal of denial of pension and ask for documents to perfect appeal (January 12, 2015)

Funds Ex. 29: Funds response to January 12, 2015 document request

Funds Ex. 30: Updated Summary created by Funds

**FINDING LIST**

**ERISA**

ERISA section 3(2), 29 USC 1002(2)

ERISA section 205( c)(1), 29 USC 1055( c)(1)

ERISA section 205( c)(7), 29 USC 1055( c)(7)

ERISA section 205( c)(1), 29 USC 1055( c)(1)

ERISA section 206(d)(4)(i), 29 USC 1106(d)(4)(i)

ERISA section 206(d)(4)(ii), 29 USC 1106(d)(4)(ii)

ERISA section 206(d)(4)(iii), 29 USC 1106(d)(4)(iii)

ERISA section 402(a)(1), 29 USC 1102(a)(1)

ERISA section 404, 29 USC 1104

ERISA section 409, 29 USC 1109

ERISA section 502( C), 29 U.S.C. 1132( C)

ERISA section 503, 29 USC 1133

**Internal Revenue Code**

IRC 401, 26 USC 401

IRC 402, 26 USC 402

**Taft-Hartley Act**

Section 302( c)(5), 29 USC 186( c)(5)

## PRELIMINARY STATEMENT

The Funds commenced this action on August 5, 2011, filing a complaint naming 18 defendants, including Michael Forde, John Greaney and Joseph Olivieri.  On November 21, 2011, the Funds filed a First Amended Complaint ("FAC")[1] naming four additional defendants.  Greaney filed an answer on or about December 22, 2011. (G. Ex. 2).

On or about May 13, 2016, John Greaney and Imelda Lovett Greaney filed an ERISA action against the Funds under ERISA Section 502.  (ERISA Complaint ("EC")(G. Ex. 3). The Funds filed an Answer on or about August 31, 2016 (G.Ex.4). On or about July 25, 2016, the FAC action and EC action were consolidated.

The FAC sought, under RICO Sections 1964( c) and (d), to hold 22 conspirators "jointly and severally liable to the Funds for the amount of their ultimate loss, trebled, plus interest, costs and attorney fees".[2]  Of the 22 co-conspirators that were initially sued, only three are left, Forde, Greaney and Olivieri.  Greaney asserts that the RICO actions are time-barred[3]  In the alternative, Greany asserts that On Par was settled and abated prior to any

---

[1] G. Ex. 1 (Greaney Exhibit 1).

[2] G. Ex.1, ¶¶ 164, 176.

[3] *See,* Section I, *infra.*

1

judgment in the FAC[4], and the Funds are bound by the MVRA
Restitution Order/Judgment in Turbo.[5]

In the FAC, the Funds brought their ERISA actions,
under ERISA §502(a)(2) and ERISA §206(d)(4).[6]  With respect
to defendant Greaney, they pleaded violations of ERISA
§404(a)[7](not acting solely in the interest of participants
and beneficiaries and violation of exclusive purpose). In
the Funds' Fifth Claim Prayer for Relief against Greaney,
the Funds sought damages and other  and other equitable
relief under ERISA §409 (personal liability) and ERISA
502(g)(attorney's fees).(G. Ex. 1).   In the Funds' Sixth
Claim Prayer for Relief against Greaney, the Funds sought an
Order under ERISA §206(d)(4) offsetting "John Greaney's
monthly benefits from the Pension Fund, when they become
payable, and his Annuity Fund account to be
offset"...against the amount he has previously been ordered
to by the Court to pay"...as well as by any additional
amounts that he is ordered to pay...in this action". (G. Ex.
1).

---

[4]  *See,* Section II(B), *infra.*

[5]  See, Section II(A), *infra.*

[6]  G. Ex. 1, ¶2.

[7]   G. Ex. 1, ¶190.

2

The Funds' Rule 26 Damage Disclosures (G. Ex. 5) describes the damages, under ERISA, as *an alternative to the RICO damages.*  The Disclosure states that the ERISA damages consist of the "actual damages"  minus the payments made.

The Rule 26 Damage Disclosure (G. Ex. 5) lists as the actual damages to be four previous MVRA Restitution Orders/Judgments against some the current or previously named RICO defendants, a belated Arbitration Award instead of the MVRA Restitution Order/Judgment that was ordered regarding Turbo, and a 2006 Default Judgment with respect to On Par (although On Par was settled with a Merger Clause). These "actual damages" are then to become a new lump-sum judgment against Greaney, including his qualified plan assets under ERISA 206(d)(4)(ii).[8]

When the FAC and Rule 26 Damage Disclosure Statement are considered together, taking away the consideration of On Par/Turbo, the essence of the Funds position is that they want either treble damages under RICO *or* the same money that was ordered in the criminal cases immediately rather than in installments.  They assert they can use the MVRA damage determinations to get a quicker lump-sum recovery against Forde and Greaney under ERISA 206(d)(4)(ii).  We respectfully submit that Congress already anticipated that

---

[8]  The Funds' Exhibit 30 attempts to alter the Rule 26 Damage Disclosure (G. Ex. 5) but not in compliance with FRCP 26(e). See Statement of Facts (D), *infra.*

parties would attempt to use a MVRA order for further civil remedies under ERISA[9].  ERISA 206(d)(4)(ii) means what is says: criminal judgment (MVRA)[10], civil judgment (ERISA 502)[11] *or* settlement.  See Section IV(C)(2),*infra*. Moreover, under MVRA, the timing of payments is *solely a judicial decision*. See Section III(A)(2),*infra*. The Funds have no right to accelerate payment except as provided in MVRA. *Id.*

The essence of the Greaneys' ERISA claim is that the Funds are required to follow their own Plan documents, ERISA and the Code and cannot simply "extinguish" a participant's benefit.[12]  The Greaneys' submit that Judge Marrero's MVRA Restitution Order/Judgment gave the Funds, as victims,  15%

---

[9]  The Victim and Witness Protection Act (VWPA) was amended in 1996 and renamed the Mandatory Victim Restitution Act (MVRA)(18 USC 3663-3664 (Supp II 1996)).  ERISA 206 was amended in 1997, with the Taxpayer Relief Act of 1997.

[10]  Certain State criminal judgments could also be cognizable but are not plead here.

[11]  Certain State civil judgments could also be cognizable but are not plead here.

[12]   The Funds attempted to "extinguish" the Greaneys' benefits in the claims proceedings.  See Funds Ex. 26. The Supreme Court denied equitable exceptions to the anti-alienation rules in *Guidry v. Sheet-Metal Workers Pension Fund, 493 US 365, 376 (1990)citing Ellis Nat'l Bank v. Irving Trust, 786 F2d 466, 470-471 at f/n 9 (2d Cir, 1986).* See, Section IV (B), *infra.*

4

of *all* of his income, including his pension and annuity income "under a judgment of conviction for a crime involving a plan". ERISA 206(d)(4)(i). Significantly, Judge Marrero determined that the MVRA Restitution Order/Judgment should be paid in monthly installments and not immediately.   There was a taking of Greaney's  property, by due process, in connection with said judgment and the Funds are and remain the beneficiary of Greaney's MVRA restitution order. The Greaneys' seek an Order from the Court, under ERISA 502(a)(1), to receive their benefits under the terms of the Pension and Annuity Plans, subject to said MVRA Order/Judgment.   Further, the Greaney's seek a finding the the Funds breached their fiducary duties and an Order, under ERISA Section 502(a)(3), to enjoin certain enumerated actions and practices that violate Title 1 and the terms of the Plans and other equitable relief for the benefit of themselves individually and on behalf of  Plans.[13]

The Statement of Facts is designed to be chronological to the extent that is possible.   An Index to the Funds' Exhibits ("Fund Ex") and Greaney Exhibits ("G.Ex.") together with a Findings List of official citations to pertinent ERISA, Taft-Hartley and the Internal Revenue Code provisions follow the Table of Contents.

---

[13]  *See, Varity v. Howe, 516 U.S. 489, 515 (1996). See* Request for Relief, *infra.*

## STATEMENT OF FACTS

The New York City District Council of Carpenters Pension Fund, Annuity Fund, Apprenticeship Fund, and Welfare Fund ("Funds") are employee pension plans within the meaning of ERISA Section 3(2).   (Funds Rule 56.1, *See* ¶1). The Funds are jointly-administered employee benefit plans established under Section 302(c)(5) of the Taft-Hartley Act. (Powers Dec. ¶3).  The Funds are each managed by a Board of Trustees, half-appointed by the District Council of New York City and Vicinity of the United Brotherhood of Carpenters and Joiners (the "District Council"), and half appointed by contractor associations.[14]  From 1997 to the present,  the Trust document for each of the Benefit Funds contained a provision that specified that one of the Employer trustees would be designated by The Association of Wall-Ceiling & Carpentry Industries of New York, Inc (WCC).

### A. History of Corruption

The history of corruption in the District Council and its Benefit Funds is a long and troubled one. Senior District Judge Charles S. Haight, Jr  has written multiple opinions which summarize the on-going history of the Government's attempt to rid the District Council of labor

---

[14] See Powers Dec. ¶4 and Article VI of the Trust Agreements of the Welfare, Annuity, Apprenticeship, and Pension Funds are annexed hereto as G. Ex. 6.

racketeering, job site corruption and organized crime influence.

In 2001, Judge Haight found:

In September 1990, the government filed a civil RICO action[15] for injunctive relief against the District Council and certain of its officers, including the then District Council President, Frederick W. Devine. The complaint alleged that  the individual defendants had engaged in a variety of forms of labor racketeering, and that organized crime had infected the operations of the District Council and its constituent local unions, resulting in these entities being maintained in a corrupt and undemocratic manner. ["Criminal RICO action"].
................................................
Trial commenced and was terminated after several weeks when the [*5] parties entered  into a Consent Decree. The Consent Decree[16] permanently enjoined all current and future officers, employees and members of the District Council and its constituent locals from engaging in certain prohibited conduct relating to organized crime.
.................................................
To effectuate and implement the terms of the Consent Decree, an Investigations and Review Officer ("IRO"), former federal judge Kenneth Conboy, was appointed by the Court and given a variety of powers, rights and responsibilities.

This Court, which endorsed the Consent Decree, also retained certain oversight responsibilities which were specifically defined in the Decree.
...........................................

---

[15]  United States v. District Council of Carpenters, 90 Civ. 5722 (CSH)("Consent Decree Litigation").

[16]  *Id.* 90 Civ. 5722 (S.D.N.Y. Mar. 7 1994).

In the spring of 1996, the IRO found evidence of the
continuing influence of organized crime over the
District Council and financial mismanagement at the
District Council. The IRO presented that evidence to
General President McCarron of the UBC.  McCarron,
purporting to act under authority conferred upon him by
the UBC Constitution and federal labor law, placed the
District Council under trusteeship.

*Local Unions 20 v. United Brotherhood of Carpenters and
Joiners of America, 2001 U.S. Dist. LEXIS 11209*4-
*5(SDNY 2001):*

In a separate opinion,   Judge Haight found that:

The UBC officers in charge of the trusteeship and
supervision over the District Council "discovered
that there was deep-rooted corruption in the day-today
operation of the District Council," and
"regularly encountered continuing corrupt practices
even after the imposed supervision." Declaration of
James Slebiska, verified October 12, 1998, at P 2.
Those practices included the disregard of job
referral rules; stewardship appointments of
individuals who supported corrupt business agents;
regular violations of prevailing wage laws;
threatening union members expressing an interest
in running for union office, or preventing [*7]
them from working; and corrupt overbillings by the
former general counsel of the District Council
(subsequently indicted for theft).

*Local Unions 20 v. United Brotherhood of Carpenters and
Joiners of America, 1999 U.S. LEXIS 1251,*8 (SDNY
1999).*

In a jury trial and sentence rendered on August 17,

1998, Frederick W. Devine was convicted of grand larceny in

the second degree and five counts of grand larceny in the third degree and sentenced.   The conviction was upheld on appeal.  *People v. Devine*, 276 AD 2d 258, 259 (1st Dept. 2000).

From 2000 through 2009, Michael Forde was the next executive secretary-treasurer (EST) of the District Council, which is the highest-ranking executive of that organization.[17]

Subsequently,  Judge Haight found:

In 2002, following a complaint by a union member alleging violation of Job Referral Rules incorporated into the Consent Decree, the government and the District Council conducted further negotiations resulting in a stipulation and order appointing Walter Mack, Esq., a former Assistant United States Attorney now in private practice, as the Independent Investigator (sometimes referred to hereinafter as "II"). .. The order appointed Mack for a two-year term as II. He served in that capacity from 2003 to 2005. At the end of that time, the District Council exercised the option granted to it by the 2002 stipulation and terminated Mack's services as II. The government moved to continue Mack in office, but the Court enforced the plain language of the stipulation to which the government had agreed. Mack departed the scene.....The Court appointed Unitel as the II in an Order dated August 18, 2005.

*United States v. Dist Council of NY, 571 F.Supp 2d. 571, 572 (SDNY 2008)*

---

[17] Funds' Rule 56.1 Statement, ¶15 and ¶16 and citations.

In its motion to terminate Walter Mack, the District
Council was represented by O'Dwyer & Bernstein, LLP (see
opinion above) who also represented the Benefit Funds as co-
counsel.[18]

Judge Haight noted that the government continued its
quest to rid the Council of corruption by bringing an
indictment in *United States v. Moscatiello, 04 CR. 343
(KMW)(S.D.N.Y.)* "which charges that the Genovese Organized
Crime Family, from the 1970s through January 2004, had the
'ability to manipulate and control the District
Council...the New York City Locals [of the District
Council]... and was able to leverage this control to benefit
favored contractors and to extort and intimidate other
contractors". *Id at 8.*[19]   On October 13, 2004, Moscatiello
pled guilty before Honorable Naomi Rice Buchwald.[20]   As part
of that litigation, restitution orders in the amount of

---

[18]    G. Ex. 7, G. Ex 11, appearances and filings in
Consent Decree Litigation (fn.15), G. Ex. 22, p 18, G. Ex. 40
¶8 and Greaney Affidavit¶ 11.

[19] *United States v. Dist Council, 571 F. Supp 2d. 555,
561,(SDNY 2008).*

[20] 1:04 CR-00343-KMW, Docket Entry 131, annexed hereto as
G. Ex. 8.

$1,000,000 each were levied against defendants Fred Nisall and James Delio, ultimately for the benefit of the Funds.[21]

At or around the same time that the US attorney was pursuing Moscatiello, state court bribery proceedings were commenced against Michael Forde, among others. Judge Haight noted :

> "Following a jury trial, [Michael] Forde was convicted of accepting a bribe from associates of the Luchese crime family in return for allowing off-the-books non-union workers at a job site. See *People v. Forde,* 8 Misc. 3d 1005A, 801 NYS2d 780(NY County, Sup. Ct. 2005)"[22].

John Greaney indicates in his affidavit that once Michael Forde was convicted Peter Thomassen held a quick meeting on the tenth floor of 395 Hudson Street. At the meeting, Thomassen announced that now he "was in charge". Brian O'Dwyer, who was counsel the District Council and co-counsel for Funds at that time[23], intervened and indicated that under Labor Law, until sentenced, an union official who was convicted did not have to step down, and that Michael Forde would remain "in charge".[24] Co-counsel to the Funds, Brian O'Dwyer, Esq. advised the Funds' at a Board meeting

---

[21] 1:04 CR-00343-KMW, Docket Entries 524 and 525 annexed hereto as G. Ex.9.

[22]  *United States v. Dist Council, 571 F. Supp 555 2d, 561, n. 7(SDNY 2008).*

[23]  See footnote 18, *supra*.

[24]  Greaney Affidavit ¶ 27.

11

held on Novmber 8, 2004 that based upon a 1995 Third Circuit decision, Forde could continue "to serve as a Trustee pending sentence and entry of judgment". (G. Ex. 10). Despite Forde's conviction by trial verdict, the Funds took no further action.[25]

On or about September 2007, Judge Haight found Michael Forde had violating job referral rules and imposed a monetary sanction. *United States v. District Council, 2007 US Dist. LEXIS 69852, *98-99 (SDNY 2007).* The Funds admit they took no action against Forde with respect to this finding either. (G. Ex. 63, ¶40).

The Government moved to terminate Unitel as the II to be replaced by a successor. *United States v. Dist Council of NY, 571 F. Supp 2d* 571, 574 (SDNY 2008)(90 Civ. 5722(CSH)). The decision notes that Schulte, Roth & Zabel, LLP appeared for The Association of Wall-Ceiling & Carpentry Industries of New York ("WWC"), Intervenor and also for N.Y.C. District Council of N.Y.C. & Vicinity of the United Brotherhood of Carpenters. *Id.* Schulte, Roth & Zabel, was co-counsel to the Benefit Fund when it appeared as counsel to intervenor WWC.[26] The WWC is one of the employer

---

[25] Quesada Affirmation, ¶10( C) .

[26] See Funds Ex. 18, and appearances in Consent Decree Litigation (fn.15, *infra)* as intervenor, G. Ex. 11, G. Ex. 22,

associations who, under the Benefit Funds Trust documents has a right of appointment to the Benefit Funds Board.(G. Ex. 6).

"On April 18, 2007, the District Council and its President were adjudicated in contempt of court for violating the Consent Decree". *United States v District Council, 2013 U.S. Dist. LEXIS 112350, (90 Civ. 55722(RMB).*

On or about May 10, 2007, the District Council, again represented by O'Dwyer and Bernstien moved, to terminate the Consent Decree on the ground that "its objectives have been met".[27]   The WCC again appeared as Intervenor and was represented by  Schulte, Roth & Zabel, LLP who also appeared for N.Y.C. District Council of N.Y.C. & Vicinity of the United Brotherhood of Carpenters.[28]   The District Council argued its "'commitment to stamping out corruption in its industry and...its willingness to investigate wrongdoing at the highest ranks of its organization'. Def. Suppl. Br. at 4."[29]   The Government argued that there was a "long-standing 'culture of corruption'" and asked for more time. *Id.*   The

---

p 18 and Greaney Affidavit ¶ 12.

[27]   *United States v. Dist Council, 571 F. Supp 2d 555, 560(SDNY 2008).*

[28]   *Id.* See appearances.

[29]   *United States v. Dist Council, 571 F. Supp 2d at 560.*

Court ruled that "the District Council has not borne its burden of showing that the Decree's objectives have been sufficiently achieved to justify termination" and ordered another year of Court supervision. *Id.* *571 F. Supp 2d  at 569.*

Within that year, on August 5, 2009, an indictment was unsealed charging various acts of racketeering against certain employees and representatives of the District Council.[30]  In the unsealed indictments it was alleged that Michael Forde, Joseph Olivieri, John Greaney, Brian Hayes, Michael Brennan, Finbar O' Neill, Brian Carson, John Stamberger and Michael Vivenzio accepted bribes to facilitate contractors' non-payment of contributions to the Funds. *United States v. Michael Forde, et. al.,* 08 CR 828 (VM)(Criminal RICO Case).[31]

After the indictments were unsealed, and the UBC again took over the District Councl in a Trusteeship, a June 3, 2010 Stipulation and Order Regarding Appointment of a Review Officer was signed by and agreed to by *both the Union and the Benefit Funds.*[32] This was the first time in the Consent

---

[30]   Funds Ex. 5.

[31]   Funds Ex. 6.

[32]   RO Stipulation, G. Ex.12.

Decree Litigation in which any investigative powers were put over the Benefit Funds and the first time in the Consent Decree Litigation in which the Court Appointee was a Review Officer with veto power in addition to review, investigative, oversight functions.[33]

It is noted in the Whereas clauses of the RO Stipulation that the indictment of John Greany and others in the Criminal RICO case made it clear that granting "powers beyond those provided to the Independent Investigator in the December 2002 Stipulation and Order and August 2005 Order, as set forth below, are essential to the eradication of corruption and racketeering as they affect union carpenters and union employers". (G. Ex. 12 at pg 3).

The RO Stipulation clearly states that the appointment of a Review Officer with veto and investigative powers was necessary even after the removal of the three defendants charged herein.

As noted by Judge Richard M. Berman, who took over the Consent Decree Litigation from Judge Haight, per the express terms paragraph 11 of the RO Stipulation (G. Ex. 12), signed by the Benefit Funds, the findings of fact and law of the Review Officer are entitled to significant deference:

> Paragraph 11 of the 2010 Stipulation and Order provides
> that, in reviewing a decision of RO, "the Court will
> apply the same standard of review applicable to review

---

[33] G. Ex. 12, pg, 3, 6-8.

of final agency action under the Administrative
Procedure Act". (2010 Stipulation and Order ¶11.)
Under this standard, the RO's conclusions of law will
be upheld unless they are "arbitrary, capricious, an
abuse of discretion, or otherwise not in accordance
with law". United States v. Dist. Council of New York
City, 941 F. Supp 349, 362 (S.D.N.Y. 1996). The RO's
findings of fact "are entitled to affirmance on review
if they are reasonable and supported by substantial
evidence in the record as a whole" and may be "'set
aside only if they are 'unsupported by substantial
evidence'".[34]

The Consent Decree litigation is on-going today.

## B. United States v. Forde, et.al.
### Criminal Trial, Damages and Restitution

John Greaney pled guilty on or about July 16, 2010.

The Plea states:

> Approximately between the years 1998 and 2004, I
> accepted or shared in the illegal cash payments from a
> number of union contractors, including but not limited
> to On Par Contracting, Turbo Construction, Pitcohn
> Construction and Pyramid Associates Construction.
> (Funds Ex. 3).

On July 28, 2010, Michael Forde withdrew his plea of

not guilty and pled guilty. (Funds Ex. 3).  On or about

August 10, 2010, Brian Hayes pled guilty.(G. Ex. 13).

Greaney was sentenced on June 17, 2011 (G. Ex. 14)  and was

incarcerated in August of 2010. (Greaney Affidavit, ¶ 8).

---

[34] Consent Decree Litigation, 1:90-cv-05722-RMB, Docket
Entry 1569, filed 9/10/14, pg 5, f/n 4 (G.Ex. 72).

On November 19, 2010, Forde was sentenced to 11 years of imprisonment, three years of supervised release, a $50,000 fine and a special assessment of $100.  The Court entered a forfeiture order of $100,000.  The Order of Restitution was adjourned "to permit the Government additional time to submit its position on the appropriate restitution amount".[35]

Greaney was sentenced, on June 17, 2011, by Judge Victor Marrero, who noted that the government indicated that his cooperation was "extraordinary". (G. Ex. 14, pg 12).  He received a sentence of  one year and one day,  supervised release of three years, and forfeiture amount of $100,000, a mandatory special assessment of $1200 and a fine of $10,000 to the United States.[36]  See pg 23-26, *infra* and Funds Ex. 8 on Restitution Order entered.

 John Greaney's office was located at 505 8th Avenue and not at 395 Hudson Street and he had little or no knowledge of what was being done or not done via legal matters and collections at 395 Hudson Street apart from what was

---

[35]  Funds' Ex. 14, pg. 1.  The Government filed a Supplemental Memorandum of sentencing for Michael Forde which requested this adjournment and noted that the co-defendants "contest the calculations leading to" the 18.1 million alleged as damages to the Funds in the fraudulent scheme.  Annexed hereto as G. Ex. 15, ¶2.

[36]  G. Ex. 14, pgs 12-15, G. Ex. 15, Greaney Judgment Funds' Ex. 8.

reported at Board Meetings.[37]   Greaney has said that he
received no formal or informal training when appointed as a
Trustee although the job entailed being at the helm of
multi-billion dollar benefit fund(s).[38]

The factual record shows that John Greaney was a
fiduciary of the Funds for a limited  period of time during
which his criminal conduct was on-going.  He was appointed a
Trustee in May of 2003.   In his plea, he stated his
illegal conduct occurred between 1998 and 2004.[39]

Ultimately, John Greaney did what a fiduciary or
former fiduciary should do under similar circumstances.
John Greaney is the only breaching fiduciary herein charged
who took reasonable steps to remedy his breach and the
breaches of others over which he had knowledge.  This was
done at personal risk to himself.[40]      John Greaney was and

---

[37]   Greaney Affidavit, ¶ 9.

[38]   Greaney Affidavit, ¶ 10. As of November 21, 2011, the
assets of the Pension Fund alone were approximately
$1,922,799,000. Third RO Report (G. Ex. 23, pg 44).

[39]   Funds Ex. 3, pg 21.

[40]   Count three of the Indictment in the Criminal Case
states:   In or about June 2008, BRENNAN told CC-1, that John
           Greaney would never cooperate with authorities, but
           that, if he did, 'we'd fucking have to kill him".
           Pertinent page annexed hereto as G. Ex. 16.

18

remains the highest-ranking official of the District Council to cooperate with the Government, admitting to his criminal conduct and sharing significant information about the corrupt conduct of others. [41]

John Greaney's cooperation was followed closely by the guilty pleas of co-defendant Michael Forde and Brian Hayes. (See pg 16, *supra).*  John Greaney testified at the trial of co-defendant Joseph Olivieri, *United States v. Joseph Olivieri,* No. 08-CR-828(S.D.N.Y. 2010)*,* who was ultimately convicted.  The Criminal RICO suit ultimately led to the appointment of a Review Officer with review, investigative, oversight functions and veto power relating to *both* the Union and Benefit Funds. (G. Ex. 12, "RO Stipulation").  Mr. Greaney's cooperation was pivotal in the success of the Criminal RICO action which, by virtue of MVRA, has had a collateral estoppel impact on the instant lawsuit.

## C. Formation of Restitution Orders

A Restitution Order was mandatory in  *United States v. Michael Forde, et. al.,*  08 CR 828 (VM) under Section 3663A(c)(1), of the Mandatory Victims Restitution Act of 1996("MVRA"), and was ultimately entered against John Greaney.   The Funds were considered Victims under MVRA and a  Restitution Order was entered for the "full" loss

---

[41]  Greaney Affidavit, ¶25-26.

proximately caused by John Greaney. See Section III(A), *infra.*

During the restitution process, the Benefit Funds were provided multiple opportunities to present evidence and argument relative of its position on the total loss sustained by the Benefit Funds.  Documents provided, by the Benefit Funds, to Greaney's counsel, demonstrate the extent of the cooperation and communication between the Funds and the Government regarding the loss determinations.[42]  There were multiple emails, from the period November 12, 2010 to February 1, 2011 mainly by and between Harry Sandick of SRZ, Liza Zornberg (and Mark Lanpher) of the US attorneys office, Gregory Polvere, forensic accountant for the Funds and Stuart GraBrois, Executive Director of the Funds(and Kristie Blase) regarding the loss calculations. None of the attorneys for the defendants were copied in on these emails. [43]

---

[42]  Copies of emails produced by the Funds between the Government and Funds' counsel and actuary are annexed hereto as G. Ex. 17. We have attached only the emails, not the attachments.

[43]  Quesada Affirmation, ¶10(D).

The docket entries of the criminal RICO case[44], detail the various submissions and hearings provided to the Funds regarding the loss calculations.

By letter dated November 18, 2010, Schulte Roth & Zabel("SRZ") as "counsel to the Board of Trustees" of the Funds submitted a detailed letter to Judge Marrero regarding Forde's restitution obligations, requesting immediate payment) and asking the Court to levy against all of Forde's assets including "retirement benefits". (Funds Ex. 18).

The Government's Restitution Memorandum acknowledged that "[s]ince November, the Government has communicated extensively with the Funds concerning the bases for the Benefit Funds' loss calculations".[45] The Funds utilized a forensic accountant, Gregory Polvere who shared his loss calculations and check schedules with the Government. The Government fully adopted Mr. Polvere's "loss calculations" ..."relating to Pitcohn and Pyramid" and recommended that the Court adopt the same[46]. The Court did so and in the Funds Rule 26 Damage Disclosures, the Funds used the 08 CR 828 Restitution awards as the measure of damage for Pitcohn and Pyramid in the instant case. (G. Ex. 5).

---

[44] *United States v. Forde*, 1:08-cr-00828 (VM-2).

[45] Funds Ex. 14, n. 4, pg. 6.

[46] *Id.* pg 8.

It was also recommended by the Government that the Funds prepare the interest calculations "once the Court had determined the actual loss amounts to be imposed relating to each contractor".[47]

The Funds responded to the Government's Restitution Memorandum and did so by letters dated February 18, 2011 [48] and March 10, 2011.[49] In its February 18, 2011 letter, Kauff McQuire, and Margolis, LLP ("KMM"), requested a minimum of $500,000 plus 100% of Forde's gross income or $500,000 plus 35% of his gross income[50]. SRZ wrote a letter to Judge Marrero on or about January 13, 2011 regarding the restitution obligations of Brian Hayes recommending full immediate payment and garnishment of his pension benefits.[51] Neither SZR nor the Funds produced any letter that they wrote to Judge Marrero relative to John Greaney nor was one found in the record.[52]

---

[47]   Funds Ex. 14, pg 12.

[48]   Funds Ex. 19.

[49]   G. Ex. 18.

[50]   Funds Ex. 19.

[51]   G. Ex. 19.

[52]   Quesada Affirmation, ¶10(B).

On March 10, 2011, Judge Marrero held a hearing regarding the restitution obligations to be imposed on defendants Forde, Greaney, and Hayes. (G. Ex. 20).   Raymond McGuire and Elizabeth O'Leary appeared on behalf of the Trustees of New York City District Council of Carpenters' Benefits Fringe Benefit Funds. Brian Quinn appeared for the New York City District Council. (G. Ex. 20, pg. 3).

At the hearing, the Court noted that it received submissions from the defendants, the Government, the Union and the Benefit Funds.  Judge Marrero indicated that he "scheduled this proceeding to hear any further matters that the parties may wish to add to the record or respond to anything that's in the submissions that has not been responded to". (G. Ex. 20, pg 4).  At  the oral argument, Mr. McQuire specifically argued that the Court could "reach pension assets as well as other assets in the possession of the defendant" under the precedent of *United States v. Irving,* 453 F.3d 110. *Id.* page 7.  After the hearing, Judge Marrero  imposed a "25 percent of gross income" restitution payment schedule on Michael Forde rather than the 20% recommended by the Government. (G.Ex. 20, pg 8).

Under MVRA, John Greaney was required to file and did file an affidavit of assets owned or controlled by him, his

financial needs and earning ability.  See 18 U.S.C.

§3664(d)(3).

MVRA requires the Court, in consideration of the

factors specified in 18 U.S.C. § 3572, to:

> specify in the restitution order the manner in which,
> and the schedule to which, the restitution is to be
> paid, in consideration of-
>
> A) the financial resources and other assets of the
> defendant, including whether any of these assets are
> jointly controlled;
>
> B) projected earnings and other income of the
> defendant; and;
>
> C) any financial obligations of the defendant;
> including obligations to dependants. 18 U.S.C.
> §3664(f)(2).

MVRA further provides that the Court sets the

restitution order and the "restitution order may direct that

the defendant make a single, lump-sum payment, partial

payments at specified intervals, in-kind payments, or a

combination of payments at specified intervals and in-kind

payments". 18 U.S.C. §3664(f)(3)(A).

At the time of John Greaney's sentence on June 17,

2011, the restitution calculations for defendants Forde,

Greaney and Hayes were complete and put on the record.

Judge Marrero determined that the full amount of the loss

was $5,002,082.82 which reflected $1,524,381.42 losses for

Turbo transactions, $2,066,565.53 losses for Pitchon

transactions, $1,382,312.97 losses for Pyramid transactions

(subtotal: $4,973,259.92) and $28,822.90 for the Promotional

Fund ($10,830.60 losses for Pitchon; $10,857.30 losses for
Turbo and $7,135 losses for Pyramid). (Funds Ex. 15).  The
Court held that "Greaney shall be jointly and severally
liable for the losses set forth above relating to Turbo,
Pitchon, and Pyramid with co-defendant Michael Forde (for
the entire amount), and with co-defendant Brian Hayes (up to
$120,00 apportioned amount of restitution that Hayes was
ordered to pay). (Funds Ex. 15).  Greaney was ordered "to
pay the forfeiture and restitution in the amounts set forth
in the proposed orders, in accordance with the payment
schedule and to pay the beneficiaries indicated." (G. Ex.
14, pg 13-14, 17).  The Judgment with the Schedule of
Payments specifies that "having assessed the defendant's
ability to pay" the Court ordered a payment of an immediate
lump-sum of $1,200 ...and:

> After release from imprisonment, defendant shall pay
> remaining fine, restitution and forfeiture amounts at
> the rate of 15% of gross monthly income. (Funds Ex. 8)

At all times relevant to this proceeding, John Greaney
has paid 15% of his gross monthly income into the Court.  He
is in receipt of a monthly pension and Greaney duly provides
15% of this monthly benefit to the Court together with his
other gross income.  John Greaney goes to the Courthouse

every month and pays this amount and he will do so for 20 years.[53]

If, and when, John Greaney receives his pension and annuity benefits from the Funds, 15% of those monies, whether received as a monthly benefit or lump-sum, would be payable to the Funds. Consequently, Judge Marrero has already made a portion of Mr. Greaney's pension and annuity assets subject to the restitution order.

When John Greaney was sentenced by Judge Marrero, the Court could, in addition to MVRA, sentence him to the forfeiture provisions under Criminal RICO. 18 U.S.C. §1963. Under that provision, the Court can order a forfeiture of real property and tangible and intangible personal property. 18 U.S.C. §1963(b).

Judge Marrero ordered a forfeiture of $100,000 and a fine of $10,000 and did not attach his real estate.[54]

**D. Instant Suit and Funds Ex. 30**

On August 5, 2011, the Funds filed the instant civil action. Under RICO Sections 1964( c) and (d), the FAC seeks to hold all the conspirators "jointly and severally liable to the Funds for the amount of their ultimate loss, trebled, plus interest, costs and attorney fees", including

---

[53] See 18 U.S.C §3613(b) and 18 U.S.C §3613( c), Greaney Affidavit ¶2.

[54] See Funds Ex. 8, Schedule of Payments (bottom) and G. Ex. 14, pg 14.

transactions involving KAFCI and EMB .[55]      In Greaney's
case, the Government specifically stated that Greaney "was
not involved" in the KAFCI transactions and "not responsible
for the losses".[56]   Greaney's plea elocution[57] and the
Restitution  Order (Funds Ex.15) determined by Judge Marrero
corroborate the same.

According to the FAC, the EMB transactions included M.
Batalias, E. Batalis, Kelleher and Hayes. [58] Nevertheless, on
or about January 2017, we received Rule 26 Damage
Disclosures which charged defendants Forde, Greaney and
Olivieri to be jointly and severally liable in the amount of
$58.5 million which the Funds claim reflected *actual damages*
for On Par, Turbo, Pitchon, Pyramid, KAFCI, and EMB.  For
the last four, the Funds used the restitution awards as the
*actual damages,* but for On Par, they used a 2006 default
judgment and for Turbo, an arbitration award that was
entered years later after the restitution award had been
entered by Judge Marrero with respect to Turbo.[59]

Subsequently, with the Funds' summary judgment papers,
we received Funds Ex. 30, which is an updated summary of

---

[55]  G. Ex.1, ¶¶ 164, 176.

[56]  Funds Ex. 14, pg 15.

[57]  Funds Ex. 3, pgs. 21-22

[58]  G. Ex.1, ¶¶ 134-140.

[59]  See Funds' Rule 26 Damage Disclosure, G. Ex. 5.

payments made by various parties toward the losses sustained by the Funds up to the filing date of the Funds motion.  The Funds new position is that they collected $123,272.70 from the KAFCI and EMB (collectively) and their principals and employees but nevertheless the Fund took the position that KAFCI and EMB:

> "are not included in the above chart because, *for purposes of their motion for summary judgment* dated September 11, 2017, the Funds are not seeking damages relating to KAFCI or EMB." (Emphasis added).

We submit that the Funds position in Funds Ex. 30 is is not in accordance with FRCP 26(e). If KAFCI and/or EMB damages were paid in full, after discovery was closed,  the defendants and the Court are entitled supplemental Rule 26 disclosure, under FRCP 26(e). Moreover, listing of the monies paid by KAFCI and EMB are added together so no one can determine how much is paid by each one.  Rule 26 disclosures are for all purposes, not "some purposes". (Quesada Affirmation, ¶18). While we by no means concede that Greaney is responsible, under civil RICO, for KAFCI and EMB, the Funds cannot keep them in the case for some *unspecified future use* and also *not* provide a setoff for the value of the settlement.  If these claims are not abated, then Greaney is entitled to a set-off for the amount of the settlements.[60]

---

[60] See Section III(B)(3), *infra.*

**E. Joseph Olivieri**

On or about April 10, 2000, Joseph Oliveri was appointed a Trustee of the Funds by the WCC. [61] Per the First Interim Report of the Review Officer ("First RO Report"):

> Mr. Olivieri has also been identified by the government and multiple witnesses in federal matters as a long-time associate of the Genovese crime family who served as a go-between for the family in its illicit dealings with the International Union of Operating Engineers and the District Council. [62]

Upon information and belief, at no time has the Benefit Funds brought any actions against WCC regarding their appointment of a known associate of the Geneovse crime family to their Board who allegedly caused damage to their Funds. (Quesada Affirmation, ¶10(F)).

The Fourth RO Report notes:

> During the tenure of former Executive Secretary Treasurer Michael Forde (also now a federal prisoner), he [Olivieri] is said to have spent hours behind closed doors with Forde, the District Council, and Funds' officials. [63]

Records filed by Joseph Olivieri with this Court indicate that the Funds offered to settle with Mr. Olivieri for a "small sum", asking him if he can "scrape together $3-4k to make the case go away". [64]

---

[61]  G. Ex. 21, p 32,  G. Ex. 30.

[62]  G. Ex. 21, pg 32.

[63]  G. Ex. 24, pg 5.

[64]  G. Ex. 31.

**F. Calculation of Turbo Losses:**

With respect to Turbo, the Government laid out the following position regarding the full amount of damages in its Restitution Memorandum [65] (*footnotes in original, in italic*):

**C) Losses relating to Turbo**

An agent with the Internal Revenue Service ("IRS") has prepared a loss calculation relating to Turbo, based upon the extensive criminal investigation conducted by the IRS and the U.S. Department of Labor of Turbo between 2005 and 2008.  That investigation led to the guilty pleas of Terence Buckley, Turbo's owner.  <u>See United States v. Terence Buckley</u>, 09 CR 732 (RPP).

However, the methodology used to calculate Turbo-related losses differs from the methodology used by Mr. Polvere for Pitcohn and Pyramid in a few respects. First, unlike Pitcohn and Pyramid-which performed carpentry work exclusively-the Government knows from its investigation that Turbo did mostly masonry work for which it owed no contributions to the Benefit Funds.  In the course of its investigations, the Government interviewed 36 Turbo employees, only 6 of whom (i.e. 1/6) reported having done carpentry work for Turbo.  Terence Buckley, when interviewed, estimated that two-thirds of Turbo's work was masonry, and that one-third was carpentry and taping work, performed by a combination of carpenters and tapers.[66]  Based upon the information available to us, we estimate that 20% of one-fifth, of Turbo's work was covered carpentry work

---

[65]   Funds' Ex. 14.

[66]

*Work by tapers is not covered by the Carpenters Union either*.

for which Turbo owed contributions to the Benefit
Funds.

During its interviews of Turbo employees, the
Government was also able to identify Turbo's managers
and administrative staff, for which no contributions
were owned to the Benefit Funds.  Accordingly, the
Government's loss calculation relating to Turbo is
tailored to the particular evidence from its
investigation.

The methodology used by the Government in calculating
the Turbo-related losses was as follows:

• Take the sum of all payroll checks to individual
payees written from Turbo's off-the-books accounts
(eight bank accounts in all, covering the years 2000
through 2005).[67]

• Exclude checks written to Terence Buckley (the owner)
Buckley family members, and known Turbo project manager
and office staff-for whom no benefits were owed to the
Benefit Funds.

•Divide by 25-reflecting the hourly wage rate
($25/hour) that Turbo typically paid to carpenters who
for worked off-the-books for the company, in order to
arrive at a likely number of hours worked by Turbo
employees.[68]

• Multiply by .20 (or 1/5) to reflect that
approximately 20% of Turbo's work was covered carpentry
work.

• Multiply by the benefit contributions rate applicable
to those time periods.

---

[67] *We note that, for approximately $4.7 million in checks
were illegible, and the payee (individual or otherwise) could
not be determined.  These checks were excluded from the
analysis.*

[68] *Some of Turbo's checks to workers reflected, on the
face of the check, a wage rate of $25/hour.  Accordingly, the
Benefit Fund's forensic auditor (Mr. Polvere) similarly used
the $25/hour wage rate in his own calculation of Turbo-related
losses.*

Following this methodology, the Government has calculated losses of **$1,376,418.22** relating to Turbo.[69]

Judge Marrero adopted the Government's recommendation relating to Turbo and rejected the calculations of the Fund's forensic accountant, Mr. Polvere.[70]  Nevertheless, in the Funds Rule 26 Damage Disclosures, the Funds used a November 30, 2011 Arbitration Award as their damage figure for the Turbo losses. (G. Ex. 5).  The Government, in its Restitution Memorandum, noted in footnote 2 that "[t]he Benefit Funds brought an arbitration action against Turbo which was fully litigated by the parties and fully submitted to the arbitrator, more than one year ago.  The arbitrator, quizzically, never issued a decision on the matter".[71]

The Review Officer noted that the "Funds were waiting for one arbitrator to issue decisions in 29 arbitrations he presided over from the period 2006 through 2011".  One of these arbitrations was with Turbo. [72] The Turbo arbitration occurred in March 2008 but there was no decision until November 2011.[73]  It was notable that "no one at the Funds was able to locate a contract, nor any document reflecting a

---

[69] Funds Ex. 14, pg 9-10.

[70] Funds Ex. 14, pg. 10, G. Ex. 20, pg 5.

[71] Funds Ex. 14, pg 6, n.2.

[72] G. Ex. 24, pg 52, G. Ex. 23 at 38.

[73] G. Ex. 24, pg 52.  This arbitrator had to be sued in order to get 5 other outstanding decisions.  *Id.*

fee arrangement, between the arbitrator and the Funds."[74]
Indeed, on the issue as to whether the work was covered
employment, this arbitrator simply said that the employer
had failed to satisfy his burden of proof.[75]

### G. Calculation of On Par Losses

As part of the Funds' Rule 26 Damage Disclosures, the
Funds alleged damages of $12,101,543.18 resulting from On
Par.  They allege that this number is based upon a 06 CV
5643 Default Judgment. (G. Ex. 5).

The Government did not seek (and Judge Marrero did not
impose) restitution for losses related to On Par.  In its
Restitution Memorandum, the Government noted that "the Funds
reached a settlement agreement with On Par in or about 2009,
pursuant to which On Par paid the Funds $4.5 million to
resolve all outstanding loss claims, including claims
relating to restitution". (Funds Ex. 14 at ¶7).

The Agreement and General Release that settled On Par
("Agreement") specifically states that "the Net Settlement
Amount is the full and final settlement of its claim(s)
against On Par and Murray and it will not claim any further
or additional amounts from the government as victim

---

[74]  G. Ex. 23, pg 37.

[75]   Funds Ex. 13-1, pg 49.

restitution in connection with the pending prosecution of Murray" [76].

The Funds initially commenced an action against On Par on or about July 25, 2006.   The Complaint alleged that the Funds and the WCC had entered into a collective bargaining agreement ("CBA") and that On Par was a member of the WCC and a signatory of the agreement.[77]  By virtue of "their CBAs with the District Council, signatory employers are and were required, among other things, to employ only union members to perform specified categories of work within the specified geographical areas ("Covered Work"), to pay specified hourly wage rates, and to make specified contributions to the Funds for each hour of Covered Work".[78]

On May 24, 2006, the principal officer of defendant On Par, James Murray, was indicted for fraudulently violating the terms of the CBA with the District Council.[79]  James Murray fled to Ireland.[80]  On Par failed to answer or move with respect to the Complaint.[81]  On or about October 20,

---

[76]  Funds Ex. 20, ¶2.

[77]  Funds Ex. 11, pg 13.

[78]  Declaration of Luke Powers, ¶8.

[79]   Funds Ex. 11, pg 5 and pgs 57-65 and Funds Ex. 20

[80]   Fund Ex. 10, pg 752.

[81]   Fund Ex. 11, pg 4.

2006, the Funds sought a default judgment.[82]  On or about October 31, 2006, a default judgment was issued against On Par.[83]

Subsequently, the  Funds as obligee and On Par and Murray as obligor sought to enter into Agreement and General Release ("Agreement").[84]  The Agreement contains a merger clause. (Funds Ex. 20, ¶6 )  The Agreement notes that the obligor and obligee agree "to settle all claims between them for the sum " of X, that X  was was prepared by "Funds forensic accountant, Gregory Polvere on March 21, 2006"[85]. In paragraph number 2, it further notes that "the Net Settlement Amount is the "full and final settlement"."[86]

Although duly requested, the Funds have failed and/or refused to produce the March 21, 2006 compilation of liability prepared by Gregory Polvere.[87]

The Funds approval of the Agreement proceeded as follows:

By letter dated  April 2, 2009, O'Dwyer & Bernstien, LLP wrote Stuart R. GraBois, Executive Director of the Funds

---

[82]   *Id,* pg. 7.

[83]   Funds Ex. 12 and Funds Ex. 20.

[84]   Funds Ex. 20.

[85]   *Id* at ¶1.

[86]   *Id* at ¶2.

[87]   Quesada Affirmation, ¶ 10(A).

enclosing copies of the Agreement and recommended that the Funds accept the settlement.  The letter notes that the monies for the settlement were coming out of monies seized by the Government and that the Government approved the settlement. The letter notes that "the amount of the settlement represents a complete recovery of our forensic auditor's evaluation of the total principle amount of fringe benefits owed to the Funds on behalf of every identifiable carpenter (based on our As/400 system) that was paid off the books by On Par." [88]

At his deposition, Joseph Olivieri testified and it was confirmed by Board Minutes that, on or about April 2, 2009, a number of Trustees voted for the Agreement via phone. John Greaney was not listed as one of the Trustees who voted on the On Par Agreement via phone.[89]  Board minutes of May 14, 2009, indicate the presence of nine Trustees who unanimously "ratified the On Par settlement".[90]   Joseph Oliveri testified at his deposition, that it was a "block vote". (G. Ex. 34).[91] On March 10, 2010, it was again

---

[88] G. Ex. 32. The letter was identified by Olivieri at his deposition. G.Ex. 33, pg 54.

[89] G. Ex. 32, G. Ex. 35 and G. Ex. 34, pgs 62-68.

[90] G. Ex. 35, ¶10.

[91] Article VI, Section 8 of each Trust Document, G. Ex. 44, G. Ex.53, G. Ex. 57-59, inclusive, describes the block vote.  See Section I(E)(4), *infra.*

reported, at a Board Meeting,  that the Agreement was "approved by the U.S. Attorney's office. Mr. O'Dwyer stated he is confident that the Fund received every penny on the dollar".  The instant defendants were no longer on the Board at the time of that report. (G. Ex. 37).

## H. Reports of the Review Officer

Dennis Walsh, the Review Officer issued his first report on December 3, 2010 (G. Ex. 21) and his last report on December 30, 2014 (G. Ex. 29).

In a word, the Review Officer described the Benefit Funds office  as " dysfunctional"[92].  The Review Officer found that "basic policies and procedures were lacking".[93] Here is an excerpt from the First Interim Report:

> The fringe benefit funds of the District Council are Taft-Hartley funds comprising pension, annuity, welfare (health benefits) and training funds. The Funds are administered in offices at 395 Hudson Street by approximately 90 employees under the supervision of an executive director and his senior managers. The employee force has been subject to cronyism (a result of pressure exerted over the years by certain District Council officials) and has not been objectively assessed or organized. Management did not have a formal employee review process until I suggested that one

---

[92] G. Ex. 29, pg 31.

[93] G. Ex. 29, pg 24.

be implemented, It now has a fledgling program but
no human resources department. [94]

According to the extensive reports of the Review
Officer, the dysfunction in the Benefit Funds went beyond
personnel and had to do with operations, management,
structure and data systems.  There was no Human Resources
Department or Director, no concrete list of job descriptions
or corresponding set pay scale.  There did not appear to be
any general training. [95]  There was no internal audit
function. [96]   There was no Employee Handbook.[97]  There was
lack of any "meaningful organization structure". [98]   There
was no compliance officer to develop and implement a
compliance and ethics program consistent with Chapter 8 of
the United States Sentencing Guidelines.[99]  The Review
Officer noted it had been "a bloated organization that was
staffed in part with friends and relatives of former senior
staff and outside collections counsel..."[100]

---

[94]  G. Ex. 21, pg 5.

[95]  G. Ex. 21, pg 48,    G. Ex. 23, pg 28-30.

[96]  G. Ex. 25, pg 28.

[97]  *Id.* pg 29.

[98]   G. Ex. 21, pg 51.

[99]   G. Ex. 21, pg 51-52, G. Ex. 22, pg 23-24, G. Ex. 23,
pg 30.

[100]   G. Ex. 24, pg 53.

The Statement of Policy for Collection of Employer Contribution from 2001 to 2007, provides that there is a Delinquency Committee "who by action of the Board of Trustees, are Trustees who have been appointed and have been empowered to determine matters which arise during the collections process and, further, to make decisions on payment plans, settlements, compromises, write-offs or waivers of all of part of delinquency assessment, interest, attorneys fees or collection costs."[101]   Nevertheless, in discovery, the Funds were only able to produce minutes of 5 meetings of the Delinquency Committee between June 2000 and August 4, 2010.[102]   On or about April 23, 2010, Arbitrator John Sands issued an Opinion and Award, in a deadlock arbitration between Union and Employer Trustees holding that it had been Joseph "Olivieri's regular practice, in his capacity as a representative of the Association [WCC] and its signatory employees, to interact with Benefit Fund personnel, its auditors, and attorneys concerning various matters, including review and adjustment of audit findings, arbitrations commenced to compel production of books and records to enable Fund auditors to perform audits or to

---

[101]   G. Ex. 38.

[102]   G. Ex. 39 and Affirmation of Victoria Quesada, ¶10(E).

determine a deficiency after audit, and payment plan agreements." (G. Ex. 67, pg 4).

In the Second Interim Report, the Review Officer notes that the spread sheet that was distributed to the trustees on the Delinquency Committee *did not even have a column that noted the status of the confessions of judgment*![103]   It was *after* the appointment of the Review Officer that new collections counsel revised the Payment Plan Approval Template and created a Monthly Payment Plan Status Chart to provide the Trustees with a summary of overall volume, dollar amounts, defaults and collection efforts.[104]

When the Review Officer began his job, he began interviews of the employees of the Fund.   It was discovered that the Legal Department was being run by *non-lawyers*. Dan Ryan, the manager (highest position)" knew Mr. O'Dwyer" and Kathleen Flannelly, the supervisor (second highest), is related to him.[105]   Significantly, the Review Officer Report notes:

> Mr. GraBois replaced the most recent manager of the Legal Department, Steven Kasarda, Esq, with Mr. Ryan, in approximately February 2006.  Mr. Ryan and Ms. Flannelly now administer the payment plan process, reporting directly to Mr. GraBois.  Mr. Kasarda was made a part-time employee and only handles

---

[103]   G. Ex. 22, pg 26.

[104]   G. Ex. 22,  pg 28.

[105]   G. Ex. 21, pg 47.

> arbitrations.  We remain dissatisfied with the reasons
> we have heard why Mr. Kasarda was demoted and
> marginalized.  We understand that he raised questions
> in connection with audits, payment plans and other
> matters.  The chief question in this regard is: why are
> non-lawyers in charge of the Legal Department?[106]

Per the Review Officer,  cronyism and nepotism was pervasive.  "Many employees learned about job opportunities at the Benefit Funds through connections, including family members, Mr. GraBois or former co-counsel for the Benefit Funds, Brian O'Dwyer."[107]  With respect to the Anti-Corruption Committee (ACC), the Review Officer noted that '[a]part from paying the audit bills, the Funds appear to have had little involvement with the process, i.e.,the Funds did not receive the audit reports."[108]  As fiduciaries, this failure ultimately lies with them.

As part of his analysis, the Review Officer reviewed and reported on the collections system for benefits due to the Benefit Funds from employers for covered work.  There were fundamental flaws in the collections of benefits, that were systematic and deeply ingrained.   Arguably, the most fundamental of the flaws was "permitting employers to treat wages and benefits separately, *e.g.* to provide money to the

---

[106]   G. Ex. 21, pg 50-51.

[107]   *Id*, pg  47.

[108]   G. Ex. 24, pg 51.

payroll company on time for wages but not for benefits, is a
significant contributing factor to the collections problems
of the Benefit Funds and the attendant expenses of chasing
contributions".[109]

The Fourth Report of the Review Officer gives a good
snapshot, in time, what the collections system looked like
on June 2012.   No doubt this was the state of affairs
*prior* to the appointment of the Review Officer, the period
for which the Funds seek an equitable toll of the statute of
limitations.

The system the Review Officer found was broken, both in
reporting and collection. The Review Officer summarizes the
system as follows:

> Under the current system, the time worked by carpenters
> on a job is logged by union stewards on hand written
> sheets called steward reports.  These reports are
> scanned into a computer at the District Council and the
> hours worked are quantified and sorted.  Employers keep
> their own records and report the time worked on jobs to
> the Funds via remittance reports.  Funds employees
> generate data reports to compare the union's total with
> those submitted by employers.  These discrepancy
> reports are complied weeks after work is actually
> performed in the field.[110]

Rather than just tracking wages and benefits with a
focus on the individuals who earned them, there were three

---

[109]  G. Ex. 24, pg 33, n. 19.

[110]  G. Ex. 21, pg 7.

separate computer systems that had some role in processing
and analyzing payments of benefits including the District
Council's Liberty system, The Funds AS4000 and ADP
Payroll.[111]

Here is a summary of how it worked.  "The District
Council relies primarily upon shop steward reports to
determine the location, date and hours worked by each of its
members.  The Funds rely upon the employers to generate this
information through their benefit remittance reports".[112]
When the Review Officer arrived the District Council was
using a paper steward report system.  He states:

> The long-used paper steward report system, as detailed
> *infra*, is a failure as a means of  keeping proper
> business records and has been exploited by persons over
> the years to defraud the Benefit Funds.[113]

The shop steward reports under this system were highly
inaccurate and very slow.  The Review Officer found that in
the year 2011, the shop steward reports captured only 74% of
the hours reported by the employers. [114]  There is also a
"delay built into the current process.  Specifically,
stewards create their reports on paper and the reports must

---

[111]  G. Ex. 24, pg 25, n.13.

[112]  *Id.* at 24.

[113]  *Id.* at 16.

[114]  *Id.* at 24.

be scanned into the Liberty system...  It takes approximately six to eight weeks".[115]

The Employers report their benefit separately on benefit remittance reports.  However, these reports do not track payroll and wages but rather "job numbers".  All work performed by signatory employer requires a job number which is generated by the "Liberty system".  Each contractor at a job site is issued a job number.  The "job numbers are shared with the Funds and ADP so contractors can remit payment for benefits under the appropriate job number". [116] The "job number" is the "link between the shop steward reports and the benefit hours reported by contractors".[117] In theory.  "In practice, however, this is not always the case.  There are many reasons for this breakdown".[118]

AS400 is the computer system used by the Funds to monitor benefit payments by employers. It tracks the hours worked for which time period for which job site by the *job number*.  The job number information is later allocated to each member.[119]

---

[115] *Id.* at 28-29.

[116] *Id.* at 26.

[117] *Id.*

[118] *Id.*

[119] *Id.* at 27.

The Funds then use the information generated from the shop steward reports and compare it to the hours issued by the employer.  They thereby generate a report called the Shop Steward Variance Report.  In theory, the hours submitted by the Union and the Employer should be the same. "[I]n practice, this is rarely the case".[120]  As we noted *supra,* in the best of times, the Shop Steward Reports were under 74% of what the employer reported!

The Review Officer found that the "unreliability of their data is caused in large measure by shop stewards submitting inaccurate or late reports and employers remitting benefits under incorrect job numbers".[121]   The Review Officer noted that a "significant issue" was "the use of job numbers".   "45% " of the job numbers in the system are inactive.[122]   "An employer can remit benefit hours at a lower rate than required if reporting under the wrong job number".  Moreover, he notes that from:

> "inception of the system through May 6, 2012, there were 51,193 job numbers that had no shop steward reports associated with them.   That is an astounding 57% of all job numbers.  The District Council cannot provide a specific explanation as to why this is the case".[123]

---

[120] *Id* at 27.

[121] *Id.* at 28.

[122] *Id.* at 29

[123] *Id. at 30.*

While the Review Officer shared some frustration as to why benefits were not remitted with wages, he suggested improvements to create some due diligence. First, he recommended electronic scanning by stewards daily at the job sites.[124]

As bad as all this is, it is even more disheartening to see the depth of weakness in the collection of benefits that are recognized as unpaid. The Review Officer found that "[s]ignificant problems with the Benefit Funds' previous collection efforts have been identified".[125]

> Following a default (or conceivably a delinquency if the Funds chose not to enter into a payment plan with a company), the Funds were faced with the option of going to arbitration with a company over the delinquencies or filing a civil lawsuit against the company. There was woefully insufficient follow-through to collect money owed the Funds. [126]

Arbitrations were also problematic. The "Funds were waiting for one arbitrator to issue decisions in 29 arbitrations he presided over from the period 2006 through 2011". One of these arbitrations was with Turbo. [127] It was notable that "no one at the Funds was able to locate a

---

[124] *Id.* at 16.

[125] G. Ex. 23 pg 35.

[126] *Id.* at 37.

[127] G. Ex. 24, pg 52 and G. Ex. 23, pg 38.

contract, nor any document reflecting a fee arrangement, between the arbitrator and the Funds."[128]

> Court actions by the Benefit Funds typically arose in two contexts: to confirm an arbitration award or to enforce a Confession of Judgment.  As noted, the issuance of arbitration decisions was much delayed without follow up...[o]riginal Confessions of Judgment were either not obtained or maintained, which would inhibit proceeding in court with motions for default judgment.[129]

There was also a "weak link" in the collection process chain.  There was a very low recovery rate, in the neighborhood of 5% recovery due to "incomplete information to the debt collection service", "and/or lackluster efforts" and "absence of follow up by the Funds and former collection counsel".[130]  "There was woefully insufficient follow-through to collect moneys owed the Funds".[131]

The payment plans that the Benefit Funds entered into was a huge part of the problem.  As noted, non-lawyers were in charge of the legal department.[132]

---

[128] G. Ex. 23,  pg 37.

[129] *Id.* at pg 38-39.

[130] *Id.* at pg 39.

[131] G. Ex. 23, pg 37.

[132] G. Ex. 21, pg 49-51.  As we noted before, Mr. Kasarda, an attorney who was in the legal department "was demoted and marginalized.  We understand that he raised questions with

The First RO Report found:

Payment plans are formal written agreements between the Funds and the employers which set a schedule of payments in fixed amounts, with interest and include stipulated confessions of judgment and personal guarantees in the event of default.  The Benefit Funds do not typically obtain collateral or a security interest in the assets of the signatory contractor before entered such agreements.   The Funds do not perform computerized public record searches to determine if a contractor which gives a personal guarantee actually has any assets to liens or judgments filed against it.


According to the most recent payment plan information, there are 28 contractors with plans who each owe the Funds greater than $100,000. Some contractors have been granted multiple revised payment plans.[133]


   The Review Officer found:

The Funds's staff routinely allowed employer companies to have payment plans for delinquent contributions. They did so *without meaningful let alone rigorous due diligence regarding the employers' assets or potential receivables.* [Emphasis added].  They did not appear to fine-tune the amount of the initial down payments and the length of the payment plans so that the employers would have a disincentive to enter the plans, rather than the incentive of essentially obtaining low-cost loans.  They did not enforce the requirement of posting a bond if the payment plan exceeded a certain dollar amount.  Payment plans wre frequently extended beyond their initial duration, sometimes repeatedly.  A

---

audits, payment plans and other matters". G. Ex. 21, pg 51.

[133]   G. Ex. 21,  pg 60-61.

featured trumpted by former Benefit Funds staff was
that Confessions of Judgment were obtained from the
company owners.  However, this has proved to be a
problem as well because Confessions of Judgment with
original signatures as needed to proceed in court are
often not available.[134]  (Emphasis added).

The Review Officer found that the "last two elected
leaders of the District Council, Frederick Devine and
Michael Forde have been convicted of felonies".[135]   The
Review Officer further found that "in the last two elected
regimes of the District council, attorneys have played a
preeminent role in the administration and governance of the
District Council and certain of these have functioned as the
proverbial right hand men of Frederick Devine and Michael
Forde."[136]

In the case of Michael Forde, the law firm of O'Dwyer
and Bernstien, LLP was retained as co-counsel to the Benefit
Funds and co-counsel to the District Council and functioned
as collections counsel.[137]

---

[134]   G. Ex. 23, pg 36.

[135]   G. Ex. 21, pg 45.

[136]   G. Ex. 21, pg 19.

[137] G. Ex. 7, G. Ex 11, appearances and filings in Consent
Decree Litigation (fn.15, ), G. Ex. 22, p 18, G. Ex. 40 ¶8 and
Greaney Affidavit¶ 11.

In 2013, the Benefit Funds later sued O'Dwyer and Bernstien, LLP alleging a "legal malpractice action against a law firm and certain of its individual attorneys whose egregious neglect of numerous collection matters caused their clients-......to lose ability to collect millions of dollars in unpaid contributions"[138].   The case was entitled *Trustees of the New York City District Council of Carpenters Pension Fund, et.al. v. O'Dwyer & Bernstien, et. al, Index No. 500098/2013 (*Kings Cty, 2013)(O'Dwyer & Bernstien Malpractice Suit).   Significantly, the Complaint alleges that:

> 14.   Defendants failed to institute legal proceedings to enforce audit findings in a timely manner; failed to commence actions to confirm arbitration awards; failed to enforce settlement agreements and pursue delinquent settlement payments; failed to take steps to collect on and otherwise enforce judgments; failed to consummate settlement negotiations in a timely manner and obtain (or maintain) proper enforceable settlement documents; failed to investigate and pursue claims against the "alter egos" of delinquent employers; failed to follow upon requests for access to the books and records of delinquent employers; failed to communicate adequately with the Funds' trustees concerning the status of collection matters; failed to provide assistance or information requested by an outside vendor responsible for assisting the Funds in enforcing judgments; failed to follow instructions or respond to inquiries from the Funds concerning audits and other matters.

---

[138]   G. Ex. 40.

15.  Furthermore, Silverman and/or other ODB attorneys were members of the District Council's anti-corruption committee and exercised substantial control over the Funds' entire anti-corruption audit program.  The purported purpose of the anti-corruption audit program was to scrutinize the employers' books and records more closely when there was reason to suspect corruption or fraud.  ODB communicated assignments to the auditors and instructed them to issue their findings directly to ODB... OBT often neglected to take timely action not only on audits in progress, but also on completed audits, thereby rendering the delinquent contributions potentially uncollectible either because the statute of limitations may have expired or because the company may have become insolvent. (G. Ex. 40).

The amount of damages alleged is a breathtaking $12,109433.07 plus additionally currently unknown amounts to be later determined at trial. (G. Ex. 40).   The case was settled but, per Fund counsel, a Court Order is required to see the settlement document.[139]

There is no record that the Funds delegated their fiduciary duty to collect delinquent contributions to O'Dwyer and Bernstein.  The Review Officer notes the retainer agreement between the Funds and O'Dwyer and Bernstein as collections counsel is unsigned and incomplete.[140]

---

[139]  Quesada Affirmation, ¶11.

[140]  G. Ex. 23, pg 35.

The Reports of the Review Officer reveal that the problems of the Benefit Fund went beyond job site corruption into a wide scale collections corruption.

As the Review Officer summaries in his Final Report. He says that he "found an organization that was ripe for improvement". [141] "Power was centralized in the long time Executive Director[142], outside collections counsel[143] and a few Funds's staff members who were close to them."[144]

## I. History of Administrative Claims Proceedings under ERISA

John Greaney was born on September 3, 1959. John Greaney joined the Union in 1984 and had 25 years of service when he left covered employment.[145]   As a consequence of his covered employment, he earned a benefit under the Pension Plan[146] and Annuity Plan.[147]   From 1997 to 2000, John

---

[141]   Final RO Report, G. Ex. 29, pg 24.

[142]   Stuart GraBois.

[143]   O'Dwyer and Bernstein who the Funds later sued for malpractice, see G. Ex. 40.

[144]   G. Ex. 29, pg 24.

[145]   G. Ex.3, ¶16 , Greaney affidavit, ¶ 4.

[146]   G. Ex. 1, ¶ 17 and Sixth Claim for Relief. The Pension Plan is a defined benefit plan by which a participant's benefit can be determined by his years of service and the actuarial factors defined in the Plan as of a valuation date.(G. Ex. 43).

[147]   G. Ex.1, ¶ 18 and Sixth Claim for Relief. The Annuity Plan is an individual account plan whose value can be

Greaney was a Local 608 business agent and the Local's elected Vice President.    In 2000, John Greaney became President and Business Manager of Local 608.  At the same time Michael Forde became the head of the District Council (Executive Secretary-Treasurer). [148]

Once a Business Manager under Michael Forde's administration, John Greaney did share with Forde, and others cash payments received from contractors.   Most of these were received around Christmas.[149] Although he never solicited bribes, he accepted money when it was offered to him by contractors he trusted.[150]

On May 6, 2003, John Greaney was appointed as a new Union-designated Trustee. (G. Ex 42). By December, 2004, in the wake of Walter Mack's investigations and following his appointment as a Trustee, John Greaney stopped accepting cash payments.[151]

As a Trustee, John Greaney reported corruption leads for the Walter Mack investigation and organized several

---

determined by the amount of monies in the account as of a valuation date. (G. Ex. 52 )

[148]  Funds Rule 56.1 statement, ¶15, 18-20, Funds Ex. 4.

[149]  Funds Ex. 3, pg 21-22 , Funds Ex. 4, pg 50.

[150]   Greaney Affidavit, ¶ 14.

[151]   Greaney affidavit ¶24(f) and Funds Ex. 4, pg 60-61.

raids on corrupt job sites[152].  He brought a large raid against On Par on a Saturday.  The following Monday, he was called into the District Council by Maurice Leary and met with him and Mr. Mack and other members of the hotline committee.  He was reprimanded for conducting the raid without notifying them what he was doing.  He deliberately did not notify anyone because when he did the contractor got tipped off and he netted nothing.[153]

In the FAC, the Funds conceded Greaney's eligibility for a benefits, apart from the misconduct alleged.  The FAC says Greaney "will be eligible" for monthly pension benefits and stated the amount of "Greaneys' Annuity Fund account balance" in the FAC:

> "John Greaney (Greaney) was an employee of the District Council" and that "[e]ffective October 1, 2014, Greaney *will be eligible* to receive a monthly benefit of $1,048.00 from the Pension Fund for the remainder of his life"[154] and "[a]s of September 2, 2011, *Greaney's Annuity Fund account balance* was $316,963.96.  That amount is subject to change based upon investment earnings or losses". (Emphasis added).[155]

---

[152]   Greaney affidavit, ¶ 18-21, 24(b), Funds Ex. 4, pg 46, 69-70.

[153]   Greaney affidavit, ¶18-20.

[154]   G. Ex.1,¶ 17 and Sixth Claim For Relief.

[155]   G. Ex. 1,¶18 and Sixth Claim For Relief.

Without the advice or assistance of counsel, on or about September 2, 2014, John Greaney applied for a Pension Benefit from the Pension Fund.[156]   By certified letter received on or about December 13, 2014[157], the Pension Fund denied John Greaney's claim for benefits.

In their denial letter, the Pension Fund claimed that "...it is the Trustees' position that the losses you caused the Benefit Funds as a result of your fiduciary breaches far exceed the amount of restitution ordered".[158]The denial letter stated:

> The Pension Fund is permitted to offset a breaching fiduciary's pension benefits against the amount the breaching fiduciary has been determined to owe the Pension Fund.[159]

According to the denial letter, the amount "determined" to be owed to the Pension Fund was "determined" in the MVRA Restitution Order/Judgment[160].  The denial letter gives no indication why the Trustees honored the dollar amounts of the Restitution Order refused to honor the Schedule of Payments also ordered under the MVRA Judgment.(Funds Ex. 8).

---

[156]  Greaney Affidavit, ¶ 4.

[157]  Greaney Affidavit, ¶ 4.

[158]  Funds Ex. 24, pg 2.

[159]  *Id.*

[160]  *Id.*

Judge Marrero provided that Mr. Greaney pay such amount in installments from all of his gross income, including his pension and annuity[161].

At all times relevant to this proceeding, the Pension Plan Document contained the following language relative to anti-alienation:

> Section 8.12.  Neither the Trust nor any assets thereof, shall be liable for the debts of any Participant or Beneficiary entitled to any benefits under this Plan nor be subject to attachment or execution or process in any court or action or proceeding. (G. Ex. 43).

At all times relevant to this proceeding, the Pension Trust, Article XII, Section 4 contains, in pertinent part, this language regarding anti-alienation:

> Unless provided by law, all benefits shall be free from the interference and control of any creditor, and except as otherwise provided by ERISA or the Code, no benefits shall be subject to any assignment, seizure, or sale under any legal, equitable or any other process. (G. Ex. 44).

 By letter dated January 12, 2015, the Law Firm of Quesada & Moore, LLP, put in an appearance, on an administrative appeal, and requested certain plan documents (G. Ex. 45).  On January 26, 2015, Quesada & Moore, LLP, on behalf of John Greaney, formally appealed but indicated they would make the arguments on the appeal when the documents were received. (G. Ex. 46).   On or about February 12,

---

[161] Funds Ex. 8, Funds Ex.15, G. Ex. 14, pg 13-14, 17.

2015, Greaney received a partial response to his document request wherein the Trustees still refused to identify the Plan provisions upon which they rely upon for their offset/extinquishment and their grounds for honoring the amount but not timing of the MVRA Restitution Order/Judgment (G. Ex. 47). On or about March 2, 2015, Quesada & Moore, LLP, on behalf of John Greaney filed formal arguments on the appeal with Exhibits.(G. Ex. 48A &B).   In his appeal, John Greaney noted that the Trustees had no specific authority under the Plan Document to deny his benefit, rather under the terms of the Plan, they were required to respect the anti-alienation provisions of Section 8.2.   John Greaney argued that the Trustees could not simply offset his benefit but were required to satisfy the provisions of ERISA Section 206.  The appeal letter urges that when ERISA and MVRA are "are considered in combination..they clearly define the appropriate offset against a breaching fiduciary who causes damage to a Plan which culminates in a Judgment and Restitution Order under MVRA".[162]   Mr. Greaney also submitted his marriage certificate as in his earlier application, he indicated he was "widowed" which was true but not pertinent to the inquiry (G. Ex. 48A & B).

---

[162]   Funds Ex. 25.

On or about July 20, 2015, Greaney received a denial of his appeal for pension benefits under the Plan.   The Trustees take the position that despite the clear language of the Plan on anti-alienation, they will not follow it as it is "grossly inequitable".   The Trustees argued that although ERISA Section 206(d)(4)(A) identified three ways in which offset may be achieved separated by an "or", they should be permitted to read it as an "and" .  Finally, the Trustees do not even address (much less comply) with what is required to eliminate spousal rights under ERISA 206(d)(4) but rather simply argue that "Mr. Greaney's interest in the Pension Fund was previously extinquished by the damages his fiduciary breaches caused the Pension Fund prior to his marriage on September 8, 2012, his spousal rights argument is misplaced". The Trustees do not explain by what manner or means Mr. Greaney's pension benefit was "extinquished". [163]

On or about May 13, 2016, with the assistance of counsel, John Greaney made an application for his annuity benefit from the Annuity Fund "[s]ubject to the Judgment and Restitution Order entered into by Hon. Victor Marrero, District Judge in *United States v. Greaney,* 08-CR-828(S.D.N.Y.)(providing for 15% of Mr. Greaney's gross income to pay such Judgment and Restitution Order)". (G. Ex. 49).

---

[163] Funds Ex. 26.

On or about April 25, 2015, John Greaney's wife, Imelda Lovett, consented to the rollover of John Greaney's entire annuity balance, subject to Judge Marrero's order, to be rolled over to a traditional IRA.[164]

John Greaney specifically noted that Section 7.19 of the Annuity Plan document (G. Ex. 52)clearly states:

> Neither the Trust nor any of the assets thereof, shall be liable for the debts of any Participant, Spouse or Beneficiary entitled to any benefits under this Plan nor be subject to attachment or execution or process in any court or action or proceeding.

The Annuity Trust (G. Ex. 53) contains an Article XII, Section 4 that is identical with the language Pension Trust with respect to anti-alienation.[165]

---

[164]  *Id.*  We respectfully submit that such waiver is no longer effective. Under ERISA §205(c)(1), a spousal waiver is not effective unless made within the applicable election period, which for the 50% joint and survivor benefit is 180 day period prior to the annuity staring date, which clearly has not occurred.   ERISA §205(c)(7).   That is the only benefit noted on the waiver form provided. In any event, Mrs. Greaney revoked all previous waivers in her ERISA Complaint, ¶¶ 196, 211 (G. Ex. 3) and by certified letter to the Plan Administrator. (G. Ex. 50 ). Assuming but not conceding the applicable election period is open for preretirement survivor annuity, Mrs. Greaney can revoke her election any time within that period and she has done so.   ERISA §205(1)(A)(iii).

[165]  G. Ex. 44 (Pension Trust), pg 1 and 30; G. Ex .43 (Pension Plan),§8.22(Governing Law), pg 77; G. Ex. 53 (Annuity Trust), Pg 1, 29-30; G. Ex. 52 (Annuity Plan), §17.20 (Governing Law), pg 61.

John Greaney received a denial letter from the Annuity Fund on or about August 11, 2015 denying his annuity claim.  The Trustees provided: "[i]n light of the pending litigation against Mr. Greaney, as well as the fact that Mr. Greaney's arguments have already been considered and rejected...the Board of Trustees has determined that an administrative appeal in these circumstances would be futile".[166]

On or about August 25, 2015, John Greaney appealed the denial of the annuity benefit (G. Ex. 51).  In his August 25, 2015 letter, John Greaney stated, in pertinent part:

> We respectfully submit that it is arbitrary and capricious of the Board of Trustees not to meaningfully participate in the administrative claims procedure guaranteed to Mr. Greaney under ERISA and DOL Regulations.  This unilateral refusal is not sanctioned by the law they are entrusted to administer.
>
> ........................
>
> As the Trustees should be aware, in the appeal process,the claimant is entitled to request certain "relevant" documents *relied upon* by the Board of Trustees in their consideration of the claimant's initial claim.  See ERISA Section 503 and the Department of Labor Regulations at §2560.503-1(h)(iii)(imposing the requirement to give access to relevant documents and §29 C.F.R. §2560.503-1(m)(8)(defining the term "relevant").

---

[166] Funds Ex. 27.

Mr. Greaney requests, pursuant to ERISA Section 503 and the applicable Department of Labor regulations, the following disclosures, during his appeal process:

1.  The entire administrative record before the Trustees when considering Mr. Greaney's annuity claim.

2.  Copies of the relevant portion of the minutes of the Board of Trustees where Mr. Greaney's annuity benefit claim was considered and/or decided.

3.  In their denial the Board specifically relied upon the dollar amount $4,973,259.92 Ordered as Restitution to the Benefit Funds in the case of *United States v. Greaney*, No. 08-828...  Inasmuch as the Trustees relied upon the sum of $4,973,259.92 in making their determination, and, as fiduciaries, either did or should have considered how much of this total sum has currently been paid by any of the other jointly liable defendants, and what remains outstanding, we are asking for disclosure of this information, in a manner "calculated to be understood by the claimant" 29 C.F.R. § 2560.503-1(g)(1); ERISA §503(1), 29 U.S.C. §1133(1).

4.  Specify the specific plan provisions upon which the denial of the claim is based. 29 C.F.R. 2560.503-1(g). We note Section 7.19 of the Annuity Plan clearly states:

Neither the Trust nor any of the assets thereof, shall be liable for the debts of any Participant, Spouse or Beneficiary entitled to any benefits under this Plan nor be subject to attachment or execution or process in any court or action or proceeding.

Kindly provide any amendment or Plan resolution which amends this provision.  Kindly advise the basis upon which provision was deemed inapplicable by the Trustees.

5.   The Trustees clearly relied upon the proceeding in
*United States v. Greaney*, No. 08-828 in rendering its
decision, including, but not limited to, the Judgment
rendered in that case*. Kindly advise as to why the
Trustees do not believe they are bound by the "Schedule
of Payments" of such Judgment which makes Mr. Greaney's
annuity benefits subject to such Judgment but at a rate
of 15% of gross monthly income.* (Emphasis added).


6.   Kindly provide, as specified under 29 C. F.R.
Section 2560.503-1(g), any additional material or
information necessary for the claimant to perfect his
claim and explain, if necessary,  why such information
is necessary.

Neither John Greaney nor his counsel received *any*
response to his letter of August 25, 2015.  We waited and
waited while the time for bringing suit was ticking by.  The
Funds had reduced the time to file suit to 365 days.[167]

On or about January 4, 2016, Ms. Quesada had a
conversation with Elizabeth O'Leary who indicated that the
Plan did not intend to respond to the appeal and, to date,
there has been no response to the appeal,  no request for an
extension, and no documents provided.[168]

Ms. Quesada' Affimation notes that the Funds responses
were incomplete relative to both the Annuity and Pension
claims.  On March 28, 2016, she received a letter from
Virginia & Ambinder, LLP which provided "discovery as to how

---

[167] Quesada Affirmation, ¶15,  G. Ex. 43.

[168] Quesada Affirmation, ¶16.

much Court Ordered Restitution has been paid" by the parties (G. Ex. 67).[169]  We received further restitution amount updates on or about January 17, 2017, with the Rule 26 damage disclosures (G.Ex. 5), and under the Funds Ex. 30 that was filed on September 11, 2017. Quesada Affirmation, ¶ 18.  To date, Ms. Quesada has never received any specification of the Plan provisions upon which the denial is based nor an indication as to why the Funds recognize the dollar determinations of Judge Marrero's MVRA Orders/Judgment but not the Schedule of Payments.[170] Significantly, the Trustees have never explained how, when and by what means was John Greaney's benefit and his spouse's benefits were "extinguished".[171]

On or about January 11, 2016, Quesada & Moore, LLP, on behalf of the Greaneys, wrote to the Trustees about their failure to participate in the appeal process.  The letter notes, in pertinent part,  that [p]ursuant to Department of Labor Regulations,  this matter will be deemed denied. Department of Labor Regulation 2560.503-1(L) provides:

> (L) Failure to establish and follow reasonable claims procedures.  In the case of the failure of a plan to establish or follow claims procedures consistent with

---

[169]  Quesada Affirmation, ¶17.

[170]  Quesada Affirmation, ¶19-¶20.

[171]  Quesada Affirmation, ¶21.

the requirements of this section, a claimant shall be
deemed to have exhausted the administrative remedies
available under the plan and shall be entitled to
pursue any available remedies under section 502(a) of
the Act on the basis that the plan has failed to
provide a reasonable claims procedure that would yield
a decision on the merits of the claim. (G. Ex. 54).

The January 11, 2016   letter concludes by saying that
the appeal has been "deemed denied", there has not been a
"full and fair" review in accordance with DOL Regs, and thus
cannot be accorded any deference by a subsequent reviewing
court.  The letter notes that the defense of exhaustion is
waived and the Plan Administrator has incurred and continues
to incur penalties for a failure to respond to the
legitimate document requests under ERISA section 502( C).29
U.S.C. 1132( C). (G. Ex. 54).

## ARGUMENT

### I:  THE FUNDS RICO CLAIMS ARE TIME-BARRED

### A. General Principles

The statute of limitations for a civil RICO filing is
4 years.  Agency Holding Corp. v. Malley-Duff Associates,
Inc., 483 U.S. 143, 156 (1987).   The applicable standard is
when the plaintiff knew of the alleged breaches or when the
breaches could, with due diligence, have been discovered.
Rotella v. Wood, 528 U.S. 549, 554(2000).  Reasonable
diligence in a civil RICO claim is required of the
plaintiff.  Plaintiffs, utilizing the principle of equitable

estoppel, can assert "fraudulent concealment" only if they have been reasonably diligent in trying to discover their civil RICO claims.  Klehr v. A.O.Smith Corporation, 521 U.S. 179, 196 (1997).

## B. Previous Decision by Judge Preska

By decision dated March 26, 2013, Judge Preska addressed the issue of the timeliness of the Funds RICO claims with against Joseph Olivieri and Michael Brennan. The timeliness of the claim against defendant Greaney was not before the Court at that time.[172]

With respect to Greaney, paragraph 72 of the FAC (G. Ex. 1) specifies that the RICO conduct complained of occurred from 1998 to 2004.  In his plea of guilty, Greaney admitted offenses which occurred from 1998 to 2004[173].   In his deposition, Greaney admits offenses which occurred between 1998-2004[174].[175]

Nevertheless, the Funds argue, in paragraph 59 their complaint:

---

[172] District Council Pension Fund v. Forde, 939 F. Supp 2d 268(SDNY 2013).

[173] Funds Ex. 3, pg 21.

[174] Funds Ex. 4, pg.23.

[175] The FAC charges Forde with conduct from 1994-2004, based upon his plea. FAC ¶66, Funds Ex.2, 14-15 (Plea).

...Plaintiff did not know of or discover, and could
not have known of or discovered in the exercise of
reasonable diligence, the unlawful conduct and
resulting injury alleged herein that underlies the
RICO claims and other wrongs alleged herein after
criminal proceedings, as set forth below, were
publicly disclosed beginning in August 2009.[176]

Judge Preska noted that the instant claim filed by the
Funds was filed on August 5, 2011.[177]   She found:

In exceptional circumstances, equitable tolling
doctrines such as the doctrine of fraudulent
concealment may provide some relief from Rotella's
injury discovery rule. 528 U.S. at 561 (stating that
equitable tolling is "the exception, not the rule").
However, "[t]he burden of demonstrating the
appropriateness of equitable tolling . . . lies with
the plaintiff." Boos v. Runyon, 201 F.3d 178, 185 (2d
Cir. 2000). To invoke the doctrine of fraudulent
concealment properly, a plaintiff must establish three
elements including: (1) wrongful concealment by
defendants (2) which prevented plaintiff's discovery
of the nature  [**22] of the claim within the
limitations period, and (3) due diligence in pursuing
the discovery  of the claim. In re Merrill Lynch Ltd.
P'ships Litig., 154 F.3d 56, 60 (2d Cir. 1998); Butala
v. Agashiwala, 916 F. Supp. 314, 319 (S.D.N.Y. 1996).
Plaintiff must plead each [*279]  of these elements
with particularity as required by Rule 9(b) of the
Federal Rules of Civil Procedure. See Butala, 916 F.
Supp. at 319 (citing cases).[178]

---

[176]  G. Ex.1,¶ 59.

[177] *District Council Pension Fund v. Forde, supra,* 939 F.
Supp 2d at 278.

[178]   *Id. at 278.*

Although presented with argument, Judge Preska did not previously decide the fraudulent concealment issue on this motion to dismiss, due to the factually intensive nature of the inquiry.[179]  We respectfully agree that this inquiry is factually intense given the length and breath of Consent Decree Litigation and extensive Reports of the Review Officer.  Nevertheless, given the *stare decisis* effect given to previous findings of the Court on these matters and the deference that the Funds stipulated and the Court found would be given to the findings of fact of the Review Officer[180], we respectfully submit that conclusions of law can be drawn.

## C.  Storm Warnings

In its most recent pronouncement of the timeliness of a civil RICO claim, the Second Circuit announced in *Rosenshein v. Jeffrey Meskel,* 688 Fed Appx. 60, 62 (2nd Cir, 2017) that:

> The timeliness of a civil RICO claim depends on a twin determination of (1) when the plaintiff sustained the alleged injury for which he seeks redress, and (2) when

---

[179]  *Id. at 280* holding that "because the defense of fraudulent concealment is ultimately a fact-intensive determination as to the reasonableness of Plaintiffs' ignorance to the injury, the determination would be premature on this motion to dismiss."

[180]  RO Stipulation ¶11 (G. Ex. 11),Consent Decree Litigation, 90-CV-05722-(RMB), Docket Entry 1569(Judge Berman decision on deference to RO findings)(G. Ex. 72).

the plaintiff discovered or should have discovered the injury, with the latter date triggering the four-year statute of limitations.

Under the first prong of the test, the injury occurred within the period 1998-2004.  With respect to the second prong of the test, the Second Circuit has held that "The RICO statute of limitations...runs even when the full extent of the RICO scheme is not discovered until a later date, as long as there were 'storm warnings' that should have prompted an inquiry. *Staeher v. Hartford Fin Servs. Group, Inc.* 547 F3d 406, 427 (2d Cir. 2008) describing the 'storm warnings' rule as 'well-settled law in this Circuit'."

Arguably, a court could identify a number of storm warnings on the extensive history of the Consent Decree litigation.  However, one storm warning particularly stands out:  the indictment and conviction of Co-Chairman of the Funds, Michael Forde, for the *same type of fraud* that is alleged the FAC.  Describing Forde's state bribery conviction, Judge Haight noted :

> "Following a jury trial, [Michael] Forde was convicted of accepting a bribe from associates of the Luchese crime family in return for allowing off-the-books non-union workers at a job site.  See *People v. Forde,* 8 Misc. 3d 1005A, 801 NYS2d 780(NY County Sup. Ct. 2005)"[181].

---

[181]    *United States v. Dist Council, 571 F. Supp 2d 555, 561, n. 7(SDNY 2008).*

Under New York Criminal Procedure Law, "'conviction' means the entry of a plea of guilty to, or a *verdict of guilty upon*, an accusatory instrument other than a felony complaint, or to one or more counts of such instrument". New York Crim Pro. Law § 1.20(13)(Emphasis added). *See also, Gunning v. Codd, 49 NY2d 495*, 499 (1980)(answering the narrow question of whether conviction occurred on verdict or sentencing and deciding verdict).

In discovery, Greaney requested copies of Board of Trustees minutes where the *indictment* of their fellow Trustee was considered or addressed.  The Funds admitted that they "have no documents responsive to" the request.[182] Greaney also requested documents reflecting minutes of the Board of Trustees wherein the *guilty verdict* rendered against Michael Forde on or about August 27, 2004, for the crime of bribe receiving was considered or discussed.[183]  The Funds ultimately produced minutes of a Board Meeting held on November 8, 2004, with one sole entry wherein Brian O'Dwyer represented to the Board that based upon a 1995 Third Circuit decision, that Forde could continue "to serve as a

---

[182] G. Ex. 63, ¶41.

[183] G. Ex. 63, ¶ 42.

Trustee pending sentence and entry of judgment". (G. Ex.
64).

The Benefit Fund Trustees did not remove Forde for
being convicted of the very *same conduct* which they later
allege "they did not know or discover, and could not have
known of or discovered in the exercise of reasonable
diligence" upon the unsealing of a later indictment.[184]

> ...In this Circuit awareness of other lawsuits or
> criminal fraud convictions involving a defendant puts a
> plaintiff on inquiry notice of the probability of fraud
> within another transaction involving the defendant.
> *Lenz on behalf of Naples Tennis Resort v. Associated
> Inns,* 833 F. Supp 362, 375 (SDNY 1993), citing *Berry
> Petroleum v. Adam & Peck, 518 F2d 402, 411 (2d Cir.
> 1975) and Zola v. Gordon, 701 F. Supp 66,68 (SDNY 1998)
> ("Zola II").*

The Second Circuit in *Rosenshein, supra at pp 63-64*
stated:

> "If the plaintiff makes no inquiry once the duty to
> inquire arises, knowledge will be imputed as of the
> date the duty arose" citing *Cohen v. S.A.C Trading
> Corp.,* 711 F.3d 355, 361-362 (2d Cir. 2013).

Equitable tolling ceases to operate when the person
exercising due diligence should have discovered the
probability of fraud. "This applies even in cases involving
a fiduciary relationship. (citing cases)", *Zola v. Gordon,
685 F. Supp. 354, 367 (SDNY 1988).* We respectfully submit

---

[184]  G. Ex. 1, ¶59 .

that knowledge should be imputed to Benefit Funds as of the **August 27, 2004** guilty verdict against Michael Forde. Michael Forde's conviction was a storm warning that was imprudent for the Trustees to ignore.   Consequently, we respectfully submit that the RICO claims brought against defendants Forde and Greaney, in the FAC, on or about August 5, 2011, are untimely.

## D. A Claim of Due Diligence is Inconsistent with the RO Stipulation

We respectfully submit, as a matter of law, that it is mutually inconsistent for the Funds to take the position, in the RO Stipulation, that the appointment of a Review Officer was *"essential to the eradication of corruption and racketeering"*[185] and simultaneously argue that the Benefit Funds were exercising due diligence *before* signing the Stipulation.   Obviously, appointing a Review Officer with review and veto powers is and was an extraordinary remedy for extraordinary circumstances and would not be necessary if the Funds were already exercising due diligence.

## E. The Findings of the Review Officer Do Not Support a Finding of Due Diligence

---

[185] G. Ex. 12, pg 3 (final "Whereas", RO Stipulation).

The record of the Review Officer, which is entitled to the same standard of review applicable to review of final agency action under the Administrative Procedure Act,[186] confirms, in great detail, that the Benefits Funds were "dysfunctional"[187] in operations, management and data systems and were not exercising due diligence even *after* the of removal the men charged herein.[188]

We take no position on what the operations, management and data systems are today.   For purposes of the due diligence inquiry, it only matters whether the Funds were operating with due diligence during the period for which they are claiming a statute of limitations toll.   We respectfully submit that when some or all these factors are present, that is either *prima facie* evidence or strong probative evidence that due diligence is not being exercised.

### 1. Not Collecting Benefits with Wages

The Review Officer stated:

I am of the view that permitting employers to treat wages and benefits separately, e.g. to provide money to the payroll company on time for wages but not for benefits, is a significant contributing factor in the

---

[186] G. Ex. 12, ¶11.

[187] G. Ex. 29, pg 31.

[188] See Statement of Facts (H), *supra*.

collection problems of the Benefit Funds and the attendant expenses of chasing contributions.[189]

In ERISA, the lens by which we consider the conduct of fiduciaries is whether they discharge their duties "solely in the interest of the Participants and Beneficiaries". ERISA Section 404(a)(1).   How can it be in the best interest of the Participants and Beneficiaries not to collect benefits with the wages?  Wages and benefits are *earned simultaneously*.[190]  Why should they not be collected simultaneously?  Once you let the horse out of the barn, you are chasing it all around the yard.

### 2.  Data Systems Designed to Fail.  Data Not Focused on The Participants Who Earn the Benefits.

The Reports of the RO illustrate that the Union collects its data and the Employers separately collect their data.  The Union assigns "job numbers" which seemed designed to lose rather than count jobs.   Then the Union and Employer attempt to coordinate their separate data and fight over the results.[191]

What happens to the interests of the Participants in all of this?  They fall through the cracks.  If the Benefit

---

[189]  G. Ex. 24,  pg 33, n.19.

[190]  Greaney affidavit, ¶ 30.

[191]  See Statement of Facts (H), *supra.*

Funds were truly acting as fiduciaries, and discharging their duties solely in the interests of the Participants and Beneficiaries, the data collected would be *focused on the Participant* who earned it.  It is one of the duties of a Trustee to make sure each Participant gets timely and accurate reporting of the covered employment he/she has earned.[192]  The Employer and Union could add columns to this information, as long as it did not disrupt the flow of information. [193]  With today's technology, this is all within reach. The RO recommended electronic scanning by stewards daily at the job sites.[194]

### 3.  Conflicts of Interest by Counsel

From 1997 to the present, the Trust document of each Plan contains an Article VI which provides that each Fund will consist of 12 Trustees[195].  Six Trustees shall be "designated by the Union and shall serve at the pleasure of the Union".   The Six Employer Trustees will be "designated" by one of six Employer Associations,  including the WCC.[196]

---

[192] *Diduck v. Kaszycki & Sons, 874 F2d 912, 916 (2d Cir. 1989).*

[193] No job numbers when something common to all like an address will do.

[194] G. Ex. 23, pg 35.

[195] G. Ex. 6.

[196]  *Id.*

According to Mr. Greaney, there was no vote, no discussion, just an announcement that "so and so" was being brought on as a representative of "X".[197]  The danger in this, as we have seen, is that one or more of these Employer Associations could be taken over by the very same influences that the Consent Decree was charged to eliminate and, yet, it is permitted by the Trust documents.

From 2000 to approximately 2009-2010, Joseph Olivieri was the WCC designee.[198] The Review Officer noted that Mr. Olivieri has been identified as a long-term associate of the Genovese crime family[199].  Mr. Greaney notes that the WCC is the largest of the associations that are employer members of the Board.[200]

The potential safeguard for this situation is that "[t]he power to appoint and remove trustees carries with it the concomitant duty to monitor those trustees", *Liss v. Smith, 991 F. Supp 278, 311 (SDNY 1998).*  Further, "[t]he duty to monitor carries with it...the duty to take action upon discovery that the appointed fiduciaries are not

---

[197]  Greaney Affidavit, ¶29.

[198]   Statement of Facts (E).

[199]  G. Ex. 21, pg 32.

[200]  Greaney Affidavit, ¶30.

performing properly". *Liss, 992 F. Supp at 311; Utility Audit Grp. v. Capital One, N.A., 2015 U.S. Dist LEXIS 40816, at *26 (EDNY,2015); In re Bausch & Lomb Inc, ERISA Litig.*, 2008 U.S. LEXIS 106269, at 32*(WDNY, 2008).

Arguably then, the Benefit Funds could have had a cause of action against the WCC for appointing Joseph Olivieri and one against the Union for appointing Forde and Greaney.  But how is such a lawsuit going to be started if the same law firm represents both the Benefit Funds and the Union,[201] and the same firm has appeared for both the Benefit Funds and the WCC?[202]

It is respectfully submitted that the Benefit Funds cannot be exercising due diligence when they permit a law firm to represent them and also another body who has an unfettered right of appointment to their Board.  The law holds the appointing body potentially liable to the Board. Recommendations to the Board of the wisdom to sue them cannot be clouded by a joint representation.  The Benefit

---

[201]  O'Dwyer and Bernstien, LLP. See G. Ex. 7, G. Ex 11, appearances and filings in Consent Decree Litigation (fn.15), G. Ex. 22, p 18, G. Ex. 40 ¶8 and Greaney Affidavit¶ 11.

[202]  Schulte, Roth and Zabel,LLP. See Funds Ex. 18, and appearances and filings in Consent Decree Litigation (fn.15) as intervenor, G. Ex. 11, G. Ex. 22, p 18 and Greaney Affidavit ¶ 12. *See* pgs 12-13, *supra.*

Fund must have independent counsel to guard the Trust for the benefit of others.

### 4. Block Vote

As noted by Joseph Olivieri (G. Ex. 34) decisions on the Board were made by "block vote".   All the Funds contained the identical language in Article V1, Section 8 of their Trust documents[203]:

> The Employer Trustees, as a body, shall have one vote, and the Union Trustees, as a body, shall have one vote. The Employer Trustees shall cast their vote in the manner determined by a majority of the six (6) Employer Trustees voting in person or by proxy. The Union Trustees shall cast their vote in the manner determined by a majority of the six (6) Union Trustees voting in person or proxy. No action shall be taken by the Trustees except by vote of two to zero.

Given that each fiduciary in an ERISA qualified plan bears personal responsibility (ERISA §409) for a host of specific individual fiduciary responsibilities (ERISA §404), the block vote both inappropriately shields and thwarts the exercise of those duties.

### 5. Grossly Inadequate Collection Reporting and Systems

The Funds pled, in their Complaint, that they exercised

---

[203] G. Ex. 44, 53, 57-59, inclusive.

due diligence by conducting "audits", "lawsuits" and "arbitrations".[204]   The RO Reports illustrate that audits, lawsuits and arbitrations were commenced and left to die on the vine. See Statement of Facts (H). The RO found "There was woefully insufficient follow-through to collect money owed the Funds".[205]   The Funds did not bring a proceeding to compel a decision in Turbo although the arbitration was outstanding from July 21, 2008 to 2011.[206]   There were 29 other decisions outstanding from this arbitrator.[207]   The RO found that there were "[s]ignficant problems with the Benefit Funds' previous collection efforts"[208], including Confessions of Judgment and  Payment Plans.[209]   The positions that the Benefit Funds take in their Complaint against their former collections counsel O'Dwyer and Bernstien negate their argument that the Funds were exercising due diligence during the period they are now asking the Court to toll the statute of limitations.   The Benefit Funds have the fiduciary duty to prudently collect

---

[204]   G. Ex. 1, ¶ 62 .

[205]   G. Ex. 23, pg 37.

[206]   Funds Ex. 13-1, pg 1.

[207]   G. Ex. 24, pg 52 and G. Ex. 23, pg 38.

[208]   G. Ex. 23, pg 35-39.

[209]   *Id.* See also G. Ex. 40.

the delinquent contributions.[210]   There is no record that
they delegated this fiduciary duty to O'Dwyer and Bernstein.
Indeed, one of the salient points of the Review Officer
Report is his finding that there was an unsigned, incomplete
retainer agreement between the Funds and O'Dwyer and
Bernstein as collections counsel.[211]   The RO Reports are
entitled to deference, per the RO Stipulation signed by the
Benefit Funds and previous decision of Judge Berman(G. Ex.
72).[212]   Based upon these Reports alone, the Court could
find, as a matter of law, that the Funds did not exercise
due diligence during the relevant period.

### 6.  No Training.  No Fiduciary Counsel

"Cheer up, you could be a fiduciary!".  The rules
regarding being a fiduciary are complex and by no means
intuitive. Mr. Greaney said he was appointed without any
training although he was being put in charge of multi-
billion dollars in assets.[213]   The history of the Consent
Decree litigation, the RO Reports and the processing of Mr
and Mrs Greaney's pension claim, all illustrate a pattern of

---

[210]  *Diduck v. Kaszycki & Sons, 874 F2d 912, 916 (2d Cir.
1989).*

[211]  G. Ex. 23, pg 35.

[212]  See footnote 34.

[213]  Greaney affidavit, ¶ 10. G. Ex. 25, pg 34.

poor fiduciary decisions. Not only did the Benefit Funds have conflicted counsel during the period they are claiming due diligence, they did not have, advising the Board, an independent attorney whose sole role was to provide advice on Trusts, ERISA/tax and fiduciary matters. Quesada Affirmation 10(H). With a Fund of this size and history, the absence of fiduciary counsel is yet another factor weighing against a claim of due diligence.

### 7. Greaney Deposition Testimony

The Funds rely upon "lying in depositions" as evidence of fraudulent concealment. John Greaney attended two depositions prior to the 2009 indictment. First, was in a deposition taken in 2005 wherein Greaney falsely denied knowing that the OWL list was be being manipulated in violation of the Consent Decree[214]. ( Ex. 3, 22-23). The second was a February 6, 2009 deposition wherein he falsely denied meeting Murray outside of a job (G Ex. 65, pg 47) and falsely denied taking money from Pitcohn (G. Ex 65, pg 49). The Funds claim that did not know and could not know of Greaney conduct until the indictments were unsealed *a few months later* in August 2009.[215]    The Funds have not

---

[214] The District Council subsequently enacted "full mobility". G. Ex. 27, pg. 2.

[215] G. Ex. 1, ¶ 59.

demonstrated how a false deposition in 2009 prevented them from filing their RICO claims on or about the year 2008. However, the record also shows that Greaney also conducted raids, filed grievances, made hot line calls during the period 2004 through 2008 with respect to the same employers (Ex. 4 at 51, 57, 69-70), and Greaney affidavit in support at ¶¶18-22, 24(b)&(e).

### 8. **You Would Have To Be Living Under A Rock**

Finally, forgive us for asking how the Funds can claim that the underlying fraud was concealed when the job site corruption and labor racketeering was and is for the past 26 years the source of intense news and litigation reporting? The Southern District has held that parties have constructive knowledge of frauds perpetuated against them when "[i]ndictments and convictions were in general circulation in the press." *Zola v. Gordon, 701 F. Supp 66, 69 (SDNY 1988).* Consequently, we are attaching as Appendix A a series of news articles, not for their truth, but on the issue of the credibility of the claims of the Benefit Fund Trustees of their ignorance of the fraud being perpetuated all around them for over 26 years. These news reports are

by no means exhaustive but rather what showed up with a quick search on Westlaw.[216]

### F.  Conclusion

Based upon the foregoing, it is respectfully submitted that the Funds have failed to meet their burden of proving that they exercised sufficient due diligence to give them the extraordinary remedy of tolling the statute of limitations.  *Rotella, 528 US at 561.* We ask that the Court deny the claim to toll the statute of limitations and find that the RICO action was untimely filed.

## II.  ON PAR AND TURBO CLAIMS

### A. The Funds Have Had Their Day in Court (Turbo)

Assuming, but not conceding, that this Court finds the Funds civil RICO claims to be timely filed and/or that it is potentially a measure of damage in the ERISA action, Greaney objects to the Funds use of the 2011 Turbo arbitration award rather than the MVRA Restitution Order/Judgment that Judge Marrero entered relative to the Turbo transactions as the appropriate measure of damage.

The Funds claim that "[r]es judicata and collateral estoppel are inapplicable to damages in this case because, as victims of the defendants' crimes, the Funds were not parties to the criminal proceedings and were not in

---

[216] Quesada Affirmation, ¶ 94.

'privity' with the government".[217]   The Funds cite *Doe v. Hesketh, 828 F3d 159, 171-174 (3d Cir. 2016)* for the proposition that a restitution order does not bar a subsequent civil action by the same victim against the same defendant for additional damages.

We respectfully submit that the Funds have been accorded due process and had their day in Court relative to the calculation of the Turbo damages and that MVRA is flexible enough of a statute to fashion an appropriate result for the instant case and an infant litigant such as *Doe*.

The Due Process Clause requires that a person receive notice and an opportunity for a hearing before a court deprives them of life, liberty or property.[218]   We respectfully submit that the doctrine of non-party issue preclusion should be applied to the Funds relative to their litigation of the Turbo damages in the restitution proceedings before Judge Marrero.   In *Taylor v. Sturgell, 553 US 880, 895 (2008),* the Supreme Court stated that  a nonparty is bound by a judgment if they "assumed control" over the litigation in which that judgment was rendered

---

[217]   Funds Memorandum of Law, pg 20.

[218]   US Constitution, Amendment V and XIV.

(citing authority).  The Court held that because such a person has had "the opportunity to present proof and argument" he has already "had his day in court" even though he was not a formal party to the litigation. (citing authority). Similarly, the Supreme Court in *Montana v. US, 440 US 147, 154 (1979)* held that [o]ne "who assists in the prosecution or defense of an action in aid of some interest of his own... is as much bound...as he would be if he had been a party to the record".  Court records, government memorandum, emails, transcripts and letters referenced previously illustrate the Funds' great involvement in the development of the restitution orders in the criminal case. Based on the record before this Court, it is clear that the Funds had multiple opportunities to present proof and argument, they attended a hearing and assumed control over the development of the restitution orders in the criminal proceeding.  See Statement of Facts(C), *supra.*  In contrast, the defendants' counsel was not even kept in the loop of their discussions.[219]

Based upon the foregoing, it is clear that the Funds had its "day in court' relative the proper calculation of the Turbo losses and should not be given another "bite of the apple".  The Funds position is more egregious given that

_____

[219]  See G. Ex. 17, Quesada Affirmation 10(D).

(1) they have given no principled reason why the previous determination should be disturbed and (2) the arbitrator's decision that they are requesting to be substituted is deeply flawed.

As Government's Restitution Memorandum reflects, "Turbo did mostly masonry work for which it owned no contributions to the Benefit Funds" [220].  The record demonstrates that the Funds' forensic accountant, Gregory Polvere, presented calculations and a methodology to the Government. However, the Government believed its calculation more properly reflected the actual amount of covered employment done by Turbo.(*Id.*)  Indeed, SRZ, the Funds own counsel, in its November 10, 2010 letter to Judge Marrero admitted, relative to Turbo:

> "[b]ecause this matter involved an off-the-books payroll dispute, there are different approaches to determining the number of carpenters who worked on the relevant project. In the course of the arbitration, the Benefit Funds also submitted an audit report based a different and more conservative methodology, according to which the principal amount owed by Turbo was approximately $1.5 million."[221]

---

[220]   Funds Ex. 14, pg 9-10.

[221]   Funds Ex 18 at 2, n1.

After considering all the submissions, Judge Marrero adopted the Government's recommendation relating to Turbo.[222]

As noted previously, the Review Officer, found that the arbitrator in the Turbo matter had 29 arbitrations outstanding for the period 2006 through 2011 when he commenced his review.[223] The Turbo arbitration record closed on July 21,2008, but there was no decision until November 2011.[224] The Review Officer found that "no one at the Funds was able to locate a contract, nor any document reflecting a fee arrangement, between the arbitrator and the Funds."[225] On March 26, 2012, Virginia and Ambinder, the Funds' current collection counsel filed a petition in New York State Supreme Court seeking an Order requiring this arbitrator to issue arbitration decisions in five outstanding arbitrations.[226] There is no record that anyone moved against this arbitrator for Turbo matter although it had been pending for 3 years. Moreover, on the critical issue of how many of Turbo's workers were actually carpenters for whom contributions were owed, the arbitrator

---

[222] Funds Ex. 14, pg. 10, G. Ex. 20, pg 5.

[223] G. Ex. 24, pg 52 and G. Ex. 23, pg 38.

[224] Funds Ex. 13-1 through 13-4.

[225] G. Ex. 23, pg 37.

[226] G. Ex. 24, pg 52.

simply said the employer failed to satisfy his burden of proof.[227]

It is true that no victim is required to participate in any phase of a restitution proceeding. 18 USC §3664(g)(3). However, it does not follow that when a victim chooses to fully and fairly participate that it has no effect. Moreover, there are judicial mandates which the Court must exercise irrespective of whether the victim participates. One of these is the judicial determination of the Schedule of Payments under 18 USC §3664(f)(3)(A)[228].

It bears stating that in the ordinary case, given the substantial resources the Government has at its disposal, it is generally an aid to the victim that the Government is required, by the statute, to establish the loss amount. 18 USC §3664(e).   A Court can modify a restitution payment schedule under the circumstances specified under MVRA: (1) a "material change in the defendant's economic circumstances" 18 U.S.C. §3664(k) or (2) 18 U.S.C. §3664(o)(lists mechanisms for correcting, modifying, amending or adjusting an order of restitution).   Under 18 U.S.C. §3613A of MVRA there are multiple remedies if a defendant is delinquent or

---

[227] Funds Ex. 13-1, pg 178.

[228]  See Section III (B).

in default of his restitution obligations.  Senate Judiciary
Committee notes:

> This new section provides for a hearing on a
> defendant's delinquency in marking or default on
> payments of fines or restitution, and; provides courts
> with a range of remedial options in the case of
> delinquency or default, including revocation or
> modification of probation or supervised release,
> resentencing, holding the defendant in contempt of
> court, ordering the sale of defendant's property, or
> adjusting the defendant's payment schedule.

> S.REP. No. 104-179, at 16 (1996), reprinted in 1996
> U.S.C.C.A.N. 924, 929.

MVRA provides a remedy for a victim who discovers
further losses to seek an amended restitution order. 18
U.S.C.§ 3664(d)(5) provides: "If a victim subsequently
discovers further losses, the victim shall have 60 days
after discovery of those losses in which to petition the
court for an amended restitution order".    It is
undisputed that the Funds never availed themselves of this
remedy[229].

The Funds take the position that the "double recovery"
provision of MVRA (18 USC §3664(j)(2)), is a green light for
a subsequent civil suit to re-litigate the same pecuniary
loss for the same victim caused by the same defendant for
the same conduct.  We respectfully submit, neither *Doe* nor
18 USC §3664(j)(2) stand for this proposition.  The Senate

---

[229] G. Ex. 61, ¶70.

Judiciary Committee stated that there has been some
confusion relative to the provision in 18 U.S. C.
§3664(j)(2).  The Senate Judiciary Committee stated:

> The committee believes that a clarification is
> necessary to ensure the proper interpretation of
> section 3664(j)(2) of the committee substitute. This
> provision states that "[a]ny amount paid to a victim
> under an order of restitution shall be reduced by any
> amount later recovered [by the victim] as compensatory
> damages for the same loss" in a later Federal civil
> proceeding or State civil proceeding to the extent
> provided by State law.
> The purpose of this provision, like its predecessor in
> current law, is to ensure that the victim is not
> compensated twice for the same loss. The committee
> believes, however, that clarification is needed
> regarding the intended meaning of "same loss". It is
> the intent of the committee that "same loss" refer to a
> specific loss arising from the same criminal act, not
> to the criminal act or episode itself in which the loss
> occurred. For example, if a victim receives restitution
> for hospitalization resulting from a criminal act, but
> suffers emotional harm or other losses not included in
> the restitution order, any later award for civil
> damages for the injuries not included in the
> restitution order should not be deemed to reduce the
> total restitution owed. The committee believes that an
> order of restitution in a criminal case should in no
> way impair the ability of the victim to seek or obtain
> civil damages for losses arising from the same criminal
> act, but for which restitution is not awarded.
>
>  S.REP. No. 104-179, at 22 (1996), reprinted in 1996
>  U.S.C.C.A.N. 924, 935.

Based upon the foregoing, it is clear that the infant plaintiff in *Doe,* who could not participate in her earlier restitution proceedings and seeks non-pecuniary damages such as pain and suffering or mental and emotional distress, should have an opportunity to bring a further claim. However, in an instance, such as the case before us, where the parties seek only pecuniary losses and the victim has fully availed themselves of "the opportunity to present proof and argument", *Taylor v. Sturgell, 553 US at 895,* the Court has made a specific decision on MVRA of the "full amount" of the loss to the Funds proximately caused by the John Greaney's conduct.  18 U.S.C. §3664(f)(1)(A).   Under these circumstances, the Funds have had their day in court and any further recovery, would be an inappropriate double recovery.

Absent a statutory command, there is no legal basis to permit an award that allows a victim to recover more than his due.  *United States v. Nucci*, 364 F3d 419, 424 (2nd Cir. 2004).

In enacting MVRA, the Senate Judiciary Committee believed its streamlined procedures would provide due process for the victim and defendant:

> The committee believes that this provision fully comports with the requirements of the due process clause of the fifth amendment. Although the sentencing phase of a criminal trial is subject to due process requirements, it does not require the same degree of

protection as does the guilt determination phase. The
sole due process interest of the defendant being
protected during the sentencing phase is the right not
to be sentenced on the basis of invalid premises or
inaccurate information. These interests are adequately
protected by the provisions of this act. Moreover, the
act also ensures the protection of the victim's right
to a fair determination of restitution owed. *21 **934
The committee believes this provision will ensure the
streamlined administration of justice while at the same
time protecting the rights of all individuals.  S.REP.
No. 104-179, at 20-21 (1996), reprinted in 1996
U.S.C.C.A.N. 924, 933-34.

In any event, we respectfully submit that the Funds

must shoulder the burden of proving that they are entitled

to further remedies and we respectfully submit that they

have not met that burden.

### B. The Unambigious Agreement and Release Was Intended to Be a "Full" Recovery of The Pecuniary Loss (On Par)

Assuming, but not conceding, that this Court finds the

Funds civil RICO claims to be timely filed and/or the On Par

default judgment could potentially a measure of damage in

the ERISA action, Greaney objects to the Funds claim that

the Agreement and General Release that settled On Par was

not intended to be a complete recovery of the underlying

pecuniary loss.

As noted previously in the factual portion of the memorandum, the On Par transaction is a contractual claim, under a CBA, to pay wages and benefits for certain Covered Work.[230]   The Funds claim in the instant case that Forde and Greaney accepted "cash payments"  from certain contractors, including On Par, in return for allowing "the contractors to violate the terms of the their CBA with the District Counsel".[231]  In the instant Complaint, the Funds pled that Forde and Greaney caused or contributed to On Par's violation of the CBA by accepting these cash payments.[232] In theory, at least, the amount that On Par owes the Funds can be determined mathematically by virtue of the underlying contract, the CBA.

On or about January, 2017, our office received the Funds' Rule 26 Damage Disclosures and learned, for the first time, the Funds' claim that the appropriate measure of damage for the defendants' RICO conduct is $12,101.543.18, which they allege is the amount of the 06 CV 5643 default judgment that was rendered against On Par.   The Funds seek treble damages of that amount. (G. Ex. 5).

---

[230]  Statement of Facts (G), *supra.*

[231]  G. Ex. 1,¶66, 72.

[232]  *Id.*  The record also shows that Greaney led raids on On Par, made hotline calls and filed grievances but there was little follow-up.  See Greaney Affidavit, ¶¶18-22, 24(b) & (e).

**1. New York Law Governs the Agreement.**

The Agreement provides, that it "shall be interpreted, construed and governed in accordance with the laws of the State of New York, except to the extent that federal law may govern." (Funds Ex. 20).

**2. No Party has claimed the Agreement is Ambiguous**

The Funds have not claimed that the Agreement is ambiguous, contains any unilateral or mutual mistakes, or was induced by fraud. Rather, they claim that since Forde and Greaney were not "released" in the Agreement the Funds are entitled to proceed against them in RICO and ERISA actions with respect to the On Par transactions. [233]

A settlement agreement and release are contracts and are thus construed according to general principles of contract law. *Collins v. Harrison-Bode, 303 F.3d 429, 433 (2d Cir. 2002).* "Where the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and reading the contract as a whole." *Ellington v. EMI Music, Inc., 24 N.Y.3d 239, 244, (2014); accord Beal Sav. Bank v. Sommer, 8 N.Y.3d 318, 324, (2007)* ("Construction of an unambiguous contract is a matter of law, and the intention of the

---

[233] Funds' Memorandum of Law, pg 8.

parties may be gathered from the four corners of the instrument and should be enforced according to its terms."); *Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 569,* (2002) ("The best evidence of what parties to a written agreement intend is what they say in their writing.").

What the parties said in their writing is that the obligor and obligee "agree to settle all claims between them for the sum" of X dollars "(hereinafter the Settlement Amount), said Settlement Amount being an amount of fringe benefit liability reflected in a compilation of fringe benefit liability prepared by the Funds forensic accountant, Gregory Polvere on March 21, 2006". (Funds Ex. 20, ¶ 1). The Agreement states that "the Net Settlement amount is described as "full and final." (Funds, Ex. 20, ¶ 2)

The Agreement also contains a merger clause. "Merger clauses are not mere boilerplate. They provide further protection for the interests of certainty and finality." *Torres v. D'Alesso, 80 A.D.3d 46*, *53,* (1st Dep't 2010) (emphasis in original). The merger clause provides: "[t]his agreement constitutes the entire and complete understanding between the parties and supersedes any prior agreement, whether oral or written, between the parties". (Funds Ex. 20, ¶6).  Based upon the merger clause, the prior agreement between the parties, the CBA, is superceded.  Consequently, any uncollected default judgment on that CBA must also be

superceded. The Funds have not explained how the default judgment was not superceded by the merger clause.

Under the unambiguous terms of the Agreement, the Funds have settled all the pecuniary losses they suffered as a result of their underlying contractual claim with On Par. Although there is a claim that Forde and Greaney may have contributed to that CBA loss, the CBA is superceded as well as any judgments thereto.  The Funds determined the Net Settlement Amount and the Government approved.

A focus on releases is inapposite when the entire underlying contractual claim is resolved.  As the Supreme Court has declared, "courts can and should preclude double recovery". *EEOC v. Waffle House, Inc., 534 US. 279,297 (2002)(quoting Gen. Tel. Co. v . EEOC, 446 US 318,333 {check} (1980).*  Although the Funds have cited no authority, their argument presumably is based upon *Skylon Corp. Guilford Mills*, 901 F. Supp 711 (SDNY 1995), wherein the fact that one individual was not put on the release when a number of other guilty individuals were specifically named was deemed intentional.  However, in the instant case essentially only the obligor and obligee (and those in privity) on the underlying contract were named to the exclusion of the rest of the world.  The Court of Appeals in *Wells v Shearson Lehman/American Express, Inc., 72 NY 2d 11,*

24-25 (1988) found that New York law does not "unvaryingly" demand that "every discharged party be specifically named or identified" or "there could never be a release that truly put an end to a disputed commercial transaction".

The Second Circuit has held that "[w]ithout departing from the 'four corners' rule" ... a court may look to certain aids, such as the circumstances surrounding a settlement agreement's formation, when construing it for enforcement purposes". *Huertas v. East River Hous. Corp., 992 F2d 1263, 1267 (*2d Cir. 1993) citing *United States v. ITT, 420 US 223, 238 (1975).* In the instant case, the April 2, 2009 letter accompanying the presentation of the Agreement provided the circumstance that personal assets of James Murray had been seized by the Government (but the debt is owed by On Par to the Funds), that the Government approves of the settlement and the "amount of the settlement represents a complete recovery of our forensic auditor's evaluation of the total principle amount of fringe benefits owed to the Funds on behalf of every identifiable carpenter (based on our AS/400 system) that was paid off the books by On Par". (G. Ex. 32).

The Government's approval of this Agreement is not without significance.  It was holding the seized monies and it otherwise had the obligation, under MVRA, to establish the loss amount. 18 USC §3664(e).

Finally, the Funds' Executive Director had the following to say about the formation of the Agreement, at the trial of Joseph Olivieri:

> It turned out that in the forensic audit, what occurred
> was that everyone on the payroll was picked up.  When I
> say picked up, when the forensic auditor went through
> the list, he included everyone in there.  Ultimately,
> what occurred was that the only ones we were able to
> prove did what we called covered work, carpentry work
> were listed and it came out to 4.2 million.  So had we
> gone ahead in a lawsuit, we would not have been able to
> prove that the others did carpentry work.[234]

### 3. The On Par Settlement Abated the Claim Prior to the Institution of the Civil RICO suit

The Second Circuit has ruled that to the extent a RICO claim has been successfully collected prior to the entry of judgment, "it is 'abated pro tanto, prior to any application of trebling'".  *Commercial Union Assur. Co. v. Milken, 17 F.3d 608, 612 (2d Cir. 1994), cert. denied,* 513 US 873 (1994)*(quoting Stochastic Decisions, Inc. v. DiDomenico, 995 F2d 1158,1166(2d Cir.), cert. denied, 510 US 945 (1993).*

## III.   MVRA AND RICO

Assuming but not conceding that the instant RICO case is not time barred, we respectfully submit that, under the clear wording of the statutes,  MVRA and RICO interrelate as to timing, amount and schedule of damages.

---

[234] G. Ex.66, pg 164.

## A. MVRA Background

Through a series of enactments from 1982 to 1996, Congress has provided that criminals, in addition to paying fines to the United States as penalties for their crimes, should pay restitution both to the private individuals and institutions victimized by their crimes and to the United States when it is the victim. *U.S. v. Witham*, 648 F.3d 40, 43(1ST Cir. 2011).

The imposition of restitution is part of a defendant's criminal prosecution.  *See Lyndonville Sav. Bank & Trust Co. V. Lussier,* 211 F.3d 697, 702 (2d Cir. 2000)("Congress intended to make restitution an element of the criminal sentencing process and not an independent action civil in nature"). *See also United States v. Thompson*, 113 F.3d 13, 15 n. 1 (2d Cir.1997)(restitution imposed pursuant to the MVRA is criminal punishment).

> "Federal courts have no inherent power to order restitution...." *United States v. Zangari*, 677 F.3d 86, 91 (2d Cir.2012). "A sentencing court's power to order restitution, therefore, depends upon, and is necessarily circumscribed by, statute." Id.

In its current form,  MVRA requires the sentencing Court to Order a defendant to make restitution to identifiable victims of certain specified crimes who have suffered loss in the full amount of such losses as determined by the Court, with the assistance of the

Government, without consideration of the defendants economic circumstance.  18 U.S.C. §§ 3663A, 3664.

Once these parameters are met, participation by the Court,  Defendant and Government is mandatory.   A *sentencing* court "shall order, in addition to ... any other penalty authorized by law," defendants convicted of specified crimes to "make restitution to the victim of the offense." 18 U.S.C. § 3663A(a)(1). "No victim shall be required to participate in any phase of a restitution order". 18 U.S.C. §3664(g)(1).

The victim is critical to the statutory scheme and is at the apex of the relief.  Under 18 U.S.C. §3663A(a)(2) "the term "victim" means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered..."

The Second Circuit's recent decision in *U.S. v. Thompson,* 792 F3d 273, 277 (2d Cir. 2015):

> In restricting its definition of "victim" to persons proximately harmed by the defendant's acts, the MVRA aims to limit restitution to those harms that "ha[ve] a sufficiently close connection to the conduct at issue." Robers v. United States, ---U.S. ----, 134 S.Ct. 1854, 1859, 188 L.Ed.2d 885 (2014) (internal quotation marks omitted). Accordingly, we have recognized that § 3663A(a)(2)'s definition of "victim" governs "the calculation of [the] reimbursable loss" itself. Maynard, 743 F.3d at 378; see also United States v. Gushlak, 728 F.3d 184, 194-95 (2d Cir.2013).

Proximate cause and the full amount of the damages are determined by reference to the victim. *U.S. v. Thompson,* 792 F3d at 277. The amount of restitution to be ordered is the "amount of loss caused by the specific conduct forming the basis for the offense of conviction." *United States v. Gushlak*, 728 F.3d 184, 195 n. 7 (2d Cir.2013) (quoting *United States v. Silkowski*, 32 F.3d 682, 688 (2d Cir.1994)),18 U.S.C.§§3663A(a)(3), 3664(a).

The Government bears the burden of establishing loss amount, and "[a]ny dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence." *United States v. Bahel*, 662 F.3d 610, 647 (2d Cir.2011) (quoting 18 U.S.C. § 3664(e)). 18 U.S.C. 3664(f)(1)(A) provides:

> In each order of restitution, the court shall order restitution to each victim in the *full amount of each victim's losses as determined by the court* and without consideration of the economic circumstances of the defendant. (Emphasis Added).

The Second Circuit in *U.S. v. Catoggio*,326 F.3d 323, 329 held:

> Congress evidently wanted to ensure that victims be fully compensated for a defendant's past crimes if that defendant "unexpectedly inherit[s] money, win[s] the lottery, or otherwise strike[s] it rich." (Citing authority).

MVRA sets up procedures by which the victim, the defendant and the Government are provided an opportunity to be heard in 18 U.S.C. §3664.[235]

The Senate Judiciary Committee explained that "the procedures contained in this section are intended to provide a streamlined process for the determination of both the amount of restitution owned to each victim and the terms of repayment based on a reasonable interpretation of the defendant's economic circumstances". S.REP. No. 104-179, at 20 (1996), reprinted in 1996 U.S.C.C.A.N. 924, 933.

Critical to the process is finality; "[t]he committee believes that the need for finality and certainty in the sentencing process dictates that this determination be made quickly, but also recognizes that justice requires that this particular aspect of the criminal sentence be subject to review in light of changed circumstances". S.REP. No. 104-179, at 20 (1996), reprinted in 1996 U.S.C.C.A.N. 924, 933.  Section 3664(o) states "[a] sentence that imposes an order of restitution is a *final* judgment".  18 U.S.C.A. §3664(o)[Emphasis supplied].

**B. Schedule of Payments**

---

[235]   The participation of the Funds in this process is described at Statement of Facts ( C), *supra.*

MVRA provides that the District Court "shall . . .
specify in the restitution order the manner in which, and
the schedule according to which, the restitution is to be
paid." 18 USC §.  The judicial determination of the Schedule
of Payments under 18 USC § 3664(f)(2) ensures that the
restitution obligation does not exceed the defendant's
ability to pay.  *US v. Kyles*, 601 F3d 78, 83. (2d Cir.
2010).  See also, US v. Kinlock, *174 F.3d 297, 301 (2d. Cir.
1999).*

     The Court is granted considerable discretion in
structuring a payment schedule. The statute provides:

> A restitution order may direct the defendant to make a
> single, lump-sum payment, partial payments at specified
> intervals, in-kind payments, or a combination of
> payments at specified intervals and in-kind payments.
> 18 U.S.C. § 3664(f)(3)(A).

Furthermore, when the court finds from the evidence
that the defendant's "economic circumstances" do not permit
him (a) to pay currently any amount of a restitution order,
and (b) to pay "the full amount of a restitution order in
the foreseeable future under any reasonable schedule of
payments," it may enter an order "direct[ing] the defendant
to make nominal periodic payments." Id. § 3664(f)(3)(B).
The Court is given the exclusive right to determine the
"full amount" of damage (18 USC § 3664(e)) and the Schedule
of Payments. 18 U.S.C. § 3664(f)(3)(A).

How the Court exercises this discretion has a
significant impact upon the collection of the judgment.  In
*United States v. Martinez*, 812 F3d 1200, 1203 (10th Cir.
2015), the Tenth Circuit held that a restitution order that
established a payment schedule did not create an immediately
enforceable debt of the full restitution amount.  The Tenth
Circuit made a considered analysis of multiple statutory
provisions of MVRA, and concluded that the statute only made
sense if determination was solely a judicial one and that
the ultimate judgment binds all, including the Government.
Recently, the Tax Court in *Klein v. Comm'r, 2017 US Tax
Court LEXIS* 48, 24*, *N. 10 (2017),* favorably cited *Martinez*
for the proposition that the Government could not take an
enforcement action which exceeded the restitution
judgments's payment terms.

     The Schedule of Payments, under the Criminal Judgment,
is binding,  except as changed, by the sentencing judge,
under  MVRA.   The Funds,  as victims, cannot modify the
Schedule of Payments except for  a "material change in the
defendant's economic circumstances" 18 U.S.C. §3664(k).
Under 18 U.S.C. §3664(o), there are  mechanisms for
correcting, modifying, amending or adjusting an order of
restitution). MVRA does not extend equitable authority to
modifying the *amount* of restitution, which forms a component

of the criminal sentence. *US v. Kyles,* 601 F3d at 83, *supra.*

Under section 18 U.S.C. §3613A of MVRA there are multiple remedies if a defendant is delinquent or in default of his restitution obligations.  Senate Judiciary Committee notes:

> This new section provides for a hearing on a defendant's delinquency in marking or default on payments of fines or restitution, and; provides courts with a range of remedial options in the case of delinquency or default, including revocation or modification of probation or supervised release, resentencing, holding the defendant in contempt of court, ordering the sale of defendant's property, or adjusting the defendant's payment schedule.

> S.REP. No. 104-179, at 16 (1996), reprinted in 1996 U.S.C.C.A.N. 924, 929.

It has also been held that MVRA does not extend equitable authority to modifying the *form* of restitution. In *U.S. v. Hamburger,* 414 F.Supp 2d 219, 227, n.6 (EDNY 2006) *the Court held:*

> With the understanding that a restitution order is imposed as an independent part of the sentence, this subsection authorizes an adjustment only to the payment schedule, not to the *form* of payment. The form of payment may be considered to be an element of the sentence. (Emphasis added).

It is respectfully submitted that the Funds have not pleaded nor proven, under MVRA,  any grounds to accelerate the MVRA determinations that were awarded to them with respect to defendant Greaney.

## C. Constitutional Challenges under MVRA

### 1. Sixth Amendment

Challenges have been made to the determination by the District Court of the full amount of the loss, by a fair preponderance of the evidence, rather than beyond a reasonable doubt See *U.S. v. Reifler*, 446 F.3d 65, 118-119 (2d Cir. 2006). The Second Circuit, while noting that "[t]he Due Process Clause is plainly implicated at sentencing"...since MVRA limits the restitution award to the amount of losses directly and proximately caused by the defendant's conduct. In *Reifler*, Second Circuit cited, with approval *United States v. Leahy*, 438 F.3d 328, 331 (3d Cir.2006) (en banc) as ("[W]e see the conviction as authorizing restitution of a specific sum, namely the 'full amount of each victim's loss'; when the court determines the amount of loss, it is merely giving definite shape to the restitution penalty born out of the conviction.)". Thus, the Court concluded that, although judicial fact-finding determines what that full amount is, the sentencing court is "by no means imposing a punishment beyond that authorized by jury-found or admitted facts," or "beyond the 'statutory maximum' as that term has evolved in the Supreme Court's Sixth Amendment jurisprudence." *Id.*

### 2. Eighth Amendment

In *U.S. v. Castillo*, 93 Fed. Appx. 273, 276(2d Cir. 2004) it was held that MVRA did not violate the Eight Amendment prohibition against excessive fines and cruel and unusual punishment.

### 3. Due Process

In *U.S. v. Castillo*, 93 Fed. Appx 273, 276(2d Cir. 2004), the defendant argued that the District Court denied her Fifth Amendment right to procedural due process because it did not conduct an evidentiary hearing as to whether the recipient of the restitution was a victim under MVRA.  The Court held that all the Due Process Clause requires the district court to do is to afford the defendant some opportunity to rebut the government's allegations and decisions as to what types of procedures are needed. The Court held that the district court properly gave the defendant an adequate opportunity to present her position as to the restitution contentions.

### D.   Interrelationship Between MVRA and RICO

MVRA, 18 U.S.C. §3664 (l) provides " A conviction of a defendant for an offense involving the act giving rise to an order of restitution shall estop the defendant from denying the essential allegations of that offense in any subsequent Federal civil proceeding or State civil proceeding, to the extent consistent with State law, brought by the victim."

The Second Circuit has consistently held that to prevail under civil RICO, "plaintiffs must show (1) a substantive RICO violation under 18 U.S.C.§ 1962, (2) injury to plaintiff's business or property, and (3) that such injury was by reason of substantive RICO violation " *Sykes v. Mel S. Harris and Associates, LLC,* 780 F3d 70, 83(2nd Cir. 2015) citing *In re U.S. Foodservice,* 729 F.3d at 117.

Based upon MVRA, Greaney is estopped from denying the essential allegations of any of the offenses that he pled guilty to in any subsequent Federal civil proceeding or State civil proceeding. MVRA, 18 U.S.C. §3664 (l).

Judge Marrero's determinations, under MVRA, establish the next two prongs of the *Sykes test for* civil RICO; proximate cause and damages.

The Funds were victims under in the criminal RICO case and a determination was made, under MVRA,  of the full amount of the damages proximately caused by  Greaney's criminal conduct.  The amount of restitution to be ordered is the "amount of loss caused by the specific conduct forming the basis for the offense of conviction." *United States v. Gushlak*, *supra,* 728 F.3d at 195 n. 7.

The Funds have already had their "day in court" with respect to the calculation of the "full amount" of the loss caused by the defendant's criminal conduct in Turbo, Pitcohn

and Pyramid under MVRA 18 U.S.C. §3664(f)(1)(A).[236]   We respectfully submit that On Par was abated prior to the commencement of the RICO suit and should not be considered.[237]

In *Lyndonville Saving Bank & Trust Company v. Lussier,* 211 F3d 697,702(2d. Cir. 2000), the Second Circuit, under the predecessor statute, the Victim and Witness Protection Act ("VWPA"), held that the victim could not bring a federal civil suit to have the restitution order modified.   The Funds are seeking to do indirectly, what the unsuccessful victims in *Lyndonville* sought to do directly.

MVRA is a statute that seeks to "engraft a civil remedy on a criminal statute, giving the victim of a crime the recovery he would have been entitled in a civil suit against a criminal."  51 A.L.R. Fed. 2d 169.  *See also, Lyndonville Savings Bank & Trust Company v. Lussier, supra*, 211 F3d at 702 )("[w]hile the enforcement mechanism is civil, adjudication of the obligation to pay is criminal").

This legislative mixing of criminal and civil remedies has made it difficult for the courts and those affected by its scheme to determine what part of the MVRA is sentence and cannot be changed by a civil proceeding and what

---

[236]   See Section II(A), *supra.*

[237]   See Section II(B)(3), *supra.*

portions of the determinations are binding in future civil proceedings.

MVRA represents successive legislative attempts to craft a restitution statute that would "streamline" the restitution process, provide "due process" to both the defendant and the victim, and ultimately reduce litigation[238].   Within the statutory scheme, the defendant, government, the court and the victim (whether or not they chose to participate), have specific roles, rights and limitations. As noted previously, the "double recovery" provisions of MVRA 18 U.S. C. §3664(j)(2), were not intended to re-litigate pecuniary losses.[239]

Defendants, under MVRA, have the least amount of choices.  Upon a conviction by plea or judgment, he is collaterally estopped from denying his guilt to civil RICO. The determinations of proximate cause and damages are mandated by MVRA. *United States v. Gushlak*, *supra,* 728 F.3d at 195 n. 7.  Under MVRA, how much damage Greaney's criminal RICO conduct proximately caused the Funds as victims has been established.[240]

---

[238]  See pgs 90-91, 101,*supra.*

[239]  See pgs 88-91, *supra.*

[240]  Funds Ex. 8, Funds Ex. 18.

MVRA provides him two safeguards: (1) the full amount of the damages are supposed to reflect factual truth, *US v. Reifler*, 446 F.3d at 118-119 and (2) the judicial determination of the Schedule of Payments under 18 USC §3664(f)(2) ensures that the restitution obligation does not exceed the defendant's ability to pay.  *US. v. Kyles*, 601 F3d at 83.

There is nothing in the civil RICO statute [18 U.S.C. §1964] that speaks to altering a preceding criminal RICO sentence.  The Funds have not identified any civil procedural mechanism to alter or modify a criminal sentence.

Congress intended that civil RICO and criminal RICO co-exist. The Second Circuit has said that closely related statutes are to be construed together, if possible, as to effectuate the legislative policies of both. *Thielebeule v. M/S Nord*see *Pilot*, 452 F2d 1230 (2d. Cir. 1971).   Where the legislature intends "to impose multiple punishments, imposition of such sentences does not violate the Constitution." *Albernaz v. United States,* 450 U.S. 333, 344 (1981).

Assuming continued viability of civil RICO in harmony with MVRA, having made a determination of the full amount of the loss proximately caused by Greaney to the Funds,  the entry of Judgement under Civil RICO of treble damages is

simply a ministerial and mathematical act of trebling the restitution orders, with offsets appropriate under the facts and law.  The Funds could submit a bill of costs and an itemization of attorney fees.

Consideration must be made by the Court precaution of double recovery . "[A]bsent a statutory command, there is no legal basis to permit an award that allows a victim to recover more than his due". *US v. Nucci, 364 F3d 419, 424 (2d Cir.2004)*(finding MVRA does not permit a double recovery to a victim).

However, the fact that Greaney owes more money due to the fact that the full amount determined under MVRA is trebled under civil RICO, is not a determination that Greaney has a better ability to pay the same.

As noted previously in Section III(A)(2), *supra* the Schedule of Payments is a integral part of the statutory scheme of MVRA, one of the judicial determinations required, part of the defendant's sentence, and an important component of the due process accorded the criminal defendant under MVRA.

**E. Entry of A Civil Rico Judgment That Trebles A MVRA Order Under FRCP 69**

Rule 69 of the FRCP governs the entry of a civil Judgment such as might be entered against Greaney under civil RICO.

Rule 69 states in pertinent part:

(1) Money Judgment: Applicable Procedure. A money judgment is enforced by a writ of execution, unless the court directs otherwise. The procedure on execution-and in proceeding supplementary to and in aid of judgment or execution-must accord with the procedure of the state where the court is located.

The Funds were a victim in the MVRA proceedings and are plaintiffs in civil RICO action against Greaney for the same underlying criminal conduct. There is a statutorily mandated judicial determination under MVRA of the full amount of the damages together with a decision to pay the damages in installments.

In order to achieve the Congressional goals of streamlining the proceedings and providing due process to the defendant and victim, entering a civil Judgment to commence *upon the completion of the Criminal Restitution* Order would achieve that end.

Under MVRA, the sentencing Court has many remedies at its disposal should there be a material change in the defendant's circumstances or any default relative to the Criminal Restitution Order.[241]

---

[241] Section III(A)(2), *supra.*

By making the civil Judgment *secondary in priority* to the Criminal Restitution Order, the Court does not modify the defendant's sentence and the victim does not modify the Criminal Restitution Order.

### 6. When to Treble

RICO §1964( c) provides "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue... and shall recover threefold the *damages* he sustains.

The Second Circuit has ruled that to the extent a RICO claim has been successfully collected prior to the entry of judgment, "it is '*abated pro tanto,* prior to any application of trebling'".  *Commercial Union Assur. Co. v. Milken, 17 F.3d 608, 612(2d Cir. 1994),cert. denied,* 513 US 873 (1994))(quoting *Stochastic Decisions, Inc. v. DiDomenico, 995 F2d 1158,1166(2d Cir.), cert. denied, 510 US 9451 (1993).* Significantly, the Court further said:

> Appellants' principal contention is that they are entitled to a trebling of their damage award *before* any offset through settlements, restitution, recoupment or otherwise.  This proposition ignores controlling precedent and mischaracterizes the monies distributed to them. Id at 612.

However, in a securities fraud case, the Second Circuit in *Singer v. Olympia Brewing Co., 878 F.2d 596, 601 (2d Cir. 1989)* has also ruled:

> In such cases, we have held that it is proper to treble the damage award before crediting settlement payments. See, e.g., *State of New York v. Hendrickson Brothers, Inc.*, 840 F.2d 1065, 1086-87 (2d Cir.) (antitrust case), cert. denied, 488 U.S. 848, 109 S. Ct. 128, 102 L. Ed. 2d 101 (1988); *Hydrolevel Corp. v. American Society of Mechanical Engineers, Inc.*, 635 F.2d 118, 130 (2d Cir. 1980) [**16] (same), aff'd, 456 U.S. 556, 72 L. Ed. 2d 330, 102 S. Ct. 1935 (1982).

Scholars who have explored the issue have noted that "[t]he damage award could be computed in one of two ways."[242] Subtract the settlements before trebling or after trebling. The Note states:

> Compare *Hydrolevel Corp. V. American Soc'y of Mech. Eng., 635 F 2d 118, 130 (2d Cir. 1980)* (damages in antitrust actions determined by trebling the damages, then deducting the amount paid in settlement)*, aff'd, 456 US 556 (1982)* with *US v. Klein, 230 F. Supp 426, 433 (W.D. Pa. 1964)* (damages under False Claims Act determined by taking credits against the actual damages and then doubling the remainder).[243]

---

[242] "Note: Treble damages Under Rico: Characterization and Computation", 61 Notre Dame L. Rev 526, (1986) pg 549.

[243] *Id at n122*.

While the Note ultimately comes in favor of deductions after trebling, in is undeniable that the *mandatory* trebling of RICO damages can result in harsh results.   We posture that perhaps a sounder approach, absent some statutory mandate to do otherwise, is to leave the timing and amount of set-offs within the sound discretion of the Court.

**IV.   THE FUNDS AND GREANEYS CLAIMS UNDER ERISA**

   **A. In an ERISA Tax Qualified Plan, the Fiduciaries
      Must Act in Accordance with Plan Documents**

      **1. Written Plan Requirement**

"Every employee benefit plan shall be established and maintained pursuant to a written agreement". ERISA §402(a)(1).[244]   Under ERISA Section 404 (fiduciary duties), it states that each fiduciary shall discharge his duties "solely in the interest of the participants and beneficiaries" (ERISA Section 404(a)(1)) and in "accordance with the documents and instruments governing the plan". (ERISA Section 404(a)(1)(D)).[245]

---

[244] See *Smith v. Dunham-Bush, Inc., 959 F 2d 6, **12 (2d Cir. 1992)(written plan requirement under ERISA).*

[245] The plan document rule is one of the four fundamental obligations of ERISA fiduciaries described in Section 404(a)(1) of ERISA, the other three are: "exclusive purpose" rule (ERISA 404(a)(1)(A); "prudence" rule (ERISA 404(a)(1)(B); and "diversification" rule (ERISA 404(a)(1)(C).

The LMRA, also known as the Taft-Hartley Act, which governs employer-union relations. 29 USC §§ 401-531, prohibits giving "any money or other thing of value" to unions (among others) with certain exceptions.  One exception is for payments to union trust funds established to pay welfare or pension benefits. *Id. §186 (c)(5).*  This exception applies only if the "detailed basis on which such payments are to be made is *specified in a written agreement* with the employer". *(Emphasis added). Id. § 186(c)(5)(B).*

Both the Annuity Plan and Trust and the Pension Plan and Trust indicate that they intend to comply with the LMRA, Internal Revenue Code of 1986 ("Code") and ERISA.[246]  ERISA 206(d)(1) provides that each "pension plan[247] shall provide that benefits provided under the plan may not be assigned or alienated".  A corresponding provision under Section 402(a)(13)(A) of the Code states that "[a] trust shall not constitute a qualified trust under [IRC §401] unless the plan of which such trust is a part provides that benefits

---

[246]   See Section 1 of the Annuity Plan (G. Ex. 52), Whereas clauses and Article XI of the Annuity Trust (G. Ex. 53), Section 8.2 of the Pension Plan (G. Ex. 43),Whereas clauses and Article XI of the Pension Trust (G. Ex. 44) indicating their intention to be tax-qualified plans.

[247]   An annuity plan is considered a pension plan under ERISA (3)(2(A), 29 USC §1002(2)(A).

provided under the plan may not be assigned or
alienated".[248]

Consequently, at all times relevant to these
proceedings, the Benefit Funds had to be governed and
maintained by a written agreement and the Trustees had a
fiduciary obligation to discharge their duties in accordance
with the plan terms and ERISA, LMRA and the Code.

**2. Duty To Act In Accordance With Plan Documents**

Under ERISA and the common law, a fiduciary has the
fundamental duty to follow the trust document and is liable
for losses incurred if he does not do so. *Dardaganis v.
Grace Capital, Inc.*, 889 F.2d 1237, 1241-1242 (2d Cir. 1989)
("A fiduciary's failure to meet these specific requirements
[of 29 U.S.C. § 1104(a)(1)(D)] is not merely evidence of
imprudent action but may, in itself, be a basis for
liability under section 1109."); *Bogert, Trusts & Trustees,*
§ 680 at 97 (2d Ed. 1982), and § 541 at 154-55 (2d Ed.
1978). Moreover, if a trust document has stipulated the
manner in which a power is to be exercised, the fiduciary

---

[248] Further, under Treasury Regulations, "a trust will not
be qualified unless the plan of which the trust is a part
provides that benefits under the plan may not be anticipated,
assigned (either at law or in equity), alienated or subject to
attachment, garnishment, levy, execution or other legal or
equitable process." Tres. Reg. 1.401-13(a)-(b)(1)(2001).

must strictly adhere to those terms. *Bogert,* § 551 at 7 (2d Ed. 1980). Neither good faith nor reliance on advice of counsel is a defense to a breach of a trustee's duty of compliance. *Restatement (Second) of Trusts* § 201 comment b (1959).

"The tax preferences provided for private retirement plans that satisfy the requirements of Section 401 et. seg. of the Internal Revenue Code of 1986 are substantial".[249] There is a current deduction for contributions, deferral on income for participants and beneficiaries and tax-free growth of assets. "[B]ecause of the significant cost in the form of lost revenue, these tax preferences must be limited". Failure to follow the requirements of IRC §401, (which includes the anti-alienation provisions and spousal rights provisions) could result in disqualification of the Plan.

As noted above, the failure to act in accordance with the Plan documents puts the Funds' at risk of Plan disqualification. Moreover, failure to comply with the terms of the Plan is a recognized basis for a lawsuit, under Section 502 of ERISA, by participants and beneficiaries, to recover, enforce or clarify their rights under the terms

---

[249] *Employee Benefits Law, Third Edition,* ABA Section of Labor and Employment Law, Chapter 5.1, pg 5-5, (2012).

of the Plan and to obtain equitable relief to enforce the terms of the Plan or Title 1 of ERISA-"Protection of Employee Benefit Rights".[250] The Greaneys brought their action under Section 502 of ERISA.[251]

As previously noted more specifically at Statement of Facts (I), *supra*, both the Pension Plan and Trust and the Annuity Plan and Trust, state that "except as otherwise provided by ERISA and the Code", the benefits of a participant and/or their beneficiaries under the Plan cannot be assigned or alienated.

The Funds can point to no authority in ERISA, the terms of the Plan or the Code, for them to simply "extinguish" the benefits of Mr. Greaney or his spouse.  The Funds have not provided any authority for their implicit position that they have any greater rights than other debtors against these protected interests.[252]

The Funds are not only not entitled to ignore the limitations of Section 206 of ERISA, they are required by virtue of their written Plan and Trust Agreements, their tax

---

[250]   Section 502 of ERISA.

[251]   G. Ex.3, pg 1.

[252]   *Friedlander v. Doherty,* 851 F. Supp. 515, 521-522, (NDNY 1994), cited by the Funds, acknowledges that ERISA 206 applies to the pension fund itself.

qualified status, and ERISA fiduciary status to specifically
act in accordance with the same.

**3.  Elimination of Spousal Rights Protected by ERISA**

The Funds have also ignored the spousal rights
protections of Title 1 of ERISA and their own Plan and Trust
provision regarding the same, including the Summary Plan
Descriptions that is distributed to the Participants and
Beneficiaries.[253]  Moreover, providing spousal benefits is
also a requirement of tax-qualification of Section 401 of
the IRC. IRC § 401(a)(13)(C)(iii).

When ERISA 206 and IRC 401 was amended by the Taxpayer
Relief Act of 1997, it specifically provided a provision
that a participant's spouse will be only be affected under
the detailed circumstances described in the statute.  See
ERISA 206(d)(4)( C) and IRC § 401(a)(13)(C)(iii), directing
where survivor annuity requirements are present, attaching a
spouses's interest requires written consent, an effective
waiver, or the specific inclusion of the nonparticipant
spouse's interest in the judgment, order, decree or
settlement.  Under ERISA §205(c)(1) and the Code §417(a)(1),
a spousal waiver is not effective if not made within the

_____

[253]  See Section 8.5 of the Annuity Plan (G. Ex. 52), Pg
13-15 of the Annuity SPD (G. Ex. 55), Section 6.1 & 6.2 of the
Pension Plan (G. Ex. 43), Pg 15-22 of the Pension SPD (G. Ex.
56).

applicable election period. Under ERISA §205(c)(7), the applicable election period, in the case of an election to waive the qualified joint and survivor form of benefit, is the 180 day period ending on the annuity starting date. Elections made before that time are not effective.   The applicable election period has not yet commenced for Imelda Greaney[254].

One has to question the wisdom of breaching the walls of ones' own Trust to get after a malefactor and essentially the Supreme Court has prevented the same.[255]   The Funds can not point to any authority where spousal rights were not respected.   In *US v Feldman*, 2017 US Dist LEXIS 143231, 15-18* (WDNY 2017 ), the Court relied upon *US v. Novak, 476 F3d 1041, 1044-1060 (9TH Cir. 2007),* holding that the government must respect plan documents and "steps into the defendant's shoes" and comply with spousal rights requirements.   See also *Lascala* v. Scrufari, 859 F. Supp.2d 509, 514 (WDNY 2012)(judgment amended to protect ERISA's survivor annuity requirements).

### 4. Not Following Title 1 or Plan Documents in Claims Proceedings

---

[254] Imelda Greaney has also formally waived any elections she has previously made. See EC ¶¶ 196,211, G. Ex. 50, Statement of Facts (I).

[255] See Section IV(B), *supra.*

Title 1 of ERISA and the DOL regulations contain specific provisions regarding claims proceedings. ERISA Section 503 requires all pension and welfare plans have administrative claims procedures.  The Pension and Annuity Plans snd SPDs have written provisions about claims procedures which the Funds are required to follow. [256]

The Greaneys' raised timely complaints as to the Funds failure to provide a "full and fair review" under ERISA §503(2) and DOL Regulations 29 CFR §2560.503-1(h)(detailing the requirements of an "[a]ppeal of adverse benefit determinations" and "full and fair review). See also *Metropolitian Life Ins. Co. v. Glenn*, 554 US 105, 115 (2008) (noting that the obligation to provide a full and fair review is a fiduciary act in which the decision maker owes a ameliorate duty of loyalty to plan beneficiaries).  A participant is provided specific and valuable rights during the "[a]ppeal of a adverse determination".  Specifically, the claimant must be given access to documents, records and other information "relevant" to the claim during the appeal

---

[256]  See Section 17.6 of the Annuity Plan (G. Ex. 52), Pg 16-20 of the Annuity SPD (G. Ex. 55), Section 8.7 of the Pension Plan (G. Ex. 43),  Pg 27-28, 33-34 of the Pension SPD (G.Ex. 56 ). Kindly note that neither the Pension nor Annuity SPD advise the participants and beneficiaries that the time for filing a lawsuit has been *drastically reduced to 365 days,* although noted in the Plan documents.

process.  29 CFR §2560.503-1(m)(8).   In the instant case, the Funds simply refused to participate in the appeal proces the Annuity Benefit Claim on the ground of the futility doctrine[257].   That doctrine was developed to ameliorate the harshness of the exhaustion rules for a *participant[258],* not to excuse fiduciaries from the performance of their fiduciary duties.   Failure to give a full and fair review results the claim being deemed denied, 29 CFR §2569.503-1(l), and potential loss of a deferential standard of review and exposes the Funds to claims for penalties for documents requested and not received. The Second Circuit in *Halo v. Yale Health Plan, 819 F3d 42, 60, (2d Cir. 2016),* held, barring a showing of inadvertence, "a plan's failure to comply with the Department of Labor's claim procedure regulation, 29 CFR §2560.503-1, will result in that claim being reviewed *de novo* in federal court".

### 5. Standard of Review

According to the Second Circuit, the plan administrator has the burden of establishing whether the arbitrary and capricious standard applies. *Kinstler v. First Reliance*

---

[257]   Funds Ex. 27.

[258]   See *Kennedy v. Empire Blue Cross & Blue Shield, 989 F2d 588,595(2d. Cir. 1993)(stating ERISA plaintiff must make "clear and positive showing" of futility to overcome exhaustion requirement).*

*Standard Life Ins. Co., 181 F3d 243, 249 (2d Cir. 1999).*  In
the instant case, the Funds have failed to address the issue
nor provided any written plan documents upon which such a
decision could be reached.  Under, *Katzenberg v. Lazzari,
2007 US Dist. LEXIS 27686, *18, (EDNY 2007),* it has been
held that when the plan administrator has :

> ...failed to address the issue of whether there are any
> written plan documents that contain a provision
> regarding administrative discretion, plaintiff's denial
> of benefits claim should be reviewed <u>de</u> <u>novo</u>. Under
> this standard, all aspects of plaintiff's denial of
> benefits claim, including fact questions and issues
> concerning the interpretation of plan terms, are
> reviewed <u>de</u> <u>novo</u>. *Kinstler v. First Reliance Standard
> Life Ins. Co., 181 F3d 243, 249-51 (2d Cir. 1999).*

Moreover, in the instant case, the issues before this
Court are the respective rights and obligations of the
parties, under these facts, under ERISA, RICO and MVRA.
Questions of law are always considered *de novo.*   *Weil v.
Retirement Plan Admin Comm. of the Terson Co.*, 913 F2d 1045,
1049 (2nd Cir. 1990)(court accords no deference to plan
administrator's determinations on questions of law), *aff'd*
in part and vacated in part on other grounds,  933 F2d 106
(2nd Cir. 1991). See also, *Penn v. Howe-Baker Engineer*, 898
F2d 1096, 1100 (5th Cir. 1990)(court owes no deference to
pension committee's conclusions of law concerning statutory
interpretation of ERISA).

## IV.  THE AMENDMENT OF ERISA SECTION 206
##      CREATED A REMEDY AT LAW

Since 1974, the Courts and Congress have wrestled how to balance the social goal to preserve ERISA retirement funds for ultimate use for participants and their beneficiaries against equitable claims from third parties. Over time, some statutory exceptions were carved out.  The Retirement Equity Act ("REA") amended ERISA to provide that the anti-alienation provisions does not apply to assignments made pursuant to a "qualified domestic relations order" (QDRO).  ERISA §206(d)(3).  Treasury Regulations also permit plans to provide "for the recovery... of overpayments of benefits previously made to a participant" without violating the anti-alienation rule.[259]

Equitable exceptions were found to ERISA §206(d)(1) by the Tenth and Eleventh Circuits in the cases of criminal conduct.[260]  The Second and Sixth Circuit held the meaning of ERISA §206(d)(1) is clear and refused to find a judicial

---

[259]  Treas. Reg. 1.401-13(c)(2)(iii)(1994).

[260]  See *St. Paul Fire & Marine Ins. Co. v. Cox,* 752 F.2d 550,552 (11th Cir. 1985); *Guidry v. Sheet Metal Workers Nat'l Pension Fund*, 856 F.2d 1457 (10th Cir. 1988), rev'd, 493 U.S. 365 (1990).

exception for criminal conduct.[261]   In *Ellis Nat'l Bank v. Irving Trust Co.*, 786 F.2d 466,471 (2d Cir. 1986), the Second Circuit held "[d]espite its equitable appeal, the 'criminal misconduct' exception ...undermines a fundamental purpose of ERISA that we believe should be modified, if at all, by Congress."

In 1990, the Supreme Court decided the case of *Guidry v. Sheet-metal Works National Pension Fund,* 493 U.S. 365,376 (1990) and resolved this conflict among the circuits in favor of the unambiguous wording of ERISA 206 and broadly pronounced:

> Nor do we think it appropriate to approve any generalized equitable exception -- either for employee malfeasance or for criminal misconduct -- to ERISA's prohibition on the assignment or alienation of pension benefits. Section 206(d) reflects a considered congressional policy choice, a decision to safeguard a stream of income for pensioners (and their dependents, who may be, and perhaps usually are, blameless), even if that decision prevents others from securing relief for the wrongs done them. If exceptions to this policy are to be made, it is for Congress to undertake that task.

---

[261] See *United Metal Products Corp. v. National Bank, 811 F.2d* 297,300 (6th Cir. 1987) *cert. dismissed*, 485 U.S. 1017 (1988)("[o]nly when a literal construction of a statute yields results so manifestly unreasonable that they could not fairly be attributed to congressional design will an exception to statutory language be judically implied) ; *Ellis Nat'l Bank v. Irving Trust Co.*, 786 F.2d 466, 471 (2d Cir. 1986).

The Supreme Court prohibited the constructive trust remedy sought by the Funds herein as a "remedy" "prohibited by §206(d)(1)."  *Id.* 491 US at 373.  The Supreme Court held that "[a]s a general matter, courts should be loath to announce equitable exceptions to legislative requirements or prohibitions that are unqualified by the statutory text. *Id. 491 US* 376. "Understandably, there may a natural distaste for the result we reach here.  The statute, however, is clear.". *Id 491 US* at 377.

Finally, the Court noted in *Guidry* that "[w]e need not decide whether the remedial provisions contained in §409(a) supercede the bar on alienation in §206(d)(1), since the petitioner has not been found to have breached any fiduciary duty *to the pension plans.(Emphasis in original). Id. 491 US at 373.*

Still without a remedy, the Third Circuit in *Coar v. Kazimir, 990 F2d 1413, 1420 (1993),* held that ERISA's §409(a) imposition of liability on a breaching fiduciary to "make good" any losses suffered by a plan because of the breach serves as an exception to ERISA §206(d)(1).

Seven years after the Supreme Court's decision in *Guidry*, the Taxpayer Relief Act of 1997 added an anti-alienation exception to ERISA for claims against a pension plan based on breach of a fiduciary duty owed to the

plan.[262] Recognizing that "courts have been divided in their
interpretation of the prohibition on assignment or
alienation" in situations where a pension plan suffered from
a participant's criminal conduct or breach of fiduciary
duty, Congress amended ERISA to allow an offset against the
participant's plan benefits.[263]  The amendment permits
reimbursement of a plan from a participant's pension
benefits only upon conviction of a crime involving the
plan[264], a civil judgment for breach of ERISA's fiduciary
provisions,[265] *or* a settlement between the participant and
the  Secretary of Labor or the Pension Benefit Guaranty
Corporation for the participant's breach of fiduciary
responsibilities regarding the plan.[266]  Additionally, the
interests of a participant's spouse will only be affected
under the detailed circumstances described in the statute.[267]

---

[262]  Taxpayer Relief Act of 1997, Pub. L. No. 105-34, §
1502, 111 Stat. 788, 1058-61; I.R.C. § 401(a)(13)(C)(i)
(2005); 29 U.S.C. § 1506(d)(4)(A)-(B) (2006).

[263]  H.R. Rep. No. 105-220, at 756-57 (1997) (Conf. Rep.)

[264] ERISA §206(d)(4)(A)(i); I.R.C. § 401(a)(13)(C)(i)(I)

[265] ERISA §206(d)(4)(A)(ii); I.R.C. § 401(a)(13)(C)(i)(II).

[266] ERISA 206(d)(4)(A)(iii); I.R.C. § 401(a)(13)(C)(i)(III)

[267] See ERISA 206(d)(4)(C) and I.R.C. § 401(a)(13)(C)(iii)
(directing that where survivor annuity requirements are
present, attaching a nonparticipant spouse's interest requires

The Funds have consistently relied upon *Coar[268],* without advising the Court how the Third Circuit's position had changed after the 1997 Amendments to ERISA.  In *Martorana v. Bd of Trustees of Steamfitters Local Union 420, 404 F3d 797, 804(3d Cir. 2005)* the Third Circuit noted that in 1997, Congress amended ERISA §206 "to specifically allow for set-off of pension benefits in several specific situations".  One situation is the "very situation presented in *Coar*, namely when a fiduciary breaches his duty to the plan. 29 U.S.C.§ 1065(d)(4)(A)(ii)".  The Third Circuit refused to craft any further equitable exceptions.

At this juncture, benefit plans have a remedy, at law, for seeking a set off against the pension benefits of a breaching fiduciary.  There is no need to carve an exception in equity for the conduct at issue in this lawsuit.  The Funds would need a civil judgment (not just unilaterally claiming that a participant's interest is "extinguished").  The Funds Complaint does plead violations of ERISA §404 and §409 and seeks relief under ERISA 206(d).  Any other

_____

written consent, an effective waiver, or the specific inclusion of the nonparticipant spouse's interest in the judgment, order, decree, or settlement).

[268]   If you shepardize *Coar,* it has a red dot and says "superceded by statute".

equitable remedies that the Funds have sought in the ERISA
claims proceeding and their moving memorandum must be denied
as "superceded by statute".

## VII.  SECTION 206 OF ERISA MEANS WHAT IT SAYS

### A.  Funds Have No New Damages But Seek A Greater Recovery

The Funds Rule 26 Damage Disclosures (G. Ex. 5) cites
four previous MVRA restitution orders the measure of damage,
together with the On Par default judgment and the Turbo
arbitration.  As we have previously briefed, On Par was
fully settled and abated prior to even the filing of the
RICO suit[269] and the Funds are bound by Judge Marrero's
determination of the pecuniary damages caused by the Turbo
transactions, under MVRA,  as they presented proofs and had
an opportunity to be heard. [270]  The Funds rely almost
exclusively on the criminal judgments and orders yet claim
they are not limited by them.  They claim they are entitled
to a further offset of Greaney's pension benefit, because
his conduct also constituted a fiduciary breach under ERISA
404.

### 2. Section 206 of ERISA Means What It Says

---

[269]  See Section II (B) *supra,*  and potentially KAFCI and
EMB also. See Funds Ex. 30.

[270]  See Section II(A), *supra.*

The Second Circuit in *Caputo v. Pfizer, Inc. 267 F.3d 181,189 (2d Cir. 2001)* relying upon Supreme Court precedent held "[w]e have stated time and time again that the courts must presume that a legislature says in a statute what it means and means in a statute what it says there*"*. *Connecticut Nat'l Bank v. Germain*, 503 US 249, 253-54 (1992)."   In *Caputo,* the Second Circuit declined "fusing the phrase 'fraud <u>or</u> concealment' into a single term 'fraudulent concealment'" (Emphasis in original) in construing Section 413 of ERISA.   *Id 267 F3d at 189.*

In 1997, Congress expressly amended ERISA to permit restitution orders to reach ERISA-covered pension benefits for crimes committed *against the plan itself*. The 1997 amendment was included in the Taxpayer Relief Act of 1997, <u>Pub L. No. 105-34, §1502, 111 Stat. 788,</u> 1058-59.  The Senate Report provides:

> Under present law, amounts held in a qualified retirement plan for the benefit of a participant are not, except in very limited circumstances, assignable or available to personal creditors of the participant...
>
> *There is no specific exception under the Employee Retirement Income Security Act of 1974....which would permit the offset of a participant's benefit against the amount owed to a plan by the participant as a result of a breach of fiduciary duty to the plan or criminality involving the plan...*
>
> Reasons for Change

The Committee believes that the assignment and
alienation rules should be clarified by creating a
*limited exception* that permits participant's benefits
under a qualified plan to be reduced under certain
circumstances including the participant's breach of
fiduciary duty to the plan.

Explanation of Provision

The bill permits a participant's benefit in a qualified
plan to be reduced to satisfy liabilities of the
participant to the plan due to...the participant being
convicted of committing a crime involving the plan...S.
Rep. No. 105-33, at 310 (1997), *see also* H.R. Rep.  No.
105-220, at 756-57(Conf. Rep.)(same).
[Emphasis Added].

The newly amended ERISA section 206(d)(4)(A)(1997)

provided, in pertinent part, that an offset would be

permitted, against an amount the participant is ordered or

required to pay the plan if:

(A) the order or requirement to pay arises-

(I) under a judgment or conviction of a crime involving
such plan,

(ii) under a civil judgment...  *or*

(iii) pursuant to a settlement agreement...

The use of the word "or" is critical in this statutory

scheme.  Black's Law Dictionary (4th Edition, 1968) describes

"or" as:

A disjunctive particle used to express an alternative
or to give a choice of one among two or more things.

Despite the fact that a criminal judgment has been

issued against Greaney convicting him of a crime involving a

plan, the Funds argue that they are entitled to multiple causes of action under ERISA 206(d)(4).  No one questions the Funds' right to bring a civil proceeding under ERISA 502 to recover for fiduciary breaches in connection with a violation of 4 of Title 1 (fiduciary responsibility) and obtain  "order or requirement to pay" recognizable under ERISA 206(d)(4)(A)(ii), if an order or requirement to pay was not already entered under ERISA 206(d)(4)(i) under MVRA for the same conduct.

The Funds argue that the word "or" "is often interpreted to mean the conjunctive if this more consistent with legal intent".[271]

 The Supreme Court in *Reiter v. Sonotone Corporation, 442 U.S. 330, 339 (1979), in construing the Clayton Act held:*

> Canons of construction ordinarily suggest that terms
> connected by a disjunctive be given separate meanings,
> unless the context dictates otherwise....

 Thus, the use of "or" separating the clauses in ERISA 206(d)(4)(A) provides the offset can be by a judgment of conviction, *or*  a civil judgment *or* a settlement, **but not in combination.**

---

[271]  Funds Memorandum of Law, pg 18.

Words are given their ordinary and usual meaning in an interpretation exercise, and must be read in context and in their place in the overall statutory scheme. *Roberts v. Sea-Land Services, Inc., et.al.*, 566 US 93,101 (2012). Unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning. *BP America Production Co. v. Burton*, 549 US 84,91 (2006). The ordinary meaning of the disjunctive controls, as there is no contrary meaning within the statute.  In deciphering this statute, it is clear that only one of two words could have been utilized to give effect to the amendment, either the conjunctive "and", or the disjunctive "or".  The literal meaning of the conjunctive "and" is "in addition to". Accordingly, if the conjunctive had been placed in the statute, the only meaning that could be derived from it, would be that a participant's benefits would be susceptible of being reached under any or all of the three qualifying events.  Thus, under the Funds' interpretation, a participant's benefits could be reached under a judgment of conviction ... and [then again], under a civil judgment ... *and* [then for a third time] pursuant to a  settlement.

Distilling the statute to its integral parts illustrates that the Funds' construction is unreasonable. There are three circumstances where ERISA 206 (d)(4) allows the taking of a participant's benefits.  The three

procedures, defined in the singular, civil trial to
conclusion, settlement (without resort to trial), and
criminal judgment.  These three procedures are uniquely
distinct and mutually exclusive, and thus properly separated
by the disjunctive term.  Where there has been a
"settlement", there is no trial.  These two are mutually
exclusive.  The disjunctive word is the only way to properly
distinguish them.  Since there can never be a double
recovery stemming from these two procedures, the Funds are
forced to argue that, while one "or" (between "settlement"
and "civil trial") must represent the disjunctive, the
remaining "or" can be read to be conjunctive.  With one
word, "or", in place in the statute, it can only have one
meaning.  It is either disjunctive or conjunctive, but it
cannot be both.  Employing the Funds reasoning, becomes an
indecipherable mess. Run to its ultimate end, the Funds
argument even envisions triple recovery, there being, as
they would have it, three processes connected by the
conjunctive.  The Funds advance no theory to support its
claim and thus their argument is without merit.

The foregoing determines the issue, "unless the context
[of the statute] dictates otherwise".  *Reiter*, *supra* at pg.
339.  The content of the statute, and the import of the
anti-alienation legislation tell us, in powerful language,

that the "context" of the statute does not indicate otherwise.   There are no words contained in ERISA 206 (d)(4) that lead to the conclusion that multiple taking of benefits may be reached by the Funds, particularly, where as here, the measure of damages are the same under the MVRA and ERISA.  See pg 138, *infra.*  When Congress intends a triple damage remedy, it knows how to fashion it as demonstrated in civil RICO and the Clayton Anti-Trust Act.

There is no language in ERISA 206 or its IRC counterpart in IRC 401(a)(13)( C), that even remotely suggests the possibility, much less the plausibility, of a double recovery of benefits.  Absent a statutory command, there is no legal basis to permit an award that allows a victim to recover more than his due.  *United States v. Nucci*, 364 F3d at 424, supra.  The Supreme Court has noted the strong aversion to any taking of the benefits of "pensioners (and their dependants)".  *Guidry v. Sheet Metal Workers Nat'l Pension Fund, et.al.*,  493 U.S. at 376, *supra*. Since the anti-alienation language of the statute remains in force, its legislative intent must also remain.  *See Freytag v. Commissioner of Internal Revenue,* 501 US 868, 877(1991)(Supreme Court is deeply reluctant to interpret a statutory provision so as to render other provisions in the same enactment as superfluous).  ERISA's anti-alienation provision reflects a considered congressional policy choice

and only a clear and specific legislative directive is
sufficient to defeat it.  *Guidry supra*, at p. 376.  There
has not been, to date, a "clear and manifest" intention to
override the wording of "or" in ERISA 206 (d)(4).

Moreover, the "context" includes the passage of MVRA
immediately before the amendment of ERISA § 206.( See fn 9,
*supra*). The Second Circuit has said that closely related
statutes are to be construed together, if possible, as to
effectuate the legislative policies of both. *Thielebeule v.
M/S Nord*see *Pilot*, 452 f2d 1230 (2d. Cir. 1971). We
respectfully submit that Congress already anticipated that
parties would attempt to use a MVRA order for further civil
remedies and prevented it in advance.  The Second Circuit in
*US v. Irving*, 452 F3d 110, 127 (2d Cir. 2006) saw MVRA as
the Congressional solution to "the Supreme Court's
invitation in *Guidry",* to passing legislation that creates
an legal exception to the anti-alienation bar to recovery of
pension assets in cases of a criminal judgment.  Congress,
in enacting MVRA, was looking for a  "once and done" scheme
to limit the post-conviction explosion of civil suits.
This is mirrored in ERISA 206(d)(4) which clearly gives the
claimant a civil judgment, a criminal judgment, *or* a
settlement.  This position is further strengthened by the
fact that the measure of damages under ERISA and MVRA is

precisely the same. The Second Circuit in *Donovan v. Bierworth II*, 754 F2d 1049,1056 (2nd Cir. 1985) held that the appropriate remedy for fiduciary breach was to restore the plan to the position it would have held but for the breach. The Second Circuit in *United States v. Boccagna,* 450 F.3d 107, 115 (2d Cir. 2006) held that in fashioning a Restitution Order under MVRA the goal is to "restore the victim, to the extent that money can do so, to the position he occupied before sustaining injury."

Again, the Funds are moving only on transactions that have been already resolved by settlement or MVRA Restitution Orders.[272]  The Funds have failed, in fact or law, to establish entitlement to a further remedy.

### 3. Irony of the Fund's Position

The irony of the Funds' position is they wrongly assume they have more to gain from a civil action under ERISA 206(d)(4)(ii) than the MVRA criminal judgment already rendered in their favor.  We submit that criminal RICO is a much easier vehicle for recovery of damages for a fiduciary breach that involve a plan.  First of all, the government bears the burden of the proof of the loss (18 USC §3664(e)

---

[272]  G. Ex 5 .

and the duty to collect under MVRA (18 USC §3613(a)).   For most litigants, this would be considered a benefit.

The burdens of proof under ERISA are more substantial than under 18 USC Section 1962(d) of RICO[273] . The Funds have burdens of proof under ERISA 405 and 409 that they have not even addressed. These burdens of proof cannot be met, under ERISA, by a "conspiracy" nor the elocution in the criminal plea alone.  Under ERISA 409, the plaintiff bears the burden of proof of (1) establishing a breach of fiduciary duty (2) a causal connection between the breach and loss to plan in order to establish monetary liability. *Diduck v. Kaszycki & Sons, 974 F2d 270, 279 (2d Cir.1992)(*reversed judgment for plaintiff and remanding because district court did not address the issue of causation), *overruled on other grounds by Gerosa v. Savasta & Co.,* 329 F3d 317(2d Cir. 2003). The *Diduck* court held plaintiffs needed "proof of a causal connection between the fraud perpetuated and the loss complained of"... Thus, the defendants "may not be held liable for contributions owing to the funds unless, absent a fraudulent breach, the funds would have collected them". *Id*

---

[273]   See, *US v. Gigante*, 737 F. Supp 292(D. NJ 1990) and *Salinas v. US, 522 US 52 (1997).*

*at 279.*   While Greaney plead guilty to some job site corruption and knowledge of some conduct on the part of Forde, the internal collections corruption, of which Greaney had no part or knowledge, was so extensive, that under these facts, it is mere speculation to presume that any monies that would have been reported by these contractors would have been collected[274].

Nor have the Funds established that damages against Greaney would be greater under ERISA.  Caselaw establishes that the measure of damages under MVRA and ERISA are essentially the same. [275]   ERISA Section 409(b), 29 U.S.C. §1109(b), states:

> No fiduciary shall be liable with respect to a breach of fiduciary duty under this title if such breach was committed before he became a fiduciary or after he ceased to be a fiduciary.

As the Funds Complaint and the criminal pleas establish that the criminal conduct occurred between 1998-

---

[274] See Statement of Facts (H), Section I(E), and  Greaney affidavit ¶ 9 & 23.

[275]  See Section IV (C)(2). See *Donovan v. Bierworth II,* 754 F2d 1049, 1056 (2d Cir.1985)(fiduciary breach measure of damage) and *Unites States v. Boccagna,* 450 F3d 107, 115 (2d Cir. 2006)(MVRA measure of damage) on 138, *supra.*

2004 and Mr. Greaney became a Trustee in May 2003.  By statute, the determination of the loss, for the same conduct under MVRA would be the larger amount. (G. Ex. 1 ¶72, Funds Ex. 3 p 21, G. Ex. 42).

### 4.  The Funds Cannot Amend Their Pleadings in Their Briefs And Raise ERISA violations which are Time Barred.

The Funds FAC brought their action "pursuant to RICO, 18 USC § 1964( c) and (d), ERISA §502(a)(2) and ERISA §206(d)(4)."[276]  With respect to defendant Greaney, they plead violations of ERISA §404(a), 29 USC §1104(a) and relief under ERISA §409 (personal liability) and ERISA 502(g)(attorney's fees).[277]

The Funds, by their own admission, state that the statute of limitations, for their claims, under ERISA, would have "expired no earlier than 2012".[278]

We have been in litigation for over 6 years and discovery had closed.  Consequently, we were surprised that the Funds claimed in their brief, for the first time, that

---

[276]  FAC ¶2 (G. Ex. 1)

[277]  FAC ¶¶ 190, 194, 196, 199, 200 (G. Ex. 1).

[278]  Funds Memorandum of Law, pg 16.

Forde and Greaney breached their duties "under ERISA 406(b)(1)"(personal use of plan assets) and under ERISA 406(b)(3)" ("receive consideration for his own personal account from any party dealing with such plan in connection with a transaction involving such plan"). [279] The Funds do not provide any factual or legal analysis apart from quoting the statute.

Moreover, the Funds claim that "Greaney is liable under ERISA-to the same extent as Forde".  However, they never plead the co-fiduciary liability provisions of ERISA nor presented any analysis as how it might apply under these facts.

"[I]t is well settled that a party may not amend its pleadings in its briefing papers." *Enzo Biochem, Inc. v. Amersham PLC,* 981 F. Supp. 2d 217, 223 (SDNY 2013); *see also Fadem v. Ford Motor Co.*, 352 F. Supp. 2d 501, 516 (SDNY 2005) ("It is long-standing precedent in [the Second] [C]ircuit that parties cannot amend their pleadings through issues raised solely in their briefs."), aff'd, 157 F. App'x 398 (2d Cir. 2005).  Consequently, we respectfully submit that these new claims are not properly before the Court.

---

[279]   *Id at 13-14.*

Moreover, we respectfully submit that such an amendment should not be permitted as they are unquestionably time barred.

Finally, as with all ERISA provisions, there are complicated burdens of proof that are necessary to establish any and all of the claims.  The co-fiduciary provisions of ERISA Section 405 are no exception.  The Court in *Silverman v. Mutual Benefit Life Ins. Co., 941 F. Supp. 1327, 1334-1338 (EDNY 1996),* makes a through analysis of the burden of proof of the proponent of an ERISA 405 claim and the showings necessary to satisfy one of its three provisions.[280]  On this motion for summary judgment, the Funds have failed to meet any of these burdens of proof.

## V. **MVRA, RICO AND ERISA WERE INTENDED FIT TOGETHER**

In *Novak, 476 F3d at 1056, supra,* the Court stated:

Congress added a statutory exception to section 206(d) of ERISA to resolve the circuit split on the interplay between the statutory provisions authorizing plans to use self-help to recover for the breach of fiduciary duty and the anti-alienation provisions by overturning

---

[280]   It is notable that ERISA Section 405 contains a disjunctive between the three sections.

> *Herberger. See* H.R.REP. No. 105-220, at 757
> (1997)(Conf. Rep.).

As noted previously, in Section IV(C)(2), The Second Circuit in *US v. Irving*, 452 F3d at 127 (2d Cir. 2006) saw MVRA as the Congressional solution to "the Supreme Court's invitation in *Guidry,* to passing legislation that creates an legal exception to the anti-alienation bar to recovery of pension assets in cases of a criminal judgment involving a plan. Congress, in enacting MVRA in 1996 and ERISA 206(d) in 1997[281], was looking for a "once and done" solution.  As previously noted this position is strengthened by the fact that the measure of damages under ERISA and MVRA is precisely the same.[282]

There is no question that a MVRA restitution order, were the victim is a Plan, is an order or requirement to pay under a judgment of conviction of a crime involving such plan. See 206(d)(i).  Moreover, as described in Section III(D)&(E), by having MVRA establish proximate cause and damages, entry of treble damages under Civil Rico following a MVRA restitution order could be a mathematical and ministerial act.  However, such civil RICO damages should

---

[281]  See Section IV(C)(3).

[282]  See Section IV(C)(2).

only be entered consecutively, so as to avoid constitutional problems and not enlarge the criminal judgment. See Section III (D) & (E).

Under ERISA, the terms of the Plan should control the action of the Trustees and such terms must comply with ERISA and the Code.[283]

Under MVRA, the terms of the Judgment should control.[284] The terms of the Judgment are solely within Judicial control.[285] There is built in discretion in the statute, for the sentencing judge.  As noted by the Supreme Court in *Gall v. US, 552 US 38, 51-52 (2007),* the district court has the advantage of actual and extensive sentencing experience and a unique factfinding position, which allows it to hear evidence, make credibility determinations and interact directly with the defendant (and often, with his victims), thereby gaining insights not always conveyed by a cold record.  *See also US v. Norman, 776 F.3d 67, 76 (2d Cir. 2015).*

---

[283]   See Section IV(A)(1)& (2).

[284]  Section III, B.

[285]   *Id.*

The foregoing leads one to the conclusion that there was a Congressional decision to interrelate these provisions which should be respected.

**VI: PENALTIES FOR FAILURE TO PROVIDE DOCUMENTS**

The hour is late and we have all traveled many legal miles with respect to this matter.  Although the Greaney's believe that they have a viable claim with respect to documents not timely provided and still not provided, they respectfully withdraw the monetary penalties portion of the Greaney's claim for failure to produce documents under ERISA §502( c) and simply ask that the relative weight of these violations be considered, by the Court, in fashioning the equitable relief, under ERISA 502(a)(3). We respectfully preserve any impact that these violations may have on the formation of the administrative record and the appropriate standard of review.

## REQUEST FOR RELIEF

Based upon the foregoing, we respectfully submit that summary judgment is appropriate on these uncontested facts and applicable law.  Consequently,  the Greaneys' request the following relief:

1. Find that the Funds civil RICO claims are time-barred. In the alternative, find that the Funds cannot resurrect the

On Par default judgment as the matter was fully settled with a merger clause and that the Funds are bound by Judge Marrero's restitution order relative to Turbo, and/or failed to meet a burden of proof to disturb such determination. Additionally, we respectfully ask the Court find, within its discretion, that some or all of the settlements for some or all of the defendants,  should be set-off before trebling and that the civil RICO damage award should be only be entered consecutively, so as to avoid constitutional problems and not enlarge the criminal judgment.

2.  Declare that the Funds' unilateral attempt to "extinquish" the Greaneys benefits is a violation of the Annuity and Pension Plan terms and ERISA and the Code and is a breach of fiduciary duty;

3.  Order, under ERISA 502(a)(1), that the Greaney's are entitled to full benefits under the terms of the Annuity and Pension Plans subject only to Judge Marrero's MVRA restitution Order, under ERISA Section 206(d)(4)(A)(i) and, as participants and beneficiaries, that they are entitled to make any such elections that are permitted under the terms of the Plan;

4.  Declare, that when some or all of the factors specified under Section 1(E)(1)-(6), are present that is either *prima facie* evidence or factors that weigh against the exercise of due diligence by the Funds;

5.  Enjoin defendants from any further acts or practices in violation of ERISA and applicable law under ERISA §502(a)(3), including but not limited to failure, to honor spousal rights, failure to honor the written terms of the Plans and/or ERISA and failure to conform with ERISA's mandated claims procedure.

6.  Order such equitable relief as the Court deems appropriate, for the benefit of the Plans, under ERISA §502(a)(3), including, not limited to appointment of independent fiduciary counsel, in addition to collection and general counsel, and fiduciary training for the Trustees.

7.  Grant such other and further relief as the Court may deem just and proper.


Dated: Hamilton, New York
       December 11, 2017

                                Respectfully submitted

                                Quesada & Moore, LLP


                        By: /s/ Victoria Quesada
                            Victoria Quesada
                            Quesada & Moore, LLP
                            35 University Ave
                            Hamilton, NY 13346
                            (315)228-2060

Victoria Quesada, Esq.
Robert L. Moore, Esq.