UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
NEW YORK CITY DISTRICT COUNCIL OF
CARPENTERS PENSION FUND, et al.,                          :

                Plaintiffs,                    :          <u>REPORT AND</u>
                                                 <u>RECOMMENDATION</u>
                                          :
   -v.-                                    :          11 Civ. 5474 (LAP) (GWG)
                                          :          (Lead Case)

MICHAEL FORDE, et al.,                                   :

                Defendants.                    :
---------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

      This case was brought by pension and annuity funds against certain former trustees

seeking damages for losses caused by the trustees' corrupt conduct.  The pension and annuity

funds are the New York City District Council of Carpenters Pension Fund, New York City

District Council of Carpenters Welfare Fund, New York City District Council of Carpenters

Annuity Fund, and New York City District Council of Carpenters Apprenticeship, Journeyman

Retraining, Educational and Industry Fund, joined in this suit by their trustees and plan

administrator (collectively, the "Funds").  Of the numerous defendants originally named in the

complaint, plaintiffs now seek summary judgment against former trustees Michael Forde and

John Greaney, who are the only remaining parties who have not been dismissed or defaulted.

Plaintiffs sue under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18

U.S.C. §§ 1961-68, and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C.

§§ 1001-1461.

      Greaney and his wife Imelda Greaney (collectively, the "Greaneys") have brought a

separate lawsuit, now consolidated with the Funds' action, against the Funds, claiming that the

Funds violated ERISA by refusing to pay him his pension or issue him a lump sum annuity and seeking to ensure that Imelda Greaney has a spousal interest in Greaney's annuity and pension. The Funds and the Greaneys cross-move for summary judgment on their claims and for damages.[1]

For the reasons that follow, the Funds' motion should be granted in part and denied in part and the Greaneys' motions should be denied.

## I. BACKGROUND

The following facts are undisputed unless otherwise noted.

### A. Facts Relating to Liability

The Funds are jointly-administered trust funds established under § 302(c) of the Labor Management Relations Act of 1947, 29 U.S.C. § 186(c).  See Powers Decl. ¶ 3.  The Funds are also employee benefits plans under § 3(3) of ERISA, 29 U.S.C. § 1002(3).  Id.

---

[1]  Notice of Motion, filed Sept. 11, 2017 (Docket # 241) ("Pls. Not. Mot."); Memorandum of Law in Support of Funds' Motion for Summary Judgment, filed Sept. 11, 2017 (Docket # 242) ("Pls. Mem."); Declaration of Luke Powers, filed Sept. 11, 2017 (Docket # 243) ("Powers Decl."); Funds' Statement Pursuant to Local Civil Rule 56.1, filed Sept. 12, 2017 (Docket # 244); Declaration of Marc. A. Tenenbaum, filed Sept. 12, 2017 (Docket # 245) ("Tenenbaum Decl."); Notice of Cross-Motion, filed Jan. 15, 2018 (Docket # 252) ("Def. Not. Mot."); Memorandum of Law in Opposition to Funds' Motion for Summary Judgment and in Support for Greaneys' Cross Motion for Summary Judgment, filed Jan. 15, 2018 (Docket # 253) ("Def. Mem."); Declaration of Victoria Quesada, filed Jan. 15, 2018 (Docket # 254) ("Quesada Decl."); Declaration of John Greaney, filed Jan. 15, 2018 (Docket # 255) ("Greaney Decl."); Greaneys' Rule 56.1 Statement, filed Jan. 15, 2018 (Docket # 256) ("Def. Rule 56.1 Statement"); Greaneys' Counter Statement to Funds' Rule 56.1 Statement, filed Jan. 15, 2018 (Docket # 257) ("Def. Counter Statement"); Reply Memorandum of Law in Further Support of Funds' Motion for Summary Judgment and in Opposition to Greaneys' Motion for Summary Judgment, filed Jan. 31, 2018 (Docket ## 258, 259) ("Pls. Reply Mem."); Funds' Response to Greaneys' Statement Pursuant to Local Civil Rule 56.1, filed Jan. 31, 2018 (Docket # 260) ("Pls. Counter Statement"); Second Declaration of Marc A. Tenenbaum, filed Jan. 31, 2018 (Docket # 261); Reply Declaration of Victoria Quesada, filed Mar. 1, 2018 (Docket # 265); Reply Memorandum of Law, filed Mar. 1, 2018 (Docket # 266) ("Def. Reply Mem."); Reply Declaration of John Greaney, filed Mar. 1, 2018 (Docket # 267).

A board of trustees administers the funds.  Id. ¶ 4.  The New York District Council of Carpenters (the "District Council") appoints half of the trustees and employer associations appoint the other half.  Id.  The District Council represents union members and enters into collective bargaining agreements ("CBAs") with employers and employer associations on its members' behalf.  Id. ¶ 7.  Among the signatory employers of the CBAs were On Par Contracting Corp. ("On Par"), Turbo Enterprises, Inc. ("Turbo"), Pitcohn Construction Enterprises, Inc. ("Pitcohn"), and Pyramid Associates Construction Corp. ("Pyramid").  Id. ¶ 10.  Under the CBAs, these employers were required to hire only union members to perform certain types of work within a specified geographical area ("Covered Work"), to pay specified hourly wages, and to make specified contributions to the Funds for each hour of Covered Work performed.  Id. ¶ 8.

Local 608 was one of the local unions that was part of the District Council.  Transcript of Forde Plea Allocution, dated July 28, 2010 (annexed as Ex. 2 to Tenenbaum Decl.) ("Forde Plea Tr."), 14.  Defendants Michael Forde and John Greaney were part of both Local 608 and the District Council.  Id.; Transcript of Greaney Plea Allocution, dated July 16, 2010 (annexed as Ex. 3 to Tenenbaum Decl.) ("Greaney Plea Tr."), 21.  From 1994 through 1997, Forde was a business agent for Local 608.  Forde Plea Tr. 14.  From 1997 through 2000, he served as Local 608's president.  Id.  He was thereafter elevated to Executive Secretary-Treasurer of the District Council, the highest-ranking executive in the District Council, and served in that role until 2009.  Id.; see also Olivieri Trial Transcript, dated Oct. 19, 2010 (annexed as Ex. 10 to Tenenbaum Decl.) ("Olivieri Trial Tr."), Greaney: 742.  As Executive Secretary-Treasurer, he also served as a trustee of the Funds.  Forde Plea Tr. 14.  During Forde's time as Local 608's president, Greaney worked as a business agent for Local 608.  Greaney Plea Tr. 21.  Greaney took over

from Forde as Local 608's president in 2000 and served Local 608 in that capacity through 2008. Id.  He was also the business manager of Local 608.  Id.  Forde appointed Greaney as a trustee of the funds in May 2003 and he served as trustee through August 2009.  Id.; Deposition of John Greaney, dated Apr. 28, 2017 (annexed as Ex. 4 to Tenenbaum Decl.) ("Greaney Dep."), at 16.

In August 2009, a federal grand jury indicted Forde and Greaney, among others, for running a scheme to deprive the Funds of millions of dollars in employer contributions in exchange for bribes.  See Sealed Indictment, dated Aug. 3, 2009 (annexed as Ex. 5 to Tenenbaum Decl.) ("Indictment").  In 2011, Forde and Greaney pleaded guilty to charges of racketeering conduct and racketeering conspiracy in violation of RICO, 18 U.S.C. § 1962(c)-(d). See United States v. Forde, Second Amended Judgment in a Criminal Case, dated Oct. 14, 2011 (annexed as Ex. 7 to Tenenbaum Decl.) ("Forde Judgment"); United States v. Greaney, Judgment in a Criminal Case, dated June 20, 2011 (annexed as Ex. 8 to Tenenbaum Decl.) ("Greaney Judgment").  Greaney also pleaded guilty to Conspiracy to Commit Wire Fraud and Embezzlement, 18 U.S.C. § 371; Deprivation of Honest Services, 18 U.S.C. §§ 1343, 1346; Unlawful Acceptance of Payments, 29 U.S.C. § 186(b)(1), (d)(2); 18 U.S.C. § 2; and Perjury, 18 U.S.C. § 1623.  See Greaney Judgment at 2.

At his plea allocution, Forde admitted to the following:

From approximately 1994 to 2004, I along with other union officials accepted bribes in the form of cash payments from certain contractors including On Par, Turbo, Pyramid, New York City Acoustics and KAFCI, in return for allowing the contractors to violate the terms of their collective bargaining agreements with the district council.  In allowing these violations of the collective bargaining agreements, I along with other union officials let contractors use undocumented workers and avoid making contributions to the district council's benefit funds that should have been paid on behalf of those workers.

4

> At the time that I accepted the bribes, I knew that I was violating the 1994 consent decree issued by Judge Haight in the civil case brought by the government, and I made efforts to obstruct investigations into my conduct.[2]
>
> Finally, in January 2009, I gave false testimony at a deposition in a civil action between the district council and a contractor.  At the deposition, I falsely denied that I had personal knowledge of a contractor using undocumented workers.

Forde Plea Tr. 14:16-15:9.  He was sentenced to imprisonment for 132 months and ordered to

forfeit $100,000, pay a fine of $50,000, and make restitution in the amount of $5,720,582.67.

Forde Judgment at 2, 5-6.

> Greaney, at his plea allocution, admitted the following:
>
> Approximately between the years 1998 and 2004, I accepted or shared in the illegal cash payments from a number of union contractors, including but not limited to On Par Contracting, Turbo Construction, Pitcohn Construction, and Pyramid Associates Construction.
> . . .
> I, along with others, accepted the illegal cash payments, and in return, allowed contractors to violate the terms of their collective bargaining agreement with the district council.
>
> I, along with others, allowed the collective bargaining agreements to be violated in the following ways:
> . . .
> [First,] I . . . allowed union work cards to be issued to illegal immigrants who are employed by the four different contractors.  I . . . [was] aware that the illegal immigrants were being paid in cash, and that the contractors did not make contributions to the district council benefit funds on behalf of the illegal immigrants as required by the collective bargaining agreements.
> . . .

---

[2]  The "consent decree" referred to was a consent decree issued in 1994 to resolve a case brought by the United States against the District Council, certain of its officers, and other individuals alleging labor racketeering.  The Consent Decree included provisions enjoining officers of the District Council "from committing any act of racketeering activity, as defined in 18 U.S.C. § 1961" and "from obstructing or otherwise improperly interfering with the work of the [Investigations and Review Officer]," as well as provisions mandating that the Union "make all job referrals in accordance with the job referral rules."  United States v. Dist. Council of N.Y.C. & Vicinity of United Bhd. of Carpenters & Joiners of Am., 571 F. Supp. 2d 555, 556-57 (S.D.N.Y. 2008).

> [Fourth,] I was aware that the contractors filed false remittance reports, under-reporting the number of men working on particular jobs and/or the number of hours actually worked.  I was aware that . . . as a result, the district council benefit funds did not receive from the contractors the contributions the contractors were required to pay pursuant to the collective bargaining agreements.
> . . .
> [Eighth,] I committed perjury when I testified at a civil deposition in 2009, brought by the New York City District Council of Carpenters Pension Funds . . . .  At the deposition, I testified falsely under oath by stating that I never met James Murray, the owner of On Par Contracting, outside of job sites.  Additionally, I testified falsely when I denied accepting cash payments from Gerard McIntee, the owner of Pitcohn Construction Enterprises Incorporated.

Greaney Plea Tr. 21:20-22:14, 23:7-15, 24:13-22.  Greaney was sentenced to imprisonment for 12 months and one day, and ordered to forfeit $100,000, pay a fine of $10,000, and make restitution in the amount of $5,002,082.82.  Greaney Judgment at 3, 6-7; Sentencing Transcript, United States v. Greaney, dated June 17, 2011 (annexed as Ex. 14-G to Quesada Decl.), 12-14.

## B.  Facts Relating to Damages

The parties dispute the losses caused to the Funds by Greaney and Forde's conduct.  The Funds allege that the bribery scheme in which Forde and Greaney participated "enabled four of the signatory employers [(i.e., Turbo, Pitcohn, Pyramid, and On Par)] to evade their collectively bargained obligations to pay the Funds a total of at least $21,579,334.97."  Pls. Mem. at 5.  These amounts are derived from the Restitution Orders issued against Forde and Greaney in their criminal cases, see Restitution Order, dated June 17, 2011 (annexed as Ex. 15 to Tenenbaum Decl.) ("Greaney Restitution Order"); Restitution Order, dated Apr. 19, 2011 (annexed as Ex. 16 to Tenenbaum Decl.) ("Forde Restitution Order"); from a default judgment issued in favor of the Funds against On Par, see Default Judgment and Order, dated Oct. 31, 2006 (annexed as Ex. 12 to Tenenbaum Decl.) ("On Par Default Judgment"); see also Proposed Default Judgment Order, filed Oct. 20, 2006 (annexed as Ex. 11 to Tenenbaum Decl.), at NYCDCCBF-2124; and from an

arbitration award issued in November 2011 in favor of the Funds against Turbo, see Opinion and Award, dated Nov. 22, 2011 (annexed as Ex. 13, pt. 3, to Tenenbaum Decl.) ("Arb. Award"), at 188.  According to the Funds, Forde and Greaney, along with the owners of various contractors and certain shop stewards, have already paid $6,486,813.90 toward that amount, leaving an unpaid balance of $15,092,521.07.  Pls. Mem. at 5-6; see also Payments Through 9/11/17, filed Sept. 11, 2017 (annexed as Ex. 30 to Tenenbaum Decl.).  They seek summary judgment in that amount on their ERISA claim.  Pls. Mem. at 1-2, 5-6, 19.  As to their RICO claim, they seek damages in the amount of $58,251,191.01, which consists of three times their losses of $21,579,334.97 for a total of $64,738,004.91, less the amounts already recovered of $6,486,813.90.  Id. at 19.

As is described further in Section V.C below, Greaney disputes the loss amount claimed. See Def. Counter Statement ¶¶ 31-39; Def. Mem. at 130, 146-47.  Specifically, Greaney contends the loss calculation amount contained in the restitution orders issued by Judge Marrero against Forde and Greaney must be reduced by any amounts previously recovered before damages are trebled under RICO.  See Def. Mem. at 112-14; Greaney Restitution Order; Forde Restitution Order.  He also contends that a 2009 settlement between the Funds and On Par and its former owner bars the Funds from pursuing Greaney for any additional amounts relating to On Par's fraud, as well as barring them from using the default order entered in the Funds' case against On Par as a measure of losses.  See Def. Mem. at 91, 94-95, 146-47; Agreement and General Release, dated Mar. 27, 2009 (annexed as Ex. 20 to Tenenbaum Decl.) ("On Par Settl."); On Par Default Judgment.  Greaney also disputes the Funds' use of the loss calculation contained in the arbitration award issued in November 2011 in favor of the Funds against Turbo.  See Arb. Award; Def. Mem. at 82.

7

The Restitution Order issued against Greaney in his criminal case decrees that "Greaney is liable for restitution in the amount of $4,973,259.92 to the [Funds]" in connection with the Funds' losses related to Turbo, Pitcohn, and Pyramid.  Greaney Restitution Order at 1-2.  It also decrees that Greaney pay $28,822.90 to the Promotional Fund for restitution in connection with losses relating to the same three companies, and notes that "Greaney shall be jointly and severally liable for the losses set forth above . . . with co-defendant Michael Forde . . . ."  Id. at 2. Greaney's Criminal Judgment states that "[a]fter release from imprisonment, [he] shall pay remaining fine, restitution, and forfeiture amounts at the rate of 15% of gross monthly income." Greaney Judgment at 7.

 Forde was found liable for restitution to the Benefit Funds in the amount of $5,085,964.05 in connection with the same losses, as well as losses related to KAFCI Corp., which totaled $112,704.13.  See Forde Restitution Order at 1-2.  Forde's Restitution Order also decrees that he pay $29,082 to the Promotional Fund, and directs him to "pay 25% of his gross monthly income, including pension income, toward restitution, with payments to begin promptly after the entry of this order."  Id. at 3.  It also states that he will be jointly and severally liable for the losses with Greaney.  Id.

During the criminal proceedings, the Funds had sought restitution in an amount exceeding $18 million from Forde, see Letter from Harry Sandick to Judge Marrero, dated Nov. 18, 2010 (annexed as Ex. 18 to Tenenbaum Decl.) ("Sandick Letter"), at 1; Letter from Raymond G. McGuire to Judge Marrero, dated Feb. 18, 2011 (annexed as Ex. 19 to Tenenbaum Decl.), at 2 ("McGuire Letter"),[3] which the Funds asserted was "undoubtedly understated," see

---

[3]  Plaintiffs have not pointed to admissible evidence supporting a claim that they also sought $18 million in restitution from Greaney.

McGuire Letter at 3.[4]  The Government, however, recommended imposition of restitution orders against Forde and Greaney of only $3,763,745.09, plus interest.  See Transcript of Hearing Before Judge Marrero, dated Mar. 10, 2011 (annexed as Ex. 17 to Tenenbaum Decl.) ("March 2011 Hearing Tr."), 5; see also Def. Counter Statement ¶ 40.[5]  Forde and Greaney did not dispute the Government's losses calculations.  March 2011 Hearing Tr. 5-6.  Judge Marrero adopted the Government's recommendation.  See Greaney Restitution Order; Forde Restitution Order. Because the Government viewed the Funds' settlement agreement with On Par as resolving all outstanding loss claims, "including claims relating to restitution," the Restitution Orders did not account for losses related to On Par.  See Government's Memorandum Regarding the Restitution Obligations of Defendants Michael Forde, John Greaney and Brian Hayes, dated Feb. 2, 2011 (annexed as Ex. 14 to Tenenbaum Decl.) ("Gov't Restitution Mem."), at 7.  The Restitution Orders also do not account for the arbitrator's award in favor of the Funds against Turbo, given that the arbitrator had not yet issued his ruling.  See id. at 6 n.3; see also Sandick Letter at 2 n.1.

C.  Procedural History

The first of these two cases was filed on August 5, 2011, by the Funds.  See Complaint, filed Aug. 5, 2011 (Docket # 1).  An amended complaint was filed shortly thereafter.  See Amended Complaint, filed Nov. 28, 2011 (Docket # 30) ("Am. Compl.").  The amended complaint names as defendants Forde, Greaney, Joseph Olivieri, Brian Hayes, Michael Mitchell,

---

[4]  Although Greaney disputes this fact in his counter statement, see Def. Counter Statement ¶ 43, the factual predicate for the dispute — that the quoted phrase is not in the letter — is incorrect and therefore we find no genuine dispute remains.

[5]  The Government also recommended that Forde pay $605,536.62 to the Union (i.e., the District Council), and $118,694.31 to the benefit funds for losses related to KAFCI.  March 2011 Hearing Tr. 5.  The Government expressly excluded Greaney from responsibility for those amounts.

Finbar O'Neill, KAFCI, Michael Brennan, Turbo, Terence Buckley, Pitcohn, Gerard McEntee, Pyramid, James Duffy, EMB Contracting Corp., Michael Batalias, Elisavet Batalias, Matthew Kelleher, Brian Cason, Joseph Ruocco, John Stamberger, and Michael Vivenzio.  Id. at 1.  The amended complaint alleges that the defendants conspired to deprive the Funds of millions of dollars in funds owed to them under the CBAs.  Id. ¶ 1.

As to Forde and Greaney, the amended complaint alleges that their involvement in the conspiracy violated RICO and ERISA.  Id. at 34, 38, 41, 43-44.  The amended complaint seeks treble damages under RICO and actual damages under ERISA, as well as an order under ERISA authorizing the Funds to offset Forde and Greaney's pension and annuity benefits.  Id. at 54-55. Greaney answered the amended complaint on December 22, 2011.  See Answer, filed Dec. 22, 2011 (Docket # 44) ("Greaney Answer").  Forde answered the amended complaint on February 6, 2012.  See Answer, filed Feb. 6, 2012 (Docket # 61) ("Forde Answer").

The second case was filed by Greaney and his wife Imelda Greaney on May 12, 2016, against the Funds, alleging that the Funds violated ERISA by refusing to pay him his pension and annuity benefits and by "refusing to acknowledge" Imelda Greaney's right to participation in these benefits.  See Complaint for Declaratory, Injunctive, and Equitable Relief, Greaney v. N.Y.C. Dist. Council of Carpenters Pension Fund, 16 Civ. 3551 (S.D.N.Y. May 12, 2016) (Docket # 5) ("Greaneys Compl."), ¶¶ 161-216.  The Greaneys sought a declaratory judgment that the Funds violated their fiduciary duties under ERISA and that the Greaneys are entitled to their full pension and annuity benefits.[6]  Id. at 42-43.  On July 25, 2016, the two cases were

---

[6] Greaney also claimed that the Funds violated ERISA by refusing to provide documents requested by him during the Funds' review of his application for benefits.  Id. ¶¶ 217-36.  He has since dropped that claim.  See Def. Mem. at 146.

consolidated under Fed. R. Civ. P. 42.  See Order, Greaney, 16 Civ. 3551 (S.D.N.Y. July 25, 2016) (Docket # 10).

The Funds moved for summary judgment on September 11, 2017.  See Pls. Not. Mot. On September 28, 2017, Forde and Greaney sought an extension of time to file their cross-motions for summary judgment.  See Letter from Dino J. Lombardi, dated Sept. 28, 2017 (Docket # 247).  Their requests were granted and the Court set a deadline of December 15, 2017, for the filing of any motions for summary judgment and opposition papers.  See Order, dated July 28, 2017 (Docket # 248).  On December 11, 2017, Greaney moved for summary judgment and filed his opposition.  See Def. Not. Mem.  Forde never filed an opposition to the Funds' summary judgment motion or his own motion.  He also never requested another extension of the deadlines or otherwise communicated with the Court.

Greaney's notice of motion, however, mentions in a single sentence that he is moving for summary judgment "in favor of John Greaney and Michael Forde."  See Def. Not. Mot. at 1-2. His brief makes no arguments specific to Forde, however, and it is unclear why Greaney's attorney could move on behalf of Forde.  Nonetheless, as is discussed below, many of the issues applicable to Greaney apply equally to Forde.

## II.  LAW GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Granting summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment."  Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d

11

Cir. 1997); <u>see</u> <u>also</u> Fed. R. Civ. P. 56(c)(4) (parties shall "set out facts that would be admissible in evidence.").

In determining whether a genuine issue of material fact exists, "[t]he evidence of the non-movant is to be believed" and the court must draw "all justifiable inferences" in favor of the nonmoving party. <u>Anderson</u>, 477 U.S. at 255 (citing <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 158-59 (1970)). Once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a <u>genuine issue for trial</u>,'" <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (emphasis in original) (citation omitted) (quoting Fed. R. Civ. P. 56(e)), and "may not rely on conclusory allegations or unsubstantiated speculation," <u>Scotto v. Almenas</u>, 143 F.3d 105, 114 (2d Cir. 1998). In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor," <u>Anderson</u>, 477 U.S. at 256, and "[a] party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory," <u>Major League Baseball Props., Inc. v. Salvino, Inc.</u>, 542 F.3d 290, 310 (2d Cir. 2008). "Where it is clear that no rational finder of fact 'could find in favor of the nonmoving party because the evidence to support its case is so slight,' summary judgment should be granted." <u>FDIC v. Great Am. Ins. Co.</u>, 607 F.3d 288, 292 (2d Cir. 2010) (quoting <u>Gallo v. Prudential Residential Servs., Ltd. P'ship</u>, 22 F.3d 1219, 1224 (2d Cir. 1994)).

The Funds seek summary judgment on their claims under ERISA, 29 U.S.C. §§ 1056(d)(4), 1104(a), 1109, 1132(g), and RICO, 18 U.S.C. § 1962(c)-(d), against Forde and Greaney, as well as summary judgment on damages for these claims. Pls. Mem. at 12, 14, 16, 18-19; Pls. Reply Mem. at 16. The Greaneys oppose the Funds' motion and move for summary

judgment dismissing the Funds' RICO and ERISA claims, and barring the recovery of damages above the amount calculated in the Restitution Orders.  Def. Mem. at 64, 82, 91, 129, 141.  The Greaneys also cross move for summary judgment in their favor.  Def. Mem. at 119, 120.

The parties' briefs (notwithstanding the Greaneys' 148-page memorandum of law) do not fully explain on what issues they base their motions for summary judgment.  It appears that the issues raised may be grouped into the following broad categories: (1) the liability of the defendants for RICO violations; (2) the liability of defendants for ERISA violations; (3) the damages the Funds may collect; (4) whether the Funds can offset Greaney's pension and annuity benefits against any damages; and (5) whether Imelda Greaney has any rights to Greaney's pension and annuity benefits.  Each of these is discussed next.

III.  CIVIL LIABILITY UNDER RICO

A.  Timeliness of Funds' RICO Claims

The statute of limitations for RICO actions is four years.  Agency Holding Corp. v. Malley–Duff & Assocs., Inc., 483 U.S. 143, 156 (1987).  Greaney seeks summary judgment on his affirmative defense that the limitations period for the Funds' RICO claims started to accrue in 2004 and that the Funds' complaint was therefore untimely filed in August 2011.  Def. Mem. at 64, 71.  "Because the statute of limitations is an affirmative defense, the defendant bears the burden of establishing by prima facie proof that the limitations period has expired since the plaintiff's claims accrued."  Overall v. Estate of Klotz, 52 F.3d 398, 403 (2d Cir. 1995); see also Gonzalez v. Hasty, 651 F.3d 318, 322 (2d Cir. 2011) ("[T]he burden is on the defendant to establish when a federal claim accrues.").

1.  <u>Facts Relating to the Timeliness of Suit</u>

In 2004, Michael Forde was convicted of accepting a bribe from members of the

DeCavalcante crime family in exchange for permitting off-the-books non-union labor at a

construction site.  <u>See</u> <u>People v. Forde</u>, 2005 WL 1490306, at *1-3 (Sup. Ct. Apr. 26, 2005)

(table decision); Def. Mem. at 68-69; Minutes of the Special Meeting of the Board of Trustees of

the New York City District Council of Carpenters Benefit Funds, dated Nov. 8, 2004 (annexed

as Ex. 64-G to Quesada Decl.) ("Nov. 2004 Bd. Meeting"), at 2 (noting Forde's conviction).  In

2005, this conviction was vacated after the presiding judge found juror misconduct substantially

prejudiced the defendants.  <u>See</u> <u>Forde</u>, 2005 WL 1490306, at *19; <u>accord</u> <u>Dist. Council</u>, 571 F.

Supp. 2d at 561 n.9; Def. Rule 56.1 Statement ¶ 7; Pls. Counter Statement ¶ 7.  The board of

trustees did not take any action against Forde.  Def. Rule 56.1 Statement ¶ 9; Pls. Counter

Statement ¶ 9.  For his part, Greaney did not disclose at that time or any time the information he

knew about illegal conduct to the other trustees.  Greaney Dep. at 66:23-67:16; <u>see also</u> Greaney

Decl. ¶ 24.g.

Greaney in fact took steps to hide his conduct.  As he admitted during his plea allocution,

at a 2005 deposition, Greaney "gave false testimony . . . by denying that [he] was personally

aware that [he] and others manipulated the out-of-work list in violation of the consent decree."

Greaney Plea Tr. 22-23.  Then in a February 6, 2009 deposition, Greaney "testified falsely under

oath . . . that [he had] never met James Murray, the owner of On Par Contracting, outside of job

sites . . . [and] falsely . . . denied accepting cash payments from Gerard McIntee, the owner of

Pitcohn."  <u>Id.</u> 24; <u>see also</u> Def. Counter Statement ¶ 60; Deposition of John Greaney, undated

(annexed as Ex. 65-G to Quesada Decl.), at 47-49.  In 2010, at Olivieri's trial, Greaney testified

that he "continued to obstruct investigations into his conduct" after he stopped taking bribes in

2004, stating that "[w]e tried to hide what we were doing so the whole plan wouldn't have been found out.  And that included lying in depositions and just covering up the whole operation." Olivieri Trial Tr. 739-40.[7]

### 2. Applicable Law

The four-year RICO limitations period accrues from when "a plaintiff knew or should have known of his injury."  Rotella v. Wood, 528 U.S. 549, 553 (2000); accord Koch v. Christie's Int'l PLC, 699 F.3d 141, 148 (2d Cir. 2012) ("It remains the law in this Circuit that a RICO claim accrues upon the discovery of the injury alone.").  In other words, "the limitations period does not begin to run until [a plaintiff] ha[s] actual or inquiry notice of the injury."  Koch, 699 F.3d at 151 (alterations in original) (quoting In re Merrill Lynch Ltd. P'ships Litig., 154 F.3d 56, 60 (2d Cir. 1998)).  A determination as to whether a plaintiff was on inquiry notice "need not be left to a finder of fact."  Merrill Lynch, 154 F.3d at 60; accord Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 427 (2d Cir. 2008).  But "[i]nquiry notice may be found as a matter of law only when uncontroverted evidence clearly demonstrates when the plaintiff should have discovered the fraudulent conduct."  Staehr, 547 F.3d at 427.

Inquiry notice "gives rise to a duty of inquiry when the circumstances would suggest to a[] [plaintiff] of ordinary intelligence the probability that she has been defrauded."  Koch, 699 F.3d at 151 (internal quotation marks omitted) (quoting Lentell v. Merrill Lynch & Co., Inc., 396

---

[7] Olivieri had served as a trustee on the board on behalf of the Metropolitan New York Dry Wall Contractors Association.  See Minutes of the Meeting of the Board of Trustees, dated Apr. 10, 2000 (annexed as Ex. 30-G to Quesada Decl.), at 2; First Interim Report of the Review Officer, dated Dec. 3, 2010 (annexed as Ex. 21-G to Quesada Decl.) ("RO Interim Report"), at 32.  Olivieri was charged in the August 2009 indictment, see Indictment at 1, and was described in a report issued in 2010 as a "long-time associate of the Genovese crime family who served as a go-between for the family in its illicit dealings with . . . the District Council," RO Interim Report at 32.

F.3d 161, 168 (2d Cir. 2005)).  The date on which knowledge is imputed to a plaintiff for the purpose of "inquiry" notice varies depending on how the plaintiff responds once it is constructively put on notice:

> [i]f the [plaintiff] makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty arose; . . . if some inquiry is made, we will impute knowledge of what a [plaintiff] in the exercise of reasonable diligence[ ] should have discovered concerning the fraud, and in such cases the limitations period begins to run from the date such inquiry should have revealed the fraud.

Lentell, 396 F.3d at 168 (internal quotation marks omitted) (quoting LC Capital Partners, LP v. Frontier Ins. Grp., Inc., 318 F.3d 148, 154 (2d Cir. 2003)); accord Koch, 699 F.3d at 151.

### 3.  Analysis

Greaney does not allege that the Funds had "actual notice" prior to the unsealing of the August 2009 indictment.  Instead, Greaney's contention is that "the indictment and conviction [in 2004] of Co-Chairman of the Funds, Michael Forde, for the same type of fraud that is alleged in the [plaintiffs' complaint]" would have placed a reasonable person on inquiry notice of the alleged conspiracy.  Def. Mem. at 68, 71.  Under that theory, the RICO limitations period expired in August 2008, three years before the complaint was filed.  Id. at 71.

We disagree.  Forde's state-court conviction on labor racketeering charges could not have put the Funds on notice of Greaney's conduct since Greaney was not charged in Forde's case and Greaney has pointed to no other evidence that would have made them suspect Greaney of labor racketeering.  Greaney has the burden of proof on this issue.  He has pointed to no uncontroverted evidence that would have placed the Funds on inquiry notice regarding his conduct.  As the Second Circuit has explained in the context of a securities fraud suit, "[f]or inquiry notice to exist, the triggering information must 'relate directly to the misrepresentations and omissions the Plaintiffs later allege in their action against the defendants.'"  Staehr, 547 F.3d

16

at 427 (alterations omitted) (quoting Newman v. Warnaco Grp., Inc., 335 F.3d 187, 193 (2d Cir. 2003)); accord Cohen v. S.A.C. Trading Corp., 711 F.3d 353, 361 (2d Cir. 2013).  Here, the alleged "triggering information" — Forde's indictment and conviction (ultimately overturned) — does not "relate directly" to Greaney's racketeering conduct but rather to Forde's.

Greaney also points to minutes of a board of trustees meeting held in November 2004 where Forde's conviction was briefly discussed, see Def. Mem. at 69-70 (citing Nov. 2004 Bd. Meeting), but again he points to nothing in the minutes that should have raised suspicions concerning Greaney's conduct.  As noted by the Seventh Circuit, the limitations period "starts running when the prospective plaintiff discovers (or should if diligent have discovered) both the injury that gives rise to his claim and the injurer or (in this case) injurers." Jay E. Hayden Found. v. First Neighbor Bank, N.A., 610 F.3d 382, 386 (7th Cir. 2010).  Here, Greaney has submitted no evidence that would permit a reasonable juror to find that the Funds had inquiry notice of the specific injury or that Greaney had caused that injury.

Greaney also contends that the funds were placed on notice of the probability of Greaney's racketeering conduct because "the job site corruption and labor racketeering was and is for the past 26 years the source of intense news and litigation reporting."  Def. Mem. at 81 (citing various news articles annexed as App. A to Quesada Decl.).  Citing Zola v. Gordon, 701 F. Supp. 66, 69 (S.D.N.Y. 1988), Greaney contends that a plaintiff is constructively placed on notice "when indictment[s] and conviction[s] were in general circulation in the press."  Id. at 70; Def. Mem. at 81.  Zola, however, involved press reports that specifically named the defendants as fraudsters, detailing their convictions for tax fraud for behavior very similar to that alleged in the plaintiff's complaint.  701 F. Supp. at 70.  Here, by contrast, Greaney directs the Court to no

17

news articles regarding his conduct whatsoever.  Accordingly, news articles could not have aroused suspicion regarding Greaney's conduct.

Finally, Greaney summarizes at length the reports of a court-mandated Review Officer, who issued reports starting in 2010, see RO Interim Report, regarding mismanagement and administrative problems at the Funds, see Def. Mem. at 71-82.  Mismanagement and administrative problems at the Funds, however, do not in any way suggest that the Funds were on notice of Greaney's illegal conduct.

Because Greaney has not carried his burden of showing that the Funds were on inquiry notice of his conduct prior to August 2009, it is not necessary to address whether the Funds acted with reasonable diligence in investigating corruption among the trustees.  See Def. Mem. at 71-82.  Without inquiry notice, the Funds had no obligation to investigate for purposes of the statute of limitations.  See Koch, 699 F.3d at 151.  The limitations period did not begin to run until the Funds learned in August 2009 that Greaney had accepted bribes from members of organized crime groups in order to allow construction firms to avoid contributing benefits to the Funds for certain hired workers performing Covered Work.  See Indictment; Greaney Plea Tr.  From the date of the indictment, the Funds had four years, or until August 2013, to file a complaint in this action.  Because the Funds filed their complaint in August 2011, Greaney's statute of limitations defense to the RICO causes of action fails.[8]

B.  Substantive Liability

The Funds seek summary judgment on their claims that Forde and Greaney violated RICO causing injury to them.  Pls. Mem. at 18-19.  Greaney does not contest his liability,

---

[8]  Greaney's brief makes no arguments specific to Forde.  Thus Forde has failed in his burden to prove his statute of limitations defense.

disputing only the Funds' claim for damages and the timeliness of the Funds' RICO claims.  See Def. Mem. at 64, 97, 106-07.  Forde, as noted previously, has not filed any opposition to this motion makes arguments specific to his own situation.  In any event, Forde and Greaney are precluded from relitigating their liability both by statute, see 18 U.S.C. § 3664(l) ("[a] conviction of a defendant for an offense involving the act giving rise to an order of restitution shall estop the defendant from denying the essential allegations of that offense . . . ."), and under principles of issue preclusion, see, e.g., Kremer v. Chem. Constr. Corp., 456 U.S. 461, 466 n.6 (1982). Nonetheless, to determine the scope of the defendants' liability, we will examine the application of these principles to the claims against Forde and Greaney.

RICO is "commonly associated with the national effort to eradicate organized crime in America." Bascunan v. Elsaca, 874 F.3d 806, 815 (2d Cir. 2017).  Specifically, "Congress was concerned about, inter alia, damage to the nation's free enterprise system by persons or entities infiltrating or operating otherwise legitimate businesses by means of criminal activities." Ideal Steel Supply Corp. v. Anza, 652 F.3d 310, 320 (2d Cir. 2011).  In addition to its criminal provisions, RICO affords a private right of action to "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter."  18 U.S.C. § 1964(c).

To make out a civil RICO claim, a plaintiff must show: "(1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962." Spool v. World Child Int'l Adoption Agency, 520 F.3d 178, 183 (2d Cir. 2008) (quoting DeFalco v. Bernas, 244 F.3d 286, 305 (2d Cir. 2001)). The Funds contend that Forde and Greaney violated sections 1962(c) and (d).  Pls. Mem. at 19. "Section 1962(c) makes it unlawful for a person employed by or associated with an enterprise to conduct the enterprise's affairs through a pattern of racketeering activity. . . . [Section] 1962(d)

19

makes it unlawful to conspire to violate any of the other three prohibitions." RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. 2090, 2097 (2016).

A showing that a defendant violated RICO § 1962(c) requires proving: "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." Moss v. Morgan Stanley, Inc., 719 F.2d 5, 17 (2d Cir. 1983); accord DeFalco, 244 F.3d at 306; Town of W. Hartford v. Operation Rescue, 915 F.2d 92, 100 (2d Cir. 1990).

"Racketeering activity" includes any act prohibited under a list of federal criminal statutes contained in the RICO statute, 18 U.S.C. § 1961(1), including wire fraud, 18 U.S.C. §§ 1343, 1346; unlawful receipt of labor payments, 29 U.S.C. § 186; embezzlement from pension and welfare benefit funds, 18 U.S.C. § 664; unlawful payments concerning benefit plans, 18 U.S.C. § 1954; and obstruction of justice, 18 U.S.C. § 1503; as well as state offenses, including bribery under New York Penal Law §§ 180.25, 20.00. "Racketeering activity" constitutes a pattern when it involves "at least two acts of racketeering activity." 18 U.S.C. § 1961(5). An "enterprise" includes any "legal entity," such as a "partnership, corporation, association," or an association-in-fact, such as "any union or group of individuals" that is not a legal entity. 18 U.S.C. § 1961(4).

To establish a RICO conspiracy under § 1962(d), a plaintiff must prove that a defendant conspired "'to participate in a charged enterprise's affairs' through a pattern of racketeering, 'not a conspiracy to commit the predicate acts.'" United States v. Pizzonia, 577 F.3d 455, 463 (2d Cir. 2009) (alterations omitted) (quoting United States v. Persico, 832 F.2d 705, 713 (2d Cir. 1987)). A plaintiff must also prove that defendants "know the general nature of the conspiracy

and that the conspiracy extends beyond [their] individual roles." United States v. Zichetteloo, 208 F.3d 72, 99 (2d Cir. 2000) (quoting United States v. Rastelli, 870 F.2d 822, 828 (2d Cir. 1989)); accord United States v. Yannotti, 541 F.3d 112, 122 (2d Cir. 2008) ("to be found guilty of RICO conspiracy, a defendant need only know of, and agree to, the general criminal objective of a jointly undertaken scheme.").

The Funds rest their argument as to Forde and Greaney's substantive RICO liability on the former trustees' plea allocutions and their criminal convictions for racketeering and conspiracy to commit racketeering under RICO, 18 U.S.C. § 1962(c)-(d). Pls. Mem. at 19. Greaney, in his allocution, admitted to accepting "illegal cash payments from a number of union contractors" during the time that he was a trustee of the district council benefit funds and president of Local 608 in exchange for "allow[ing] contractors to violate the terms of their [CBAs] with the district council." Greaney Plea Tr. 21:21-22:5. Forde similarly admits that while he was executive secretary treasurer of the district council he "accepted bribes in the form of cash payments from certain contractors . . . in return for allowing the contractors to violate the terms of their [CBAs] with the district council." Forde Plea Tr. 14. Greaney states that he accepted the money from 1998 through 2004 in cooperation with "a number of other union officers, including Michael Forde." Greaney Plea Tr. 21:20-22:2. Forde states that he accepted the bribes from 1994 to 2004 "along with other union officials." Forde Plea Tr. 14. They admit to allowing the contractors to employ "illegal immigrants," aware that the contractors would "not make contributions to the district council benefit funds on behalf of the illegal immigrants as required by the [CBAs]." Greaney Plea Tr. 22:8-14; see Forde Plea Tr. 14-15 ("I along with other union officials let contractors use undocumented workers and avoid making contributions to the district council's benefit funds that should have been paid on behalf of those workers.").

21

Greaney also admitted that he "was aware that the contractors filed false remittance reports, under-reporting the number of men working on particular jobs and/or the number of hours actually worked," and that he knew "as a result, the [Funds] did not receive from the contractors the contributions the contractors were required to pay pursuant to their [CBAs]."  Greaney Plea Tr. 23.  They both also admitted to covering up their conduct by lying in depositions.  See id. at 22, 24; Forde Plea Tr. 15.

It is not necessary to match the allocution to the elements of the RICO statute because, by pleading guilty, both men were convicted of committing racketeering and conspiring to commit racketeering in violation of 18 U.S.C. § 1962(c)-(d).

In addition to showing that the defendants violated 18 U.S.C. § 1962(c)-(d), the Funds have also shown that no dispute of material fact remains concerning the injury and causation elements of their RICO claims against Forde and Greaney.  The defendants need to show that the above RICO violations were "not only [] a 'but for' cause of [their] injury, but [were] the proximate cause as well."  Holmes v. Sec. Inv'r Prot. Corp., 503 U.S. 258, 268 (1992).  Showing proximate causation requires "some direct relation between the injury asserted and the injurious conduct alleged."  Id.  In other words, the harm to the plaintiff must be "a foreseeable and natural consequence of [defendants'] scheme."  Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 658 (2008).  Here, both defendants admitted in their allocutions that they knew by accepting bribes, the contractors would, among other injurious conduct, forgo contributions to the Funds that they were otherwise required to pay under the CBAs.  See Forde Plea Tr. 14-15; Greaney Plea Tr. 21-23.  These uncontroverted facts establish that Forde and Greaney's violations of 18 U.S.C. § 1962 were the proximate cause of at least some injury to the Funds.  As a result,

plaintiffs are entitled to summary judgment against Forde and Greaney as to liability for violating RICO.

## IV. LIABILITY UNDER ERISA FOR BREACH OF FIDUCIARY DUTIES

The Funds also move for summary judgment on their claim that Forde and Greaney breached their fiduciary duties to the Funds under ERISA, 29 U.S.C. § 1109.  See Pls. Mem. at 12.  While Forde and Greaney do not contest their liability under ERISA, we review the statute's elements to explain the scope of their liability.[9]

ERISA provides that "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries . . . shall be personally liable to make good to such plan any losses to the plan resulting from each such breach."  29 U.S.C. § 1109(a).  Subsection (b) adds that "[n]o fiduciary shall be liable with respect to a breach of fiduciary duty . . . if such breach was committed before he became a fiduciary or after he ceased to be a fiduciary."  Id. § 1109(b).  In other words, to find that Forde and Greaney breached their fiduciary duties under ERISA, the Funds must prove that Forde and Greaney were (1) fiduciaries who (2) violated their fiduciary duties while (3) acting in a fiduciary capacity.  See  Cunningham v. Cornell Univ., 2017 WL 4358769, at *4 (S.D.N.Y. Sept. 29, 2017) (citing 29 U.S.C. § 1109); see also John Blair Commc'ns, Inc. Profit Sharing Plan v. Telemundo Grp., Inc. Profit Sharing Plan, 26 F.3d 360, 367 (2d Cir. 1994) (finding defendant liable for breach of fiduciary duties and addressing all three elements).

---

[9] Greaney contends that the Funds' claims under certain sections of ERISA — sections 405, 406(b)(1) and (b)(3) — are improper because they were not contained in the Funds' amended complaint.  Def. Mem. at 141-43. The Funds do not respond to this argument and thus we assume they do not contest it.  Accordingly, we examine their claims without reference to these sections.

A. <u>Fiduciary Status</u>

"ERISA broadly defines the concept of fiduciary."  <u>John Blair Commc'ns</u>, 26 F.3d at

367; <u>accord</u> <u>LoPresti v. Terwilliger</u>, 126 F.3d 34, 40 (2d Cir. 1997) ("Congress intended

ERISA's definition of fiduciary 'to be broadly construed.'") (citation omitted).  ERISA provides

in pertinent part:

> a person is a fiduciary with respect to a plan to the extent (i) he exercises any
> discretionary authority or discretionary control respecting management of such
> plan or exercises any authority or control respecting management or disposition
> of its assets, . . . or (iii) he has any discretionary authority or discretionary
> responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A); <u>see also</u> 29 C.F.R. § 2509.75-8, at D-3 (Department of Labor

regulation explaining that "[s]ome offices or positions of an employee benefit plan by their very

nature require persons who hold them to perform one or more of the functions described in

[§ 1002](21)(A)," including a trustee of a plan); <u>Bouboulis v. Transp. Workers Union of Am.</u>,

442 F.3d 55, 63-64 (2d Cir. 2006) (applying § 1002 to plan administrator).  This definition

"focuses on the exercise, as well as the possession, of authority or control."  <u>Blatt v. Marshall &</u>

<u>Lassman</u>, 812 F.2d 810, 813 (2d Cir. 1987).  Hence, it "creates a bifurcated test: 'Subsection one

imposes fiduciary status on those who exercise discretionary authority, regardless of whether

such authority was ever granted.  Subsection three describes those individuals who have actually

been granted discretionary authority, regardless of whether such authority is ever exercised.'"

<u>Bouboulis</u>, 442 F.3d at 63 (quoting <u>Olson v. E.F. Hutton & Co., Inc.</u>, 957 F.2d 622, 625 (8th Cir.

1992)).

There is no dispute that Forde and Greaney exercised discretionary authority and were

authorized to exercise discretionary authority with respect to management of the Funds.  Both

men admit that they were trustees of the Funds.  <u>See</u> Forde Plea Tr. 14; Greaney Plea Tr. 21;

Greaney Dep. at 16.  The trustees administer the Funds, Power Decl. ¶ 4, and under controlling regulations, "a trustee of a plan must, by the very nature of his position, have 'discretionary authority or discretionary responsibility in the administration' of the plan within the meaning of [§ 1002](21)(A)(iii) of the Act.  Persons who hold such positions will therefore be fiduciaries." 29 C.F.R. § 2509.75-8, at D-3.

    B.  <u>Violation of Fiduciary Duties</u>

The Funds accuse Forde and Greaney of violating their fiduciary duties by taking bribes in exchange for "help[ing] employers evade their obligations to make contributions to the Funds."  Pls. Mem. at 13.  ERISA imposes on fiduciaries the duties of loyalty and prudence.

ERISA imposes a duty of loyalty by requiring a pension plan fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."  29 U.S.C. § 1104(a)(1)(A).  In other words, "§ 404 of ERISA requires that the decisions of a fiduciary 'must be made with an eye single to the interests of the participants and beneficiaries.'"  <u>John Blair Commc'ns</u>, 26 F.3d at 367 (quoting <u>Donovan v. Bierwirth</u>, 680 F.2d 263, 271 (2d Cir. 1982)).

ERISA imposes a duty of prudence by requiring that a fiduciary act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. §  1104(a)(1)(B).  This standard is process-oriented, <u>see</u> <u>Rosen v. Prudential Ret. Ins. & Annuity Co.</u>, 2016 WL 7494320, at *9 (D. Conn. Dec. 30, 2016) ("ERISA's prudence requirement has traditionally focused on the 'process involved in making decisions for a plan' rather than whether the ideal result was reached") (citation

omitted), and focused on the methods employed by fiduciaries "to investigate the merits of [an] investment," Katsaros v. Cody, 744 F.2d 270, 279 (2d Cir. 1984).  Hence, in the context of evaluating a trustee's actions to recover delinquent contributions, the prudent person standard does not dictate a required course of action; "[r]ather, the trustees' duty is to act with 'care, skill, prudence and diligence,' 29 U.S.C. § 1104(a)(1)(B), in attempting to recover [the] delinquent contributions or in declining to take a particular course of action to recover those contributions." Diduck v. Kaszycki & Sons Contractors, Inc., 874 F.2d 912, 917 (2d Cir. 1989).  "In performing this duty, trustees have a range of options — including suing the delinquent employer, randomly auditing the employer's records, threatening work stoppages, picketing the employer, or similar actions — depending upon the circumstances.  There is no duty to take any particular course of action if another approach seems preferable."  Id.

Forde and Greaney have admitted to accepting cash payments from certain contractors in exchange for permitting the contractors to avoid paying contributions to the Funds for work performed by unauthorized workers.  Greaney Plea Tr. 21-23; Forde Plea Tr. 14-15.  They accepted the money not "in the interest of the beneficiaries," Pegram v. Herdrich, 530 U.S. 211, 224 (2000) (citation omitted), but in pursuit of their own interests.  This resulted in the Funds losing millions of dollars in contributions from several contractors.  See Greaney Restitution Order at 1-2; On Par Settl. at 2-3; Greaney Plea Tr. 23-24.  Forde and Greaney also admitted to lying in depositions in order to obstruct attempted investigations into their conduct and the conduct of the contractors.  Greaney Plea Tr. 22, 24; Forde Plea Tr. 14-15; Olivieri Trial Tr. 739-40.  "ERISA clearly assumes that trustees will act to ensure that a plan receives all funds to which it is entitled, so that those funds can be used on behalf of participants and beneficiaries . . . ."  Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc., 472 U.S. 559, 571

(1985); accord Diduck, 874 F.2d at 916.  Here, Forde and Greaney breached this obligation and in so doing, breached their duties to act prudently and with loyalty to their fund beneficiaries.

  C.  While Acting in a Fiduciary Capacity

  The Funds seek to hold Greaney liable to the same extent as Forde "for helping employers evade their contribution obligations for work performed both before and after May 2003."  Pls. Mem. at 15.  They rely on a theory that Greaney breached the duty of prudence by failing to investigate or otherwise seek to ameliorate the ongoing corruption at the Funds once he became a trustee in 2003.  Id. at 14-15.  The parties dispute whether Greaney may be held liable under that theory for losses incurred prior to 2003, see id.; Def. Mem. at 140-41, but these arguments go to the question of the scope of damages for which Greaney is responsible, see infra Section V.B — not to whether he was acting in a fiduciary capacity at the time of the breaches. Here, it is undisputed that he was a trustee of the Funds from 2003 through 2009, Greaney Plea Tr. 21, and that he was acting in a fiduciary capacity during this time period.

  Because no genuine dispute of material fact exists concerning Forde or Greaney's liability for breach of fiduciary duties owed to the Funds under ERISA, the Funds should be granted summary judgment on their ERISA causes of action against Forde and Greaney.

V.  THE FUNDS' ENTITLEMENT TO DAMAGES

  The Funds move for summary judgment on damages under RICO and ERISA.  See Pls. Mem. at 1-2, 16, 19, 20.  Greaney raises four issues that he contends must limit the Funds' claim for damages: (1) that the Funds are barred under the issue preclusion doctrine from relitigating the issue of damages related to Turbo because of the existing criminal restitution order, see Def. Mem. at 82-91; (2) that any losses related to On Par were resolved through a settlement with On Par, id. at 91-97; (3) that any amounts previously recovered must be subtracted from any

damages awarded in this action prior to their being trebled under RICO, id. at 113-15; and (4) that the Funds may not offset any damages award in this case against his pension and annuity benefits, id. at 130-41.

We address the Funds' entitlement to summary judgment on damages as well as the defenses offered by Greaney.  As to whether the Funds may withhold pension benefits due to the Greaneys as an offset, we discuss that issue in a separate section following our discussion of the Funds' entitlement to damages.

A. Evidence Provided by the Funds As to Damages

The Funds seek $15,092,521.07 in damages against Greaney and Forde.  See Pls. Mem. at 5-7.  The Funds proffer three bases to support this claimed amount, see id. at 6-7: (1) an arbitration award issued in November 2011 in favor of the Funds against Turbo, see Arb. Award at 188; (2) the Greaney Restitution Order and the Forde Restitution Order entered in their criminal cases; and (3) the On Par Default Judgment, which is a default judgment issued in favor of the Funds against On Par in 2006 in a case between the Funds and On Par.

We note that "[t]he principles governing admissibility of evidence do not change on a motion for summary judgment."  Presbyterian Church of Sudan v. Talisman Energy, Inc., 582 F.3d 244, 264 (2d Cir. 2009) (citation omitted).  "Rule 56(e) provides that affidavits in support of and against summary judgment shall set forth such facts as would be admissible in evidence. Therefore, only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment."  Id. (citation omitted).  In this case, of the three bases offered by the Funds for their damages request, only the restitution orders would support a request for damages. The Funds must be denied summary judgment as to the remaining aspects of their claim for damages because the Funds have not submitted admissible evidence that would allow a jury to

find in their favor in the amount claimed.

The Funds assert that the arbitration award would be admissible under Rule 1006 of the Federal Rules of Evidence as a summary of voluminous evidence.  Pls. Reply Mem. at 19. Under Rule 1006, a "proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court."  Fed. R. Evid. 1006.  The arbitration award, however, is not such a "summary."  Rather, it is a

resolution of conflicting evidence as a result of the dispute between Turbo and the Funds. Moreover, the Funds have not provided the underlying data that is purportedly summarized in the arbitration award or set forth why such data would be admissible.  "Summary evidence is admissible as long as the underlying documents also constitute admissible evidence and are made available to the adverse party."  Tamarin v. Adam Caterers, Inc., 13 F.3d 51, 53 (2d Cir. 1993).  We have no basis for concluding that any of the underlying evidence is admissible.  Thus the arbitration award cannot support the Funds' motion for summary judgment as to damages.[10]

As for the default judgment against On Par, the Funds make no argument as to why it has any evidentiary value.  They supply no admissible documentation supporting the amount in the default judgment and our examination of the record in the case against On Par where the default judgment was entered (Case No. 06 Civ. 5643) has not revealed any admissible evidence explaining the basis for the judgment.  The default judgment itself is of course inadmissible because, under Federal Rule of Evidence 801 "judicial findings of fact are inadmissible hearsay"

---

[10]  The Funds do not argue that Greaney or Forde are collaterally estopped from challenging the calculations of the arbitrator.  Nor could they given that neither Greaney nor Forde were parties to the arbitration.

to the extent they are offered for the truth of the findings.  <u>Penree v. Watson</u>, 2017 WL 3437680,

at *3 (N.D.N.Y. Aug. 10, 2017); <u>accord</u> <u>United States v. Boulware</u>, 384 F.3d 794, 806 (9th Cir.

2004); <u>U.S. Steel, LLC v. Tieco, Inc.</u>, 261 F.3d 1275, 1287 (11th Cir. 2001); <u>Nipper v. Snipes</u>, 7

F.3d 415, 471 (4th Cir. 1993); <u>United States v. Nelson</u>, 365 F. Supp. 2d 381, 388 (S.D.N.Y.

2005); <u>Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.</u>, 141 F. Supp. 2d 320, 323

(E.D.N.Y. 2001).  The hearsay exception for public records, Fed. R. Evid. 803(8), does not apply

to factual findings in a judicial document.  <u>U.S. Steel, LLC</u>, 261 F.3d at 1287; <u>Nipper</u>, 7 F.3d at

417; <u>Blue Cross & Blue Shield of N.J., Inc.</u>, 141 F. Supp. 2d at 323.

The only other pieces of evidence offered by the Funds to support their calculation of

damages are the restitution orders issued as part of Greaney's and Forde's criminal convictions.

These orders have no evidentiary value, of course, but rather may be used under the doctrine of

collateral estoppel.  Because Greaney and Forde were parties to the criminal restitution

proceeding, they are bound by the court's determination that their violations of RICO caused the

damages found in the restitution orders.  <u>See</u> <u>Ball v. A.O. Smith Corp.</u>, 451 F.3d 66, 69 (2d Cir.

2006) (collateral estoppel bars relitigation of a prior federal judgment where "(1) the identical

issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the

previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the

resolution of the issue was necessary to support a valid and final judgment on the merits.")

(citation omitted); <u>see</u> <u>also</u> 18 U.S.C. § 3664(l) ("A conviction of a defendant for an offense

involving the act giving rise to an order of restitution shall estop the defendant from denying the

essential allegations of that offense in any subsequent Federal civil proceeding . . . brought by

the victim."); <u>Cumis Ins. Soc'y, Inc. v. CU Pac. Audit Sols., LLC</u>, 2015 WL 7737311, at *4 (D.

Haw. Nov. 30, 2015) ("§ 3664(1) 'simply implements issue preclusion or collateral estoppel

30

principles.'") (quoting <u>Wiand v. Cloud</u>, 919 F. Supp. 2d 1319, 1329 n.12 (M.D. Fla. 2013)).

Thus, barring any applicable defenses (discussed further below), the Funds are entitled to

summary judgment that Greaney's and Forde's RICO violations caused them $4,973,259.92 in

damages. <u>See</u> Greaney Restitution Order at 1; Forde Restitution Order at 1 (total calculated

losses due the Funds less amounts related to KAFCI Corp.).

> B. <u>Whether the Funds May Obtain ERISA Damages Attributable to Defendants'</u>
> <u>Conduct Before They Became Trustees</u>

The parties dispute whether the amounts in the restitution orders that are attributable to

RICO damages also constitute damages under ERISA — a question that has some import for

purposes of the Funds' desire to offset Greaney's pension benefits against the damages he

caused the Funds. As explained further in Section VI.B below, such offset is available only with

respect to Greaney's breach of his duties under ERISA, not RICO.

The scope of ERISA damages is not necessarily governed by the plea allocutions that led

to the restitution orders. This is because the plea allocutions covered conduct during periods

<u>before</u> Greaney and Forde became trustees. Under ERISA, a fiduciary is not liable for breaches

"committed before he became a fiduciary or after he ceased to be a fiduciary." 29 U.S.C.

§ 1109(b). Thus, Forde arguably would not be liable for conduct that occurred prior to 2000, and

Greaney would not be held liable for conduct that occurred prior to 2003, the years in which they

became trustees. Forde Plea Tr. 14; Greaney Plea Tr. 21.

Nonetheless, "as the case law makes clear[,] [fiduciaries] remain liable for pre-existing

breaches whose effects they could, during the period they were fiduciaries to the plan, have

corrected or ameliorated." <u>In re Beacon Assocs. Litig.</u>, 282 F.R.D. 315, 337 (S.D.N.Y. 2012).

Put another way, fiduciaries have "an affirmative obligation to investigate risks that may have

come into existence prior to their becoming a fiduciary — including those that result from a

prior breach — and, where possible, to take remedial steps to guard against them." Id. (citing

cases); see also Chao v. Merino, 452 F.3d 174, 182 (2d Cir. 2006) ("If a fiduciary was aware of a

risk to

the fund, he may be held liable for failing to investigate fully the means of protecting the fund

from that risk. . . .  Further, 'the common law of trusts . . . imposes a duty on a successor trustee

to remedy the breach of a prior trustee, and imposes liability for breach of this duty 'to the extent

to which the loss results from [the successor trustee's] failure to take such [remedial] steps.'")

(emphasis in original) (quoting Silverman v. Mut. Benefit Life Ins. Co., 138 F.3d 98, 104 (2d

Cir. 1998)) (citation omitted).  Here, it is undisputed that Greaney did not take actions after he

became trustee to remedy the effects of his prior corruption — in fact, he continued to take

bribes while a trustee — and he continued to cover up the corruption until 2009 when he was

indicted.  See Greaney Plea Tr. 22-24 (discussing bribes through 2004, perjury in 2005 and

2009); Olivieri Trial Tr. 739-40 (admitting to covering-up corruption).  Forde similarly hid his

conduct.  See, e.g., Forde Plea Tr. 15.  Thus, while neither Greaney nor Forde may be held liable

under ERISA for taking bribes prior to their appointment as trustees, they are liable under

ERISA for violating their duty to remediate the effects of corruption by attempting to collect the

forgone employer contributions.  See Liss v. Smith, 991 F. Supp. 278, 290 (S.D.N.Y. 1998)

(finding a failure to pursue collection of delinquent contributions constituted a breach of

trustees' fiduciary duties). After they became trustees, both defendants obviously still retained

the knowledge of their previous corrupt acts.  Because they took no action whatsoever to remedy

the matter (for example, by causing the Funds to seek payment from themselves and the

delinquent employers),  they are liable for the damage caused by those unremediated acts.  The

restitution orders provide for those damages.[11]

     C.  <u>Whether the Funds at Trial May Seek More Than the Amounts in the Restitution Orders</u>

     While the Funds may not obtain summary judgment for any amount other than for the amounts in the Restitution Orders, they seek the option to recover the losses related to Turbo that were calculated in the 2011 arbitration award issued in favor of the Funds and against Turbo as well as in a default judgment issued with respect to On Par.  <u>See</u> Pls. Mem. at 6; Pls. Reply Mem. at 16.  As already discussed, the Funds cannot be awarded summary judgment on this issue, but nothing prevents them from presenting evidence at a trial to obtain the damages relating to Turbo and On Par.  The Restitution Order states that the Funds suffered losses relating to Turbo in the amount of $1,524,381.42.  Greaney Restitution Order at 1.  The arbitration award, by contrast, calculated losses related to Turbo as $4,318,197.05, plus interest through November 22, 2011, in the amount of $1,710,716.24, for a total of $6,028,913.29.  <u>See</u> Arb. Award at 188.  Similarly, the Restitution Order does not provide for losses relating to On Par, while the default judgment calculated losses related to On Par as $9,455,283.17, plus interest

---

    [11]  Greaney appears to argue that the claim that his violations of ERISA caused damages is speculative considering the rampant "internal collections corruption." Def. Mem. at 140. But Greaney admitted in his allocution that "[he], and others, were aware that the illegal immigrants were being paid in cash, and that the contractors did not make contributions to the district council benefit funds on behalf of the illegal immigrants as required by the [CBAs]." Greaney Plea Tr. 22. Similarly, he admitted to knowing that "false remittance reports were filed by wire, and that as a result, the district council benefit funds did not receive from the contractors the contributions the contractors were required to pay pursuant to their [CBAs]." <u>Id.</u> 23. He, in turn, ignored this conduct in exchange for bribes. <u>Id.</u> 22. In other words, he was paid so that contractors would not need to make contributions to the Funds. To suggest that contributions might not have been collected absent his conduct does not obviate or mitigate his admitted liability for corruption while he was a trustee.

through October 31, 2006, in the amount of $2,646,260.01, for a total of $12,101,543.18.

See On Par Default Judgment.

Greaney contends that the Funds are precluded under the doctrine of "non-party issue preclusion" from seeking any amount greater than the amount in the restitution order. Def. Mem. at 82-83. The Supreme Court explained the doctrine of non-party issue preclusion in Taylor v. Sturgell, 553 U.S. 880 (2008):

> Issue preclusion . . . bars "successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment," even if the issue recurs in the context of a different claim. [New Hampshire v. Maine, 532 U.S.] at 748-749, 121 S. Ct. 1808. By "preclud[ing] parties from contesting matters that they have had a full and fair opportunity to litigate," [the doctrine] protect[s] against "the expense and vexation attending multiple lawsuits, conserv[es] judicial resources, and foste[rs] reliance on judicial action by minimizing the possibility of inconsistent decisions." Montana v. United States, 440 U.S. 147, 153-154, 99 S. Ct. 970, 59 L. Ed.2d 210 (1979).
>
> A person who was not a party to a suit generally has not had a "full and fair opportunity to litigate" the claims and issues settled in that suit. The application of . . . issue preclusion to nonparties thus runs up against the "deep-rooted historic tradition that everyone should have his own day in court." Richards, 517 U.S. at 798, 116 S. Ct. 1761 (internal quotation marks omitted). Indicating the strength of that tradition, we have often repeated the general rule that "one is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service of process."

Id. at 892-93 (some citations omitted and punctuation altered). Taylor noted that, "[t]hough hardly in doubt, the rule against nonparty preclusion is subject to exceptions." Id. at 893; accord Briscoe v. City of New Haven, 654 F.3d 200, 203 (2d Cir. 2011).

Taylor grouped these exceptions into six categories, which have been succinctly summarized by the Third Circuit as follows:

> 1) the nonparty agrees to be bound by the determination of issues in an action between others;
> 2) a substantive legal relationship — i.e.[,] traditional privity — exists that binds the nonparty;

34

3) the nonparty was "adequately represented by someone with the same interests who [wa]s a party";
4) the nonparty assumes control over the litigation in which the judgment is rendered;
5) the nonparty attempts to bring suit as the designated representative of someone who was a party in the prior litigation; and,
6) the nonparty falls under a special statutory scheme that "expressly foreclos[es] successive litigation by nonlitigants."

Nationwide Mut. Fire Ins. Co. v. George V. Hamilton, Inc., 571 F.3d 299, 312-13 (3d Cir. 2009)

(quoting Taylor, 553 U.S. at 894-95)

Greaney argues that the Funds should be bound by the restitution orders under the exception for parties who "assumed control" over the prior litigation.  See Def. Mem. at 83.
That exception applies to "the persons for whose benefit and at whose direction a cause of action is litigated," such as "one who prosecutes or defends a suit in the name of another to establish and protect his own right, or who assists in the prosecution or defense of an action in aid of some interest of his own."  Montana, 440 U.S. at 154 (citation, internal quotation marks, and alterations omitted); accord 1 Restatement (Second) of Judgments § 39, at 382 (1982).

That exception has no relevance here.  A prosecutor "represent[s] the interest of society as a whole," Ferri v. Ackerman, 444 U.S. 193, 203 (1979), and does not represent a victim's interests, see Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 571 (1980) ("Civilized societies withdraw both from the victim and the vigilante the enforcement of criminal laws . . . .").  Moreover, Montana and Taylor, both relied on by Greaney, Def. Mem. at 83-84, are far afield from the situation here.

In Montana, the litigant who was bound as a non-party to a judgment was the United States government, which had among other things, approved the complaint in the civil action at issue, paid the attorneys' fees and costs, directed the filing of the appeal, and had filed a brief as

35

amicus on appeal.  440 U.S. at 155.  Here, at issue is a criminal case, not a civil case, and in any event the Funds had no control whatsoever over the prosecution of the criminal case.  Neither Montana nor any case cited by Greaney has bound a non-governmental actor to a result in a criminal prosecution.  In addition, the showing required to find that a nonparty has assumed control over a case at a minimum requires a showing that the nonparty "be able to decide what legal theories and evidence should be advanced in the first action and whether an appeal should be taken from an adverse decision."  Algie v. RCA Global Commc'ns, Inc., 891 F. Supp. 839, 852 (S.D.N.Y. 1994); accord Marshak v. Treadwell, 240 F.3d 184, 195 (3d Cir. 2001).  Obviously, the Funds had no such ability in the criminal case.

Greaney correctly notes that the Supreme Court in Taylor stated that because a party who had assumed control "has had 'the opportunity to present proof and argument,' he has already 'had his day in court' even though he was not a formal party to the litigation."  Def. Mem. at 84 (quoting Taylor, 553 U.S. at 895).  He then argues that because the Funds had an opportunity to "present proof and argument" at the restitution hearing, they "assumed control" over the restitution proceeding.  This argument, however, turns the quoted language from Taylor on its head.  Taylor simply noted (in dictum) that where a party "assume[s] control" of a proceeding, the party obtains the opportunity to present "proofs and arguments."  553 U.S. at 895.  Taylor certainly did not hold that wherever a party has an opportunity to present "proofs and arguments," that means it has "assumed control" of the litigation.  Id.  Nor does such an argument even make sense.  Because Greaney provides no evidence that the Funds "assumed control" over the portion of the prosecution relating to the restitution order, the Taylor exception does not apply.

36

Notably, the rule sought by Greaney was considered and rejected by the Third Circuit in Doe v. Hesketh, 828 F.3d 159 (3d Cir. 2016). Doe considered whether a victim who participated in a criminal restitution proceeding under the MVRA may be collaterally estopped from litigating the issue of damages in a later civil action. 828 F.3d at 162. Doe declined to "apply collateral estoppel to prevent [the victim plaintiff] from litigating the question of her damages based on [the defendant's] criminal conduct," because "[the plaintiff] was neither a party to [the defendant's] prior criminal proceeding nor in privity with a party, and did not have a full and fair opportunity to litigate the question of her damages." Id. at 171-72. Doe rejected the application of collateral estoppel by evaluating the Taylor exceptions that consider whether "the nonparty was 'adequately represented by someone with the same interests who [wa]s a party'; . . . [or], [] the nonparty falls under a special statutory scheme that 'expressly foreclos[es] successive litigation by nonlitigants.'" Id. at 172 (quoting Nationwide Mut. Fire Ins. Co., 571 F.3d at 312-13). Finding that there was no such special statutory scheme and that the plaintiff did not share the same interests as the government in the restitution determination, id. at 172-73, it also concluded that the victim plaintiff "did not have a full and fair opportunity to litigate the question of her damages in [the defendant's] sentencing proceeding," even if she had taken advantage of the opportunities provided to a victim to influence the process under the restitution statutes, id. at 173. Additionally, Doe determined that equity did not favor application of collateral estoppel in part because "[the victim plaintiff] was not able to obtain appellate review because she was not a party to the criminal proceeding." Id. at 174.

In addition to not meeting any of the Taylor exceptions, Greaney has not shown that the Funds had a "full and fair opportunity to litigate the issue" of damages at the restitution hearing as would be required for any form of issue preclusion. Taylor, 553 U.S. at 892. As the Second

Circuit has noted, "the victim is not a party to a sentencing hearing and therefore has only a limited ability to influence the outcome. The victim cannot control the presentation of evidence during . . . the sentencing hearing and is not even guaranteed the right to testify about the extent of his losses." United States v. Brown, 744 F.2d 905, 910 (2d Cir. 1984). Under 18 U.S.C. § 3664, a victim's role at the sentencing is limited to conferring with the government as to its losses, id. § 3664(d)(1); providing an affidavit attesting to losses to probation, id. § 3664(d)(2)(B); and testifying at the sentencing hearing in the event the sentencing judge considers it helpful, id. § 3664(d)(4). Accord Doe, 828 F.3d at 173. As one court noted with respect to the consultation requirement, "[s]uch consultation does not require the victim's seal of approval, or even solicitation of the victim's opinion beyond those facts that would assist the government's required calculations." United States v. Rubin, 558 F. Supp. 2d 411, 426 (E.D.N.Y. 2008).

The Funds lack of ability to litigate the damage issue is highlighted by the fact that the Government requested a figure for restitution far below what the Funds sought at the time, compare Gov't Restitution Mem. at 15 (seeking $3,882,439) with Sandick Letter at 1 (Funds seeking $18,244,927), and as Greaney notes, Def. Mem. at 85, rejected loss calculations submitted by the Funds' forensic accountant regarding Turbo's missing contributions, see Gov't Restitution Mem. at 9-10. The Government also declined to wait for the arbitrator's ruling as to Turbo in spite of the Funds' request that it do so. See id. at 6 n.3; see also Sandick Letter at 2 n.1.

Greaney points to 18 U.S.C. § 3664(f)(1)(A), which provides that the sentencing court should order restitution to each victim in the "full" amount of each victim's losses. See Def. Mem. at 90. This provision, however, says nothing about the right of a victim to obtain

additional amounts that were not awarded by the sentencing court.  To the contrary, as was noted in an earlier proceeding, N.Y. Dist. Council of Carpenters Pension Fund v. Forde, 939 F. Supp. 2d 268 (S.D.N.Y. 2013), the MVRA specifically contemplated successive civil litigation by a victim.  Id. at 277.  It provides that "[a]ny amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim in . . . any Federal civil proceeding."  18 U.S.C. § 3664(j)(2) (emphasis added); see also United States v. Marino, 654 F.3d 310, 321 (2d Cir. 2011) (noting that "[r]estitution under the MVRA is a remedy provided to victims independent of the availability, or lack thereof, of a private right of action against a defendant.").  Similarly, the various provisions in the MVRA providing for modification or amendment of a restitution payment schedule or order of restitution, 18 U.S.C. § 3664(d), (k), (o), cited by Greaney, Def. Mem. at 87-88, do not foreclose successive litigation over the losses caused by a defendants' conduct.

Accordingly, for the foregoing reasons, the Funds are entitled to seek at trial additional damages against Greaney and Forde notwithstanding the calculations of damages contained in the restitution orders.

D.  Effect of Settlement of Claims Against On Par

As to any damages that the Funds seek beyond the restitution orders that relate to On Par, Greaney argues that a settlement agreement operates to bar such recovery under principles of contract law and the doctrine of "double recovery."  Def. Mem. at 91.  We discuss each issue separately.

1.  Contract Law Defense

Greaney argues that the settlement between the Funds and On Par released him from any liability for losses related to On Par.  Id. at 93, 95.  He notes that the settlement agreement

provides that the parties "agree to settle all claims between them for the sum of four million two

hundred ninety two four hundred eighty seven ($4,292,487.00) dollars," On Par Settl. ¶ 1, and

that this amount was described as "full and final," id. ¶ 2.  Def. Mem. at 94.  He also notes that

the agreement contains a merger clause.  Id.  This argument, however, elides important language

in the text Greaney quotes.  The agreement provides that "On Par, Murray and the Benefit Funds

agree to settle all claims between them," and "[t]he Benefit Funds agree the payment of the Net

Settlement Amount is the full and final settlement of its claim(s) against On Par and Murray and

it will not claim any further or additional amounts from the government as victim restitution in

connection with the pending prosecution of Murray."  On Par Sett. ¶¶ 1-2 (emphasis added).

> Greaney also fails to quote the language of the release, which states:

> For and in consideration of payment in the sum set forth above, the Benefit Funds
> does hereby forever release, waive and discharge On Par Contracting Corp. and
> James Murray, for himself and his wife, Tracy Murray, their heirs, executors,
> administrators, successors and assigns, from any and all claims, causes of action,
> or rights against James Murray, individually, they may have arising from or
> related to the collective bargaining relationships between the Union and On Par
> . . . .

Id. ¶ 3.  Greaney does not contend that he is a successor, assign, heir or legal representative of

On Par or Murray.  Accordingly, the agreement does not expressly release him.

> Notwithstanding this clear language, Greaney next contends that "New York law does

not 'unvaryingly' demand that 'every discharged party be specifically named or identified.'"

Def. Mem. at 95-96 (citation omitted).  In other words, he asserts that the Settlement Agreement

releases him even if he was not named or identified.  In support of this assertion, Greaney cites

Wells v. Shearson Lehman/Am. Express, Inc., 72 N.Y.2d 11 (1988).  Wells, however, held that

while a general release need not specifically name or identify every discharged party, the "clear

intention" to do so must be apparent from the words of the document.  72 N.Y.2d at 22 ("other

40

tortfeasors are not to be beneficiaries of a general release or covenant not to sue unless the releasor indicates a clear intention to do so by the inclusion of an express term to that effect in the document.") (internal quotation marks and citation omitted); see generally N.Y. Gen. Oblig. Law § 15-108(a) ("[w]hen a release . . . is given to one of two or more persons liable or claimed to be liable in tort for the same injury . . . it does not discharge any of the other tortfeasors from liability for the injury . . . unless its terms expressly so provide . . . ."). The facts in Wells illustrate the rule. There, the settlement agreement expressly released the defendant corporation and executives from liability as well as "anyone else in connection with . . . the Action, the Settlement[,] . . . or any matters, transactions or occurrences referred to in the complaint." 72 N.Y.2d at 16. Wells found the agreement expressly released the defendants even though it did not identify them by name or other specific description. Id. at 22. While Wells rejected the plaintiff's argument that a release must specifically identify, by name for instance, each party whom is to be released in order to be effective, it also rejected the common law rule that "release of one joint tort-feasor automatically released all." Id. at 18. Rather, under Wells, "the courts must look to the language of a release — the words used by the parties — to determine their intent." Id. at 19; accord Starr v. Johnsen, 143 A.D.2d 130, 132 (2d Dep't 1988) ("[i]t is the mutual intention of the parties which determines whether release of one wrongdoer releases all wrongdoers . . . even wrongdoers whose liability is only vicarious."); see also Linn v. N.Y. Downtown Hosp., 139 A.D.3d 574, 575 (1st Dep't 2016) ("A release may not be read to cover matters which the parties did not desire or intend to dispose of . . . .") (internal quotation marks and citation omitted) (rejecting attempt by defendant to benefit from a release which "unambiguously" excluded him or her). Here, in contrast to the circumstances in Wells, the On Par settlement agreement did not release both On Par and "anyone else" in connection with the

41

On Par fraud.  There is not the slightest suggestion in the agreement that the Funds intended to release other tortfeasors such as Greaney.

Greaney also argues that the Court should look to the "circumstances surrounding [the] settlement agreement's formation" to find that the parties intended to release him from liability. Def. Mem. at 96-97.  He cites Huertas v. East River Housing Corp., 992 F.2d 1263 (2d Cir. 1993), to support his claim.  Huertas, however, allowed an examination of "surrounding" circumstances only for purposes of "construing" a settlement agreement — not for altering its clear language.  Id. at 1267.  In any event, Greaney points to nothing in the "surrounding circumstances," id., suggesting that the Funds intended to release unknown and unnamed tortfeasors who were not agents of On Par.

 Accordingly, Greaney should be denied summary judgment on his defense that the On Par settlement agreement released him.

### 2. "Double Recovery" Defense

Greaney argues that any recovery of damages relating to On Par's conduct would result in an inequitable double-recovery.  Def. Mem. at 95.  Greaney correctly notes that under the common law, "it goes without saying that the courts can and should preclude double recovery by an individual."  EEOC v. Waffle House, Inc., 534 U.S. 279, 297 (2002) (internal quotation marks omitted) (quoting Gen. Tel. Co. of Nw. v. EEOC, 446 U.S. 318, 333 (1980)); accord United States v. Nucci, 364 F.3d 419, 423 (2d Cir. 2004) ("At common law, joint and several liability does not permit double recovery.").  Thus, to the extent that the Funds have recovered certain amounts from Murray or On Par, we agree that Greaney is excused "from paying any portion of the judgment" already collected, Nucci, 364 F.3d at 423 (citation omitted), as the Funds have acknowledged, Pls. Mem. at 5-6, 21.

We note, however, that Greaney's argument does not dispose of the claims for damages relating to On Par because Greaney has not proved that the Funds have recovered the full amount of these losses.

E.   Calculating Treble Damages Under RICO

In a related argument, Greaney argues that the amounts that On Par and Murray already paid to the Funds must be deducted prior to the trebling of damages provided in RICO.  See Def. Mem. at 97, 113-15.  He argues that under Second Circuit case law any amounts successfully collected are "abated pro tanto, prior to any application of trebling."  Id. at 97 (citation omitted). Additionally, Greaney argues that trebling damages should be left to the "sound discretion of the Court" because "mandatory trebling of RICO damages can result in harsh results."  Id. at 115. The Funds provide no legal analysis of this issue but simply state without argument that any amounts paid must be deducted only after trebling.  See Pls. Mem. at 19, 21.

RICO provides that an injured plaintiff "shall recover threefold the damages [it] sustains."  18 U.S.C. § 1964(c); see also Allstate Ins. Co. v. Afanasyev, 2016 WL 1156769, at *12 (E.D.N.Y. Feb. 11, 2016) (describing treble damages as "automatic upon a showing of harm" under RICO).   Thus, treble damages under RICO are "automatic," Allstate Ins. Co., 2016 WL 1156769, at *12, and courts do not have discretion in awarding them once a plaintiff proves his or her damages, see, e.g., Cullen v. Margiotta, 811 F.2d 698, 713 (2d Cir. 1987) ("civil RICO requires that a successful plaintiff be awarded treble damages"); Resolution Tr. Corp. v. S & K Chevrolet, 868 F. Supp. 1047, 1062 (C.D. Ill. 1994) ("Under RICO, treble damages are mandatorily assessed upon the finding of liability."); MDO Dev. Corp. v. Kelly, 735 F. Supp. 591, 593 (S.D.N.Y. 1990) ("In fact, imposition of treble damages is required by RICO.").

Accordingly, we reject Greaney's suggestion that a court has discretion to not treble damages awarded under RICO.[15]

As to how the damages are calculated where some damages have been compensated, we begin by noting that the Clayton Act is the model for RICO's private right of action.  Holmes, 503 U.S. at 267 ("Congress modeled § 1964(c) on the civil-action provision of the federal antitrust laws, § 4 of the Clayton Act . . . .").  The Second Circuit held in Hydrolevel Corp. v. American Society of Mechanical Engineers, Inc., 635 F.2d 118 (2d Cir. 1980), that settlements received from other defendants should not be setoff from a jury verdict prior to trebling a verdict under the Clayton Act.  Id. at 130.  It explained:

> First, the antitrust laws provide that the plaintiff should receive three times the proven actual damages.  If settlement proceeds are deducted before trebling, the plaintiff's total award is less than what the law allows.  Since antitrust defendants are joint tortfeasors, each is liable to complete the total deserved damages irrespective of fault.  Second, . . . one purpose of the trebling provision is to encourage private plaintiffs to bring suit.  Any ultimate recovery totaling less than three times proven damages would weaken the statutory incentive through judicial construction.  Third, deduction of settlement proceeds before trebling would discourage settlement by making litigation relatively more profitable for plaintiffs; every dollar received in settlement would cause a three dollar reduction in the judgment at trial.

Id. (citing Flintkote Co. v. Lysfjord, 246 F.2d 368 (9th Cir. 1957)).  As other courts have noted, each of these three reasons applies with equal force to RICO.  See In re Nat'l Mortg. Equity Corp. Mortg. Pool Certificates Sec. Litig., 636 F. Supp. 1138, 1151-52 (C.D. Cal. 1986) (applying rule even though plaintiff's "actual damages were completely, rather than only partially, satisfied"); accord Allstate Ins. Co. v. Kumar, 2013 WL 2395748, at *3 (S.D.N.Y. June

---

[15]   At least one authority cited in Greaney's brief specifically notes that RICO mandates trebling of awarded damages.  See Judith A. Morse, Note, Treble Damages Under RICO: Characterization and Computation, 61 Notre Dame L. Rev. 526, 528 (1986) ("Unlike punitive damages, treble damages are not discretionary either in award or amount").

3, 2013) (citing <u>Hydrolevel Corp.</u>, 635 F.2d at 130).  RICO mandates that a plaintiff receive

three times the proven damages to his or her business or property, 18 U.S.C. § 1964(c), and co-

defendants are jointly and severally liable in civil RICO cases, <u>see</u>, <u>e.g.</u>, <u>Allstate Ins. Co. v.

Nazarov</u>, 2015 WL 5774459, at *17 (E.D.N.Y. Sept. 30, 2015).

     Through enactment of RICO's private right of action, "Congress intended to bring 'the

pressure of private attorneys general on a serious national problem for which public

prosecutorial resources [were] deemed inadequate.'"  <u>Holmes</u>, 503 U.S. at 283 (quoting <u>Agency

Holding Corp.</u>, 483 U.S. at 151).  Adopting Greaney's construction of RICO's trebling

provisions would weaken the incentive of plaintiffs to litigate RICO suits civilly and thus

frustrate Congress's intentions in enacting RICO.  Additionally, those who nonetheless bring

civil RICO claims would be discouraged from settlement because "every dollar received in

settlement would cause a three dollar reduction in the judgment at trial" or at least through

summary judgment.  <u>Hydrolevel Corp.</u>, 635 F.2d at 130.  Thus, we follow the many court

decisions that deduct compensation for RICO injuries only after the trebling of damages.  <u>See</u>,

<u>e.g.</u>, <u>Pyramid Sec. Ltd. v. IB Resolution, Inc.</u>, 924 F.2d 1114, 1117 n.3 (D.C. Cir. 1991); <u>Liquid

Air Corp. v. Rogers</u>, 834 F.2d 1297, 1310 (7th Cir. 1987); <u>Gilmore v. Pawn King, Inc.</u>, 2016 WL

1180147, at *4 (D. Conn. Mar. 25, 2016); <u>Kumar</u>, 2013 WL 2395748, at *3; <u>City of New York

v. Venkataram</u>, 2009 WL 1938984, at *7 (S.D.N.Y. July 7, 2009); <u>State Farm Mut. Auto. Ins.

Co. v. Kalika</u>, 2007 WL 4326920, at *9 (E.D.N.Y. Dec. 7, 2007); <u>City of New York v. Pollock</u>,

2006 WL 522462, at *17 (S.D.N.Y. Mar. 3, 2006).

     Greaney cites only one case to support his position: <u>Commercial Union Assurance Co.,

plc v. Milken</u>, 17 F.3d 608 (2d Cir. 1994).  <u>See</u> Def. Mem. at 97, 113.  <u>Commercial Union

Assurance Co.</u> is of no help because the court found that the plaintiffs "had not suffered

compensable damages under RICO." 17 F.3d at 612.  In that case, the plaintiff investors were

suing the managing partner of an investment partnership and related advisors for securities fraud

and RICO violations, seeking to recover their investment.  Id. at 610-11.  After the filing of the

lawsuit, the investors received a full return of their capital investment plus 14.6 percent interest,

in addition to their partnership shares which they still possessed.  Id.  The court found that the

payments amounted to "a return of [plaintiffs'] capital investment" and thus rejected the notion

that the payments amounted to settlements.  Id. at 612.  While damages might have been

recoverable had "a portion or all of their investment [been] unrecoverable," the court noted

"damages as compensation under RICO § 1964(c) for injury to property must, under the familiar

rule of law, place [the investors] in the same position they would have been in but for the illegal

conduct."  Id.  The court found that the investors had already obtained that position.  Id.

Accordingly, the court concluded that "without provable damages, no viable RICO cause of

action may be maintained."  Id.  Here, of course, any monies paid to the Funds cannot be

characterized as a return on an investment.

       Notably, Stochastic Decisions, Inc. v. DiDomenico, 995 F.2d 1158 (2d Cir. 1993) — the

case relied on by Commerical Union Assurance Co. — is even further afield from the

circumstances in this case.  Stochastic involved a RICO claim to recover debt allegedly hidden

during bankruptcy.  995 F.2d at 1162-63.  The court held that a RICO claim to recover such debt

"does not accrue until it is established that collection of the claim or judgment has been

successfully frustrated."  Id. at 1166.  Conversely, the court noted that if the lost debt is

recovered successfully, the RICO claim is abated pro tanto because the alleged injury occurred

only to the extent the debt was not recovered.  As one court has noted, in Stochastic as well as

Commercial Union Assurance Co., "the collection efforts were integral to the RICO injury."  In

re Crazy Eddie Sec. Litig., 948 F. Supp. 1154, 1169 n.12 (E.D.N.Y. 1996).  Here, of course, any efforts by the Funds to obtain payments were not "integral" to the RICO injury.

For these reasons, any damages to the Funds should be trebled before deducting the amounts recovered in restitution or through settlement with other defendants.[16]

## VI.  OFFSETTING PENSION AND ANNUITY BENEFITS UNDER ERISA

### A.  Facts Relating to Greaney's and Forde's Pension and Annuity Benefits

As former employees of the District Council, Forde and Greaney participated in the District Council's pension and annuity funds.  See Am. Compl. ¶¶ 12, 16; Forde Answer ¶ 12; Greaney Answer ¶ 5; Greaney Decl. ¶ 4.  As of November 2011, Forde was receiving a monthly pension of $704 from the Pension Fund.  Am. Compl. ¶ 13; Forde Answer ¶ 13.  Greaney was entitled to pension benefits starting October 1, 2014, in the amount of $1,048.00 monthly for the remainder of his life.  Def. Rule 56.1 Statement ¶¶ 146, 152.  On September 2, 2011, Greaney's annuity fund account balance was $316,963.96.  Def. Rule 56.1 Statement ¶¶ 147, 153.  This amount was subject to fluctuation along with the stock market.  Def. Rule 56.1 Statement ¶¶ 147, 153.[17]

On September 2, 2014, or a month before they vested, Greaney applied for pension benefits from the Pension Fund.  Greaney Decl. ¶ 4.  His request for a pension was later denied, id. ¶ 4, "due to [his] acts of fraud with respect to the Pension Fund," Letter from Elizabeth

---

[16]  Greaney requests any effort to collect on a judgment in this case under Rule 69 be delayed until the completion of the time period of the criminal restitution order.  Def. Mem. at 112-13.  This request is premature inasmuch as no judgment has been entered.

[17]  The Funds have not pointed to admissible evidence regarding Forde's annuity fund account balance.  This does not affect our analysis of the Funds' authority to offset any existing balance, however.

O'Leary to John E. Greaney, dated Nov. 26, 2014 (annexed as Ex. 24 to Tenenbaum Decl.), at 1. The Pension Fund's position was that "the losses [Greaney] caused the Funds as a result of [his] fiduciary breaches far exceed the amount of restitution ordered," and that the Fund could in response "offset a breaching fiduciary's pension benefits against the amount that the breaching fiduciary has been determined to owe the Pension Fund." Id. at 2. The denial letter provided that Greaney could "appeal this denial to the Administrative Committee of the Board of Trustees within 60 days of the date you receive this letter. . . . If the Administrative Committee denies your appeal, you will have the right to bring a civil suit under ERISA Section 502(a)." Id. at 3. Greaney timely appealed the denial, see Letter from Victoria Quesada to Elizabeth O'Leary, dated Jan. 26, 2015 (annexed as Ex. 46-G to Quesada Decl.); see also Letter from Victoria Quesada to Elizabeth O'Leary, dated Mar. 2, 2015 (annexed as Ex. 48A-G to Quesada Decl.), and made certain requests for documents, including a request for "[d]ocuments or information which form or explain the basis of the Plan's conclusion that the Plan is not bound by the Restitution determination made by the Court in the Criminal Case," Letter from Victoria Quesada to Elizabeth O'Leary, dated Jan. 12, 2015 (annexed as Ex. 45-G to Quesada Decl.), at 3. The Pension Fund responded to the request for documents on February 12, 2015, addressing each request and enclosing responsive documents. See Letter from Elizabeth O'Leary to Victoria Quesada, dated Feb. 12, 2015 (annexed as Ex. 29 to Tenenbaum Decl.). On July 20, 2015, the Pension Fund denied the appeal. See Letter from Elizabeth O'Leary to Victoria Quesada, dated July 20, 2015 (annexed as Ex. 26 to Tenenbaum Decl.) ("July 20 O'Leary Letter").

In the meantime, on May 13, 2015, Greaney also applied for annuity benefits. See Letter from Victoria Quesada to Plan Administrator, dated May 13, 2015 (annexed as Ex. 49-G to

Quesada Decl.) ("Annuity Benefits App.").  The application contained "[a] fully completed Request for Distribution which includes a notarized spousal waiver."  Id. at *1, *6.[18]  The spousal waiver, signed by Imelda Greaney on April 25, 2015, functioned as a consent "to the rollover of John Greaney's entire annuity balance . . . to a traditional IRA."  Pls. Counter Statement ¶ 176.  On August 11, 2015, the Annuity Fund denied his application giving the same reasons as were given for the denial of his pension benefits application.  See Letter from Elizabeth O'Leary to Victoria Quesada, dated Aug. 11, 2015 (annexed as Ex. 27 to Tenenbaum Decl.), at 1.  The Administrative Committee also denied him an appeal, finding that "an administrative appeal in these circumstances would be futile."  Id. at 3.  Greaney nonetheless tried to appeal.  See Letter from Victoria Quesada to Elizabeth O'Leary, dated Aug. 25, 2015 (annexed as Ex. 51-G to Quesada Decl.).  Because of their prior position, the Funds did not respond to this appeal in writing, although counsel to the Funds orally confirmed their position on January 4, 2016.  Quesada Decl. ¶¶ 15-16.

B.  Analysis.

In their fourth and sixth claims for relief, the Funds seek an order under ERISA, 29 U.S.C. § 1056(d), allowing them to offset any Annuity or Pension Fund balance against the damages Forde and Greaney have caused the Pension and Annuity Funds for violating their fiduciary duties under ERISA.  Am. Compl. ¶¶ 183-88, 195-200.  The Greaneys seek a declaratory judgment and injunctive relief that would provide them with the full benefits they are due under the pension plans.  Greaneys Compl. ¶¶ 161-216.  Both parties move for summary judgment on this issue.  Pls. Mem. at 16-18; Def. Mem. at 131-38.

---

[18]  Pages cited as "*__" refer to the page numbers created by the ECF system.

ERISA contains a provision, known as the "anti-alienation" provision stating that "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated." 29 U.S.C. § 1056(d)(1).  The Third Circuit in Coar v. Kazimir, 990 F.2d 1413 (3d Cir. 1993), found that "[n]othing in section 206(d)(1) [or its legislative history] suggests that Congress intended [the anti-alienation] provision to limit the remedies afforded to beneficiaries under section 409(a) or in any way to protect unscrupulous fiduciaries."  Id. at 1420.  "Indeed, a contrary reading would permit dishonest trustees, such as [the defendant], 'who repeatedly and indeed blatantly breached their fiduciary duties to the pension plan' to evade their obligations to the fund and would result in '[p]lan members and their families [having] to watch their pension monies disappear once again into the [dishonest trustees'] pockets.'"  Id. at 1423 (citation omitted).  Other cases have agreed with this reading.  See, e.g., Park er v. Bain, 68 F.3d 1131, 1140 (9th Cir. 1995) ("We note initially our agreement with the Court of Appeals for the Third Circuit, which concluded that ERISA's anti-alienation provision, 29 U.S.C. § 105\6(d)(1), does not prohibit a plan from withholding benefits from a fiduciary cum participant it believes to have wronged the pension fund."); Brovarski v. Local 1205, Int'l Bhd. of Teamsters Union, Pension Plan, 1998 WL 765141, at *9 & n.9 (E.D.N.Y. Feb. 23, 1998) ("Congress did not intend the anti-alienation clause to preclude an offset against the pension benefits of a breaching fiduciary.") (citing cases).

In 1997, Congress passed a statute that specifically addressed this issue.  Section 1056(d)(4) provides that a pension plan may offset a participant's benefits against "an amount that the participant is ordered or required to pay to the plan if — "

> (A) the order or requirement to pay arises —
>> (i) under a judgment of conviction for a crime involving such plan,

> > (ii) under a civil judgment (including a consent order or decree) entered by a court in an action brought in connection with a violation (or alleged violation) of part 4 of this subtitle [i.e., Fiduciary Responsibility], or
> > (iii) pursuant to a settlement agreement between the Secretary and the participant, or a settlement agreement between the Pension Benefit Guaranty Corporation and the participant, in connection with a violation (or alleged violation) of part 4 of this subtitle by a fiduciary or any other person,
>
> > (B) the judgment, order, decree, or settlement agreement expressly provides for the offset of all or part of the amount ordered or required to be paid to the plan against the participant's benefits provided under the plan, and
>
> > (C) in a case in which the survivor annuity requirements of section 1055 of this title apply with respect to distributions from the plan to the participant, if the participant has a spouse at the time at which the offset is to be made . . . . [remaining limitations in subpart C omitted]

29 U.S.C. § 1056(d)(4). As courts have recognized, "[t]his provision, adopted by Congress in 1997, carves out an exception from the statute's general prohibition on alienation of pension benefits, ERISA § 1056(d)(1), to specifically allow for the set-off of pension benefits in several specific situations." LaScala v. Scrufari, 859 F. Supp. 2d 509, 513 (W.D.N.Y. 2012); see also Katzenberg v. Lazzari, 2010 WL 680985, *3, *6 (E.D.N.Y. Feb. 24, 2010) (where plaintiff trustee "committed serious, costly breaches of his fiduciary duties owed as trustee of the pension plan," court found that "the appropriate remedy . . . is for plaintiff . . . to forfeit his pension and be deprived of any pension benefits"), aff'd, 406 F. App'x 559 (2d Cir. 2011).

Greaney's argument is a simple one. He accepts that a pension may be offset by the amounts contained in a criminal restitution order as provided in 29 U.S.C. § 1056(d)(4)(A)(i). He also accepts that in a civil suit such as this one for breach of fiduciary duties, a pension may be reduced by the amount of damages awarded by the court as provided in 29 U.S.C. § 1056(d)(4)(A)(ii). See Def. Mem. at 133. He argues, however, that because the statute separates these clauses by "or," the statute directs that once a criminal restitution order is issued

under subsection (A)(i) for the benefit of a pension plan, that pension plan is barred from suing under subsection (A)(ii) to obtain a court-ordered offset. Id. He likens his interpretation to the common law rule against "double recovery," id. at 135-36, and contends that his reading best reflects the statute's "ordinary and usual meaning," id. at 134, the context of the clauses at issue within the larger ERISA statute, id. at 135-36, and the timing of its passage in relation to the MVRA, which he argues is a "closely related" statute, id. at 137-38.[19]

We reject this strained and unnatural reading of the statute. Greaney does not convincingly explain why "or" rendered the three predicates "mutually exclusive" as opposed to making each an available alternative. Case law recognizes that the use of the word "or" in a statute may allow the selection of more than one of the separated elements. See Balko v. Ukrainian Nat'l Fed. Credit Union, 2014 WL 1377580, at *24 (S.D.N.Y. Mar. 28, 2014) (finding that use of "or" in a structurally similar statute "does not preclude courts from granting more than one of the three enumerated categories of relief.") (citing United States v. Zahavi, 2012 WL 5288743, at *4 (S.D.N.Y. Oct. 26, 2012) ("[I]n statutes, a seemingly disjunctive 'or' can often signify 'such as' or 'including.'")); see also Local Civ. R. 26.3(d)(2) (instructing litigants for purposes of responding to discovery requests to construe "[t]he connectives 'and' and 'or' . . . either disjunctively or conjunctively as necessary" to produce more responsive documents). Thus, we do not find that Greaney suggests an "ordinary and usual meaning" for the word "or." Def. Mem. at 134. Here, an ordinary reading of the statute, especially in light of the remedial

---

[19] Greaney's brief also contains a lengthy discussion of the anti-alienation provision in ERISA, 29 U.S.C. § 1056(d)(1), as well as a summary of the history preceding enactment of section 1056(d)(4). See Def. Mem. at 125-30. Because Greaney makes no argument based on the history of the statute, we do not address it.

purpose of ERISA, would not make the three options in 29 U.S.C. § 1056(d)(4) mutually exclusive.

In any event, there is a second and independent reason why Greaney could not obtain summary judgment on this point. The premise of Greaney's argument is that "an order or requirement to pay [has] already [been] entered under [29 U.S.C. § 1056(d)(4)(A)(i)] under MVRA for the same conduct" that is the subject of this lawsuit. Id. at 133. While that is true as far as it goes, the argument is irrelevant because it ignores the effect of subsection B of 29 U.S.C. § 1056(d)(4). That provision states that an offset can be achieved only through a "judgment, order, decree, or settlement agreement [that] expressly provides for the offset of all or part of the amount ordered or required to be paid to the plan against the participant's benefits provided under the plan." Id. § 1056(d)(4)(B) (emphasis added). The restitution orders against Greaney and Forde contain no such "express[]" provision. Thus, there is no order yet in existence that complies with the statute. Rather, this lawsuit is the vehicle by which the Funds hope to obtain such an order. There is nothing in the statutory language to suggest that plaintiffs are prevented from obtaining such an order now notwithstanding the fact that there exists a restitution order, which does not address the offset question. Accordingly, barring any other defenses, the Funds may offset Forde and Greaney's pension and retirement benefits against any amount they are required to pay in a judgment issued in this case.[20]

---

[20] Greaney did not apply for benefits until 2015, when the lawsuit had been pending for four years. Pl. Reply Mem. at 16. We reject any argument made by Greaney that the Funds had to pay him benefits while their action seeking the right to offset was pending. As noted above, case law has specifically permitted an equitable offset remedy against trustees who breach their fiduciary obligations. See Coar, 990 F.2d at 1420-23; Brovarski, 1998 WL 765141, at *9 & n.9. We do not view the enactment of section 1056(d)(4) either as extinguishing this remedy or as creating an affirmative obligation to pay benefits to breaching trustees while they seek the order contemplated by the statute. Nonetheless, we agree with the Greaneys' argument that the

VII.  SPOUSAL OFFSET

The remaining issue in this case is whether any offset by the Funds may be applied to

benefits due to Greaney's wife, Imelda Greaney

A.  Facts

John Greaney and Imelda Greaney were married on September 9, 2012.  See Certificate

of Marriage Registration, dated Oct. 18, 2012 (annexed as Ex. B to Ex. 48-A-G attached to

Quesada Decl.).  As already noted, Imelda filed a form waiving any right to receive certain

benefits on April 25, 2015, with the result that Greaney could accelerate his ability to obtain his

annuity.  See Annuity Benefits App. at *1, *6.  Notwithstanding this waiver, Imelda Greaney

included allegations in her federal court complaint stating she "revokes any waivers she has

heretofore made."  See Greaneys Compl. ¶¶ 196, 211.  She also sent a letter to the Plan

Administrator stating that she was revoking any waiver.  See Letter from Imelda L. Greaney to

Plan Administrator, dated Oct. 26, 2017 (annexed as Ex. 50-G to Quesada Decl.).  The Funds

deny that these statements effectuate a waiver.  See Pls. Reply Mem. at 15.

B.  Analysis

While the Funds argue that Imelda Greaney's interests in any pension or annuity benefits

do not exist because John Greaney's benefits have been "extinguished," see Pl. Mem. at 17 n.3,

we do not see how the plain statutory language that provides for an offset of spousal benefits can

be avoided.  Section 1056(d)(4)(C) of ERISA permits offset against a spouse's survivor's

annuity only where the spouse has consented, waived his or her right to the annuity, or is also the

---

Court's review of the Funds' decision as to their entitlement to offset is reviewed "de novo,"
Def. Mem. at 121-24, and we have conducted our review here under that standard.

subject of an order requiring a payment to the plan in connection with a violation of fiduciary duties.

The Funds argue that Imelda Greaney "expressly waived any spousal benefits to which she may have been entitled," and her purported revocations were ineffective because they fell outside the applicable election period.  Pls. Reply Mem. at 15.  ERISA provides that an election to waive spousal benefits may occur "any time during the applicable election period."  29 U.S.C. § 1055(c)(1)(A)(i), (c)(2)(A).  If made outside the election period, a waiver is invalid.  Id. § 1055(c)(1)(A)(i); see also Def. Mem. at 120-21 ("waiver is not effective if not made within the applicable election period."); Pls. Reply Mem. at 15 (same).  In turn, a waiver may also be revoked during that period, but not afterwards.  29 U.S.C. § 1055(c)(1)(A)(iii).

Under ERISA, the period applicable to an "election to waive the qualified joint and survivor annuity form benefit" is the 180 days prior to the "annuity starting date."  29 U.S.C. § 1055(c)(7)(A); accord Def. Mem. at 121; Pls. Reply Mem. at 15.  ERISA provides that the "annuity starting date" is "(i) the first day of the first period for which an amount is payable as an annuity, or (ii) in the case of a benefit not payable in the form of an annuity, the first day on which all events have occurred which entitle the participant to such benefit."  29 U.S.C. § 1055(h)(2)(A); accord In re Lefkowitz, 767 F. Supp. 501, 509 n.14 (S.D.N.Y. 1991).

The parties dispute the timing of the election period.  According to Greaney, the election period "has not yet commenced," and thus her revocation was effective.  Def. Mem. at 121.  The Funds, in contrast, argue that the "annuity starting date" was in "mid-2015," and therefore the election period was the 180 days prior to that.  Pls. Reply Mem. at 16.  On this critical issue, neither side has submitted evidence, see id.; Def. Mem. at 121, instead resting on unsubstantiated assertions.  Indeed, the Funds, best positioned to have evidence on this issue, could not even

identify a specific "first day" under 1055(h)(2)(A) — asserting only that the "annuity starting date" was sometime in the vague "mid-2015" period.  Summary judgment may not be granted based on "conclusory allegations or unsubstantiated speculation." Scotto, 143 F.3d at 114. Accordingly, because neither side has presented the evidence on which the determination of the election period can be made, both sides must be denied summary judgment.

VIII.  SUMMARY

In sum, the Court's rulings are as follows:

(1) The Funds should be granted partial summary judgment on the issue of liability of Forde and Greaney for violating RICO and ERISA.  See Sections III, IV.

(2) The Funds should be granted partial summary judgment on compensatory damages under both RICO (before trebling) and ERISA as to Greaney in the amount of $4,973,259.92, and as to Forde in the amount of $4,973,259.92.  See Sections V.A, V.B..

(3) The Funds should be granted partial summary judgment that they are not limited in any further claim for damages by the restitution orders or the settlement agreement with On Par. See Sections V.C, V.D.

(4) The Funds should be granted partial summary judgment on the issue of calculation of treble damages under RICO as set forth in Section V.E.

(5) The Funds should be granted partial summary judgment on their ability to offset any damages against Greaney's pension and annuity payments.  See Section VI.

(6) Both sides must be denied summary judgment on the question of whether Imelda Greaney is entitled to benefits from the Fund. See Section VII.

Conclusion

The Funds' motion for summary judgment in its own action (Docket # 241 in 11 Civ. 5474) should be granted in part and denied in part and their motion for summary judgment in the Greaneys' action (Docket # 18 in 16 Civ. 3551) should be granted in part and denied in part. The Greaneys' motion seeking summary judgment in the Funds' action (Docket # 252 in 11 Civ. 5474) should be denied and the Greaneys' motion for summary judgment in their case against the Funds (Docket # 29 in 16 Civ. 3551) should also be denied.

## PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file any objections. See also Fed. R. Civ. P. 6(a), (b), (d). A party may respond to any objections within 14 days after being served. Any objections and responses shall be filed with the Clerk of the Court, with copies sent to the Hon. Loretta A. Preska at 500 Pearl Street, New York, New York 10007. Any request for an extension of time to file objections or responses must be directed to Judge Preska. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; Fed. R. Civ. P. 6(a), 6(b), 6(d); Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated: June 1, 2018
      New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge